UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEBORAH CARUSO the Chapter 7 Trustee for ITT Educational Services Inc., ESI Service Corp., and Daniel Webster College, INC., | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) No. 1:18-cv-02182-JPH-TAB ) |
| KEVIN MODANY, JOHN E. DEAN, C. DAVID BROWN II, JOANNA T. LAU, THOMAS I. MORGAN, JOHN VINCENT WEBER, JOHN F. COZZI, SAMUEL L. ODLE, JERRY M. COHEN, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**ORDER ON MOTIONS TO DISMISS**

The Trustee in ITT's bankruptcy proceeding filed an adversary action alleging that ITT's former directors and former CEO breached their fiduciary duties to ITT.  The complaint also includes a claim for equitable subordination of the former CEO's creditor claims.  The former directors and former CEO have filed separate motions to dismiss.  Under the business judgment rule and exculpation provision of ITT's articles of incorporation, the complaint fails to state a claim against the former directors for breach of fiduciary duties, so their motion to dismiss is **GRANTED**.  Dkt. [39].  The allegations against Mr. Modany, which do not fall under the business judgment rule or the exculpation provision, are sufficient to state a claim so his motion is **DENIED**.  Dkt. [40].

1

# I.
## Facts and Background

Because Defendants have moved for dismissal under Rule 12(b)(6), the Court accepts and recites "the well-pleaded facts in the complaint as true." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

This case arises out of the financial collapse and eventual bankruptcy of ITT Educational Services, Inc. ("ITT"). Founded in 1946 and publicly traded since 1994, ITT was one of the largest for-profit education companies in the country. Dkt. 3 at 8 ¶ 20. Kevin Modany had served as ITT's CEO since 2007. *Id.* at 4-5 ¶ 11. Like many for-profit education companies, ITT generated most of its revenue through federal financial aid programs for students. *Id.* at 8-9 ¶ 21. About 90% of ITT's revenue came from funds provided by Title IV of the Higher Education Act of 1965. *Id.* 8-9, 10 ¶¶ 21, 25.

To qualify for Title IV funds, ITT had to meet the requirements set out by the Department of Education. *Id.* at 8-9 ¶ 21. One requirement was that ITT had to be accredited by a reputable accrediting agency such as the Accrediting Council for Independent Colleges and Schools ("ACICS"). *Id.* at 2, 8-9 ¶¶ 3, 21. ITT was also required to meet specific financial requirements and demonstrate compliance with federal laws. *Id.* at 9 ¶ 22.

## A.    ITT receives a Show Cause Letter from ACICS

Starting in 2014, ACICS learned that ITT was facing legal and financial problems. *Id.* at 39. Attorneys General from 19 states had placed civil investigative demands on ITT for potential violations of their state consumer-

protection laws.  *Id.*  ITT was also subject to unresolved litigation by the Consumer Financial Protection Bureau ("CFPB"), the Securities Exchange Commission ("SEC"), and the Department of Justice.  *Id.* at 40.  These agencies believed that Mr. Modany was responsible for promoting the misconduct that led to the lawsuits and they encouraged ITT to terminate him.  *Id.* at 11 ¶ 27. The SEC would not settle its case unless Mr. Modany admitted to fraud.  *Id.*

On April 20, 2016, ACICS sent ITT a "Show-Cause Directive Letter" (the "Show Cause Letter") informing ITT that ACICS was aware of the "variety of financial and regulatory issues confronting" ITT.  *Id.* at 39.  ACICS questioned ITT's "administrative capacity, organizational integrity, financial viability and ability to serve students in a manner that complies with ACICS standards."  *Id.* ACICS ordered ITT to show cause why ITT's accreditation should not be revoked.  *Id.* at 40.  ACICS also demanded evidence demonstrating that ITT was taking steps to address ACICS's concerns.  *Id.* at 40-42.  This included providing a listing "of comparable programs offered at other institutions" in case a teach-out agreement was needed, evidence that it had improved instructional resources and quality, and evidence that it was complying with laws and attempting to resolve litigation.  *Id.* at 41-42.

The complaint alleges that eight Defendants who were ITT directors ("Former Directors")[1] and Mr. Modany breached their fiduciary duties to ITT

---

[1] The Former Directors are John E. Dean, C. David Brown II, Joanna T. Lau, Thomas I. Morgan, John Vincent Weber, John F. Cozzi, Samuel L. Odel, and Jerry M. Cohen.

starting with the receipt of this letter and ending September 16, 2016 (the "Crisis Period").  *Id.* at 2, 24-26 ¶¶ 1, 61-67.

**B.    ITT's response to the Show Cause Letter**

On April 24, 2016, four days after receiving the letter, the Former Directors met.  *Id.* at 14 ¶ 35.  During this meeting, ITT's management briefed the Former Directors regarding a possible transaction with U.S. Skills LLC and Thomas H. Lee Partners.  *Id.*  The Former Directors were advised that a precondition to this transaction was U.S. Skills and Thomas H. Lee speaking with the SEC regarding the pending lawsuit, and that the SEC would only settle if Mr. Modany admitted to fraud.  *Id.* at 11, 14 ¶¶ 27, 35.  Mr. Modany told the Former Directors that the offer was not serious, so it was not pursued.  *Id.* at 14 ¶ 35.

The Former Directors met again the next day, April 25, 2016, to discuss ITT's response to the Show Cause Letter.  *Id.* at 11-12 ¶ 29.  At that meeting, Mr. Modany recommended that ITT pursue a transaction—either a sale of ITT's assets or the company itself—to solve its mounting problems and prevent ITT's collapse.  *Id.*  Mr. Modany's severance package provided a large bonus if he was terminated as the result of a transaction but provided no bonus if he was terminated for cause.  *Id.* at 12-13 ¶¶ 30-31.

In early May, Genki Capital contacted an ITT employee about possibly acquiring ITT.  *Id.* at 15-16 ¶ 39.  The employee forwarded the inquiry to Mr. Modany who dismissed it as "wild ass fishing."  *Id.*  Mr. Modany spoke with the Department of Education about a possible transaction between ITT and the

4

Dream Center Foundation. *Id.* at 16 ¶ 40. This transaction would not have required Mr. Modany to admit to fraud and would have allowed him to stay involved in the transaction. *Id.*

Later that summer, ITT received a letter of intent for a potential acquisition by Starcore Venture Group. *Id.* at 17-18 ¶ 44. Mr. Modany recommended rejecting this offer because he believed it would leave insufficient residual value for shareholders. *Id.* The Former Directors deferred to his judgment. *Id.*

**C.   The Department of Education's letter**

On June 6, 2016, the Department of Education sent a letter to Mr. Modany saying that it received ACICS's Show Cause Letter. *Id.* at 45. The Department believed that ITT risked losing its accreditation, which "would result in the loss of its Title IV eligibility." *Id.* at 46. Based on these concerns, the Department of Education increased its surety demand from around $78 million to $124 million. *Id.* By July, it allowed ITT to pay its surety in installments, and ITT made the first payment. *Id.* at 19, 22 ¶¶ 48, 55.

**D.   ITT's collapse and bankruptcy**

On August 17, ACICS notified ITT that it would remain on "show-cause" status because many of ACICS's initial concerns had not been resolved. *Id.* at 20 ¶ 51. On August 25, 2016, the Department of Education, aware of ACICS's findings, sent a follow-up letter to ITT. *Id.* at 55-61. In the letter, the Department of Education said that "[i]t no longer expresse[d] concerns about the quality of instructional material or development and submission of a teach

5

out plan." *Id.* at 56.  Nevertheless, the Department had many other concerns, so it increased ITT's surety bond from roughly $94 million to more than $247 million—due 30 days after receipt of the letter.  *Id.* at 57.

Shortly after receiving this letter, while still pursuing potential transactions, the Former Directors sought to secure bankruptcy counsel.  *Id.* at 21, 23 ¶¶ 53, 57.  Mr. Modany also became the subject of "increased board awareness," and he believed that some of the Former Directors were now "meddling" in his management of ITT's operations.  *Id.* at 21 ¶ 53.

The day after ITT received the letter from the Department of Education, the Dream Center—which had been working with the Department of Education on a deal—"changed the deal terms."  *Id.* at 22 ¶ 55.  Among other things, Dream Center no longer wanted Mr. Modany to remain part of the transaction; instead, it demanded that ITT put in a new CEO and end all bonus and severance payments.  *Id.*  Mr. Modany and the Former Directors rejected this revised offer.  *Id.* at 22-23 ¶¶ 55-56.

By September 16, ITT ceased operations and commenced Chapter 7 bankruptcy proceedings.  *Id.* at 23 ¶ 58.  This left ITT with seven-figure litigation costs incurred in resolving the handling of student records and millions of dollars in rent payments on ITT property.  *Id.* at 23-24 ¶ 59.

**E.    Procedural history**

On May 31, 2018, the Trustee in ITT's bankruptcy sued the Former Directors and Mr. Modany alleging they breached their fiduciary duties to ITT during the Crisis Period.  *Id.* at 2, 24-26 ¶¶ 1, 61-67.  The Trustee also sued for

equitable subordination of Mr. Modany's creditor claims. *Id.* at 26-27 ¶¶ 68-73. The Former Directors and Mr. Modany have filed motions to dismiss the complaint. Dkt. 39; dkt. 40.

## II.
## Motion to Dismiss Standard

Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Trustee's claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When ruling on a 12(b)(6) motion, the Court will "accept the well-pleaded facts in the complaint as true," but will not defer to "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley*, 671 F.3d at 616. The Court must also draw all reasonable inferences in favor of the plaintiff. *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017).

## III.
## Analysis

The claims for breach of fiduciary duties are governed by Delaware law. Ind. Code § 23-0.5-5-1(a)(1); dkt. 39-1 at 2 n.1; dkt. 39-2 at 10 n.4; dkt. 40-1 at 3.

**A.      Former Directors' Motion to Dismiss**

The Trustee challenges the Former Directors' actions during the Crisis Period, alleging that their conduct breached the Former Directors' two fiduciary duties: the duty of loyalty and the duty of care.

**1.      Duty of loyalty**

The duty of loyalty requires "that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). The duty of loyalty includes the duty to act in good faith. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).[2] A director may violate the duty of loyalty by acting out of self-interest, failing to exercise independence, or failing to act in good faith. *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014). Examples of bad faith include when a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation" or "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

---

[2] The Court is mindful that *Stone* was a derivative suit. Federal Rule of Civil Procedure 23.1 and Chancery Rule 8 for Delaware state courts both impose heightened pleading standards, requiring a plaintiff to allege some facts with particularity. *See In re Tower Air, Inc.*, 416 F.3d 229, 236 (3d Cir. 2005) (explaining different standards). The Court cites this case, and other derivative-suit and Delaware state-court cases, not for the pleading standard, but for Delaware substantive law.

**a.      The Trustee's allegation that the Former Directors abdicated their decision-making authority to Mr. Modany.**

The Trustee argues that the Former Directors "abdicat[ed] all decision making" to Mr. Modany and intentionally disregarded "their duty to make informed decisions, maximize ITT's value and avoid unnecessary liabilities." Dkt. 39-2 at 10-18.  The Trustee claims the Former Directors trusted Mr. Modany's judgments when they should have removed him as CEO, secured a comprehensive teach-out plan, and evaluated potential transactions themselves.  Dkt. 3 at 13 ¶ 33; dkt. 40 at 1.  The Former Directors respond that the facts in the complaint do not support these allegations and their decisions are protected by the business judgment rule.  Dkt. 39-1 at 18; dkt. 39-3 at 2-14.  The Trustee replies that the business judgment rule is an affirmative defense not mentioned in the complaint, so it cannot be considered on a motion to dismiss.  Dkt. 39-2 at 21-24.

The business judgment rule is a substantive rule of Delaware law; a plaintiff must "rebut the presumption of the business judgment rule" in order to state a claim for breach of fiduciary duty.  *McMullin v. Beran*, 765 A.2d 910, 916-17 (Del. 2000).  Courts in the Seventh Circuit, therefore, treat the business judgment rule as a substantive element of a claim rather than an affirmative defense.  *Gordon v. Goodyear*, No. 12 C 369, 2012 WL 2885695, at *11 (N.D. Ill. July 13, 2012); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04-c-0698, 2005 WL 589000, at *27-29 (N.D. Ill. Mar. 11, 2005); *see also Lowinger v. Oberhelman*, 924 F.3d 360, 366–67 (7th Cir. 2019).

9

But even if the business judgment rule were an affirmative defense, the outcome would be the same because courts in the Seventh Circuit consider affirmative defenses when "all the facts necessary to rule on the affirmative defense are properly before the district court on the motion to dismiss." *ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 745 (7th Cir. 2017). For example, a court may consider a statute-of-limitations affirmative defense—even when the phrase "statute of limitations" does not appear on the face of the complaint—if the complaint unambiguously sets forth the relevant dates. *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009).

Here, although the complaint does not use the phrase "business judgment rule," its allegations plainly implicate it. All the facts necessary to decide if the business judgment rule applies are before the Court on the motion to dismiss. Therefore, the Court reviews the Former Directors' decisions challenged by the Trustee under the business judgment rule.

The business judgment rule requires the Court to presume that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *McMullin*, 765 A.2d at 916. Under the business judgment rule, a court will not substitute its judgment for the judgment of directors if the decisions can be "attributed to any rational business purpose." *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)). This rule prevents courts from second-guessing the merits of directors' decisions as long

10

as a reasonable businessperson could possibly have authorized them.  *In re MFW Shareholders Litig.*, 67 A.3d 496, 520 (Del. Ch. 2013) (stating that when a decision can be attributed to "a rational mind," then the business judgment rule "precludes judicial second-guessing").  This standard applies to directors' decisions to delegate tasks because the informed decision to delegate is "as much an exercise of business judgment as any other."  *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985).  Therefore, the Court will presume the Former Directors acted loyally and in good faith unless their actions cannot be attributed to any rational business justification.

Here, the allegations in the complaint are not sufficient to support the inference that the Former Directors' decisions lacked any rational business justification.

First, the Former Directors' decision not to fire ITT's long-time CEO during a corporate crisis cannot be said to have wholly lacked any rational business justification.  The Former Directors discussed whether to terminate Mr. Modany and how to satisfy ACICS's other demands.  Dkt. 3 at 10, 17 ¶¶ 26, 43.[3]  But Mr. Modany had served as ITT's CEO since 2007 and during his tenure ITT had been able to hold cash and cash equivalents of more than $100 million.  *Id.* at 2, 4-5 ¶¶ 2, 11.  The Former Directors understood that various government regulators wanted Mr. Modany out, but that does not make firing

---

[3] The complaint also alleges that the Former Directors "knew" that Mr. Modany's "desire to protect his employment and compensation was impairing ITT's efforts to close a deal," dkt. 3 at 23 ¶ 56, but that statement is conclusory and not supported by corresponding factual allegations.

him the only rational business decision.  While firing Mr. Modany may have appeased the government regulators, the lack of continuity and loss of Mr. Modany's institutional knowledge would undoubtedly have created other problems for ITT.  Therefore, the complaint has not sufficiently alleged that the Former Directors' decision to retain Mr. Modany lacked any rational business justification.  *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 776-79 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (holding that corporate officers did not violate their fiduciary duties when they decided not to terminate a company president for cause).

The same is true for the Former Directors' decisions with respect to the teach-out plan.  They were aware of the issue and considered it.  Dkt. 3 at 17 ¶ 43.  ACICS's initial Show Cause Letter did not demand an immediate teach-out plan, but rather a list of comparable programs offered elsewhere "in case teach-out agreements . . . are needed."  *Id.* at 41.  And later that summer, the Department of Education no longer had any concerns about the need for a teach-out plan.  *Id.* at 56 (saying, "[i]t no longer expresses concerns about the quality of instructional material or development and submission of a teach out plan.").  So even if the Former Directors did not create a teach-out plan during the Crisis Period, the complaint has not sufficiently alleged that their decision lacked any rational business justification.

Finally, the complaint does not sufficiently allege that the Former Directors' decisions regarding the evaluation of potential transactions lacked any rational business justification.  Five days after ITT received the Show

12

Cause Letter, the Former Directors held a board meeting at which Mr. Modany was asked to speak about the Show Cause Letter. *Id.* at 11-12 ¶ 29. He recommended that ITT "pursue a transaction as soon as possible to avoid any potential collateral consequences of ITT's receipt of the letter." *Id.* In furtherance of this goal, the Former Directors were briefed by ITT's management on a possible transaction with U.S. Skills LLC and Thomas H. Lee Partners, *id.* at 14 ¶ 35, and they considered possible transactions with Starcore Venture Group and the Dream Center Foundation, *id.* at 16-18 ¶¶ 40, 44, 55.

The Former Directors also considered retaining a restructuring specialist. *Id.* at 18-19 ¶ 47. After the Department of Education dramatically increased the surety demand, they retained bankruptcy counsel. *Id.* at 21 ¶ 53. These allegations do not establish that the Former Directors acted without any possible rational business justification when navigating ITT through the Crisis Period. *See In re NYMEX Shareholder Litigation*, No. CIV.A. 3621-VCN, 2009 WL 3206051, at *4 (Del. Ch. Sept. 30, 2009).

The cases cited by the Trustee are distinguishable. In *Bridgeport*, the directors inexplicably approved the sale of a $126 million asset for $28 million, $25 million of which was spent settling a claim that the sale was fraudulent. *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 554-56 (Bankr. D. Del. 2008). And in *McMullin*, board members insisted on favoring bids that were provided in cash—to the detriment of the company—because they personally needed cash to fund their own business acquisitions. *McMullin*, 765 A.2d at 921. In

both cases, the defendants' actions were either motivated by self-interest or they lacked any rational business justification, so the business judgment rule did not apply.  *In re Bridgeport*, 388 B.R. at 554-56; *McMullin*, 765 A.2d at 922; *see also Gantler*, 965 A.2d at 706.

This case is more like *In re NYMEX*, 2009 WL 3206051, at *4 where shareholders of a corporation alleged that the board members breached their fiduciary duties by negotiating a sale of the corporation for less than fair value. The shareholders alleged that the board members were "dominated and controlled" by the chairman of the board, and therefore acted in bad faith when they approved the sale without giving it adequate independent review.  *Id.* at *6.  The court rejected this argument and dismissed the claim (albeit under a heightened pleading standard) because the complaint alleged only that the board "relied upon, and sometimes deferred to, its chairman."  *Id.*  The court found it was "well within the business judgment of the Board . . . to delegate the task of negotiating to the Chairman and the Chief Executive Officer."  *Id.* at 7.  As in *NYMEX*, the Former Directors' decision here to delegate to Mr. Modany the task of screening potential transactions to identify those that were worth pursuing did not lack any rational business justification.

Since the Former Directors' decisions are reviewed under the business judgment rule standard, the Former Directors are entitled to the presumption that they acted with loyalty and in good faith unless the challenged decisions lacked any rational business justification.  *In re Tower Air, Inc.*, 416 F.3d at 238.  The Trustee's allegations are not sufficient to support the inference that

14

the Former Directors' decisions regarding a teach-out plan, Mr. Modany's continued employment and the evaluation of potential transactions lacked any rational business justification.

      **b.**    **The Trustee's allegation that the Former Directors failed to exercise oversight over Mr. Modany.**

The Trustee alleges that the Former Directors breached their duty of loyalty by "chronically failing to exercise reasonable oversight over Modany." Dkt. 39-2 at 15.  The Former Directors argue that the facts in the complaint do not meet the high standard required for this claim.  Dkt. 39-1 at 6-11.

Directors can be held liable when a company suffers damages from "a sustained or systematic failure . . . to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).  Under *Caremark*, directors violate their duty when they "(a) utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d at 370.

The standard for *Caremark* liability is high—it is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *Caremark*, 698 A.2d at 967.  For example, the plaintiff in *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 799 (Del. Ch. 2009) sufficiently pleaded a *Caremark* claim after alleging that the corporate officers intentionally manipulated the company's books to overstate its value by billions of dollars

15

and implemented illegal schemes to avoid paying taxes, and that the directors "were aware of the schemes and knowingly failed to stop them." *Id.* at 799.

The facts alleged in the complaint here fail to state a claim under *Caremark*. The complaint does not allege that the Former Directors failed to implement any reporting or information system or controls. On the contrary, it suggests that Mr. Monday and other employees were regularly reporting to board members and appearing for meetings. Dkt. 3 at 10-12, 14-23 ¶¶ 26, 29, 35, 38, 43-44, 47-49, 50, 53-57. Nor does the complaint allege facts demonstrating that the Former Directors consciously disregarded a reporting system by "disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. Rather, the facts in the complaint demonstrate that the Former Directors were engaged in ITT's business by communicating with the CEO, outside counsel, restructuring specialists, bankruptcy counsel, and potential buyers throughout the Crisis Period. *See e.g.*, dkt. 3 at 11-12, 14, 17-18, 21 ¶¶ 29, 35, 44, 53. The Trustee believes the Former Directors' decisions were wrong, exacerbated ITT's problems, and further contributed to its demise, but directors cannot be held liable for "business decisions that, in hindsight, turned out poorly for the Company." *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009) (holding that corporate directors did not violate the *Caremark* standard in failing to monitor how employees managed business risks).

The cases that the Trustee relies on are distinguishable and do not support her position. In *Clingman & Hanger Mgmt. Assocs., LLC v. Knobel*, No.

16

16-62028-CIV, 2018 WL 2006763, at *1 (S.D. Fla. Jan. 9, 2018), corporate officers took tens of millions of dollars in Title IV funds without first enrolling students who were entitled to those funds, then used inflated enrollment numbers to cover up the deceit. The court found the directors liable under *Caremark* because they knew this practice violated the law and allowed it to continue. *Id.* at *9-12.

And in *ATR-Kim Eng Fin. Corp. v. Araneta*, No. CIV.A. 489-N, 2006 WL 3783520, at *1 (Del. Ch. Dec. 21, 2006), the chairman of a board transferred over $35 million in assets from the corporation to his family members. The court found the directors liable under *Caremark* because the directors had no reporting system in place and no system for monitoring the chairman. In fact, the board of directors never held a meeting and "they never bothered to check whether the [company] retained its primary assets." *Id.* at *18-21.

The facts alleged in the complaint fall far short of the facts alleged in *Clingman* and *ATR-Kim*. Instead, the allegations show that the Former Directors were aware of what Mr. Modany was doing, the steps that were being taken to address accreditation concerns throughout the Crisis Period, and ITT's various transactional options. Dkt. 3 at 10-12, 15-23 ¶¶ 26, 29, 35, 38, 43-44, 47-49, 50, 53-57.

The Trustee's duty-of-loyalty claims fail under the business judgment rule and the high standard set forth in *Caremark*. To the extent the Trustee argues that the Former Directors' actions during the Crisis Period were inadequate and that doing more would have mitigated the impact of ITT's

17

collapse and avoided a last-minute bankruptcy filing, that argument goes to whether the Former Directors breached a duty of care—not a duty of loyalty. *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("if the directors failed to do all that they should have under the circumstances, they breached their duty of care").

### 2.   Duty of care

The Trustee alleges that the Former Directors breached their duty of care by making uninformed decisions and failing to implement a rational decision-making process.  Dkt. 39-2 at 18-21.  But the Court does not need to analyze whether these allegations are sufficient to state a claim for breach of the duty of care because ITT's articles of incorporation exculpated the Former Directors from duty-of-care liability.

Under Delaware law, shareholders are permitted to "to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care."  *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001).  ITT's article of incorporation included such an exculpatory provision, stating that ITT's directors cannot be held liable for "monetary damages for breach of fiduciary duty as a director" within the limits of Delaware law.  Dkt. 39-1 at 12-13.[4]  Therefore, the claim for breach of the duty

---

[4] Although the text of ITT's articles of incorporation are not included in the complaint, the Court may take judicial notice of public documents available through the Delaware Secretary of State such as Articles of Incorporation.  *Seidel v. Byron*, 405 B.R. 277, 284 (N.D. Ill. 2009) (citing cases).

of care against the Former Directors is foreclosed even if they acted with gross negligence.

The Trustee argues that the exculpatory clause is an affirmative defense that should not be considered in the context of a 12(b)(6) motion.  But "plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the suit."  *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).  The cases the Trustee cites for her position either predate *Cornerstone* or stand for the position that if a plaintiff sufficiently alleges facts to support a claim for a breach of the *duty of loyalty*, then a court may consider the plaintiff's claims despite an exculpatory clause.  *See In re Bridgeport*, 388 B.R. at 568; *In re Simplexity, LLC*, No. 14-10569(KG), 2017 WL 65069, at *6 (Bankr. D. Del. Jan. 5, 2017).  Here, as explained above, the Trustee has failed to state a duty-of-loyalty claim against the Former Directors; the only claim left is the duty-of-care claim.  Since ITT has exculpated the Former Directors from any liability for breaching their duty of care, the Trustee's duty-of-care claim against the Former Directors fails.

In conclusion, the Trustee contends that the Former Directors should have fired Mr. Modany, started winding down ITT, analyzed the transactions themselves, and secured a teach out plan.  Dkt 39-2 at 1.  But these were business decisions and when applying the business judgment rule, a court does not "substitute its own notions of what is or is not sound business

19

judgment." *Sinclair Oil*, 280 A.2d at 720.  At most, these allegations suggest

that the Former Directors "failed to do all that they should have under the

circumstances." *Lyondell*, 970 A.2d at 243.  But that alleges a breach of the

duty of care, and ITT's shareholders exculpated the Former Directors from

liability for breaching their duty of care.  Therefore, the Trustee has failed to

state a claim that the Former Directors breached either of their fiduciary

duties.  The Former Directors' Motion to Dismiss is **GRANTED**.  Dkt. [39].

**B.      Mr. Modany's motion to dismiss**

The Trustee alleges that Mr. Modany breached his fiduciary duties to ITT

(Count I) and seeks equitable subordination for his creditor claims (Count II).

Mr. Modany has moved to dismiss both claims.  Dkt. 40.

**1.      Duty of loyalty**

Mr. Modany argues the complaint fails to state a claim that he breached

his duty of loyalty.  Dkt. 40-1 at 10-25.  The Trustee argues the complaint

provides enough facts to state a claim that Mr. Modany violated his duty of

loyalty by acting with a purpose other than ITT's best interests.  Dkt. 40-2 at

10.

The duty of loyalty includes a duty to act in good faith.  *Stone*, 911 A.2d

at 370.  The duty to act in good faith is violated if a corporate officer

"intentionally acts with a purpose other than that of advancing the best

interests of the corporation." *In re Walt Disney*, 906 A.2d at 67.  A corporate

officer can violate that duty by placing his or her desire to keep a lucrative

position above the best interests of a business.  For example, in *In re Enivid.*

*Inc.*, 345 B.R. 426, 434-440 (Bankr. D. Mass. 2006), one of the defendants was the CEO of a tech company that was quickly becoming insolvent.  The plaintiff alleged that the CEO violated his duty of loyalty after he pursued an acquisition strategy that was ruinous for the finances of the company but allowed the defendant to maintain his position as CEO.  *Id.* at 436-440.  The court denied dismissal, finding that the complaint alleged enough facts to infer that the CEO's "principal motivation in the performance of his duties was his desire to maintain his acquisition strategy by maintaining his position and office as the Company's chief executive officer."  *Id.* at 445.

Drawing all inferences in the Trustee's favor, *see Forgue*, 873 F.3d at 966, the facts in the complaint state a claim that Mr. Modany acted with a purpose other than ITT's best interests.  During the Crisis Period, the CFPB and several state Attorneys General stated that they would not settle their claims against ITT unless Mr. Modany stepped down, and the SEC required that he admit to fraud.  Dkt. 3 at 11 ¶ 27.  But Mr. Modany knew that if he was terminated for cause, he would lose his severance payment.  *Id.* at 11 ¶ 28.  In contrast, if he was terminated as part of a "strategic transaction," he would gain enormously because his severance package would be subject to a "three times' multiplier."  *Id.* at 12 ¶ 30.

Knowing what he stood to gain, Mr. Modany chose to pursue a strategic transaction in response to the Show Cause Letter.  *Id.* at 11-12 ¶ 29.  But when ITT was presented with a possible transaction with U.S. Skills LLC and Thomas H. Lee Partners which may have required Mr. Modany to admit to

21

fraud, he dismissed this transaction. *Id.* Mr. Modany was also informed about possible transactions with Genki Capital and Starcore Venture Group, but he dismissed both of those transactions as well. *Id.* at 15-18 ¶¶ 39, 44.

The complaint alleges that Mr. Modany pursued a transaction with Dream Center. *Id.* at 16 ¶ 40. This transaction was unique because Dream Center was willing to allow Mr. Modany to be involved with the transaction. *Id.* But when Dream Center changed the terms, wanting to "put in a new CEO" and prohibit bonuses and severance payments, Mr. Modany said ITT "isn't agreeing to do anything that was suggested in your summary." *Id.* at 22 ¶ 55. Around this time, Mr. Modany sent an email lamenting that ITT was "tracking towards a $0.00 executive bonus," and that he did not "have a chance to get much of anything." *Id.* at 19 ¶ 49.

Like in *In re Enivid.*, these allegations are sufficient to raise the inference that Mr. Modany violated his duty to act in good faith. Together, these facts are sufficient to support an inference that Mr. Modany pursued a strategy designed to maximize his compensation and allow him to remain as CEO and acted with a purpose other than ITT's best interests. And while the business judgment rule can apply to decisions made by corporate officers, *Cede*, 634 A.2d at 361, it does not apply if a corporate officer acts out of self-interest rather than the best interests of the corporation, *In re Enivid.*, 345 B.R. at 434.

Mr. Modany argues that *In re Enivid.* is unpersuasive because there the board of directors "questioned" the value of the CEO's suggested acquisitions and the CEO concealed material information from the board. Dkt. 40-3 at 2-3.

But the complaint alleges that Mr. Modany—like the CEO in *In re Enivid.*—made a series of decisions that seem inconsistent with the ITT's interest but consistent with a desire to maintain his position as CEO and maximize his compensation. *See In re Enivid.*, 345 B.R. at 445. Mr. Modany also is alleged to have concealed information from the Former Directors by unilaterally dismissing the offer from Genki Capital. *Id.* at 15-16 ¶ 39. In total, that is enough to state a claim that he violated his duty to act in good faith.

Mr. Modany also argues the allegation that a corporate officer wanted to continue his employment and retain his severance package is "not sufficient to claim a breach of the duty of good faith." Dkt. 40-1 at 25. Indeed, CEOs do not violate their duty of loyalty merely by wanting to retain their position and pay. But they may not pursue that desire if it runs contrary to their duty of "advancing the best interests of the corporation." *In re Walt Disney Co.*, 906 A.2d at 67. A CEO cannot pursue an acquisition strategy if the chief motivation behind that strategy is retaining the CEO's compensation rather than the best interests of the company. *See In re Enivid.*, 345 B.R. at 434-440. The Trustee has alleged enough facts to support the inference that Mr. Modany did that here.

The cases cited by Mr. Modany do not hold otherwise. *Grobow v. Perot*, 539 A.2d 180 (Del. 1988) and *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002), demonstrate that a director does not necessarily violate the duty of loyalty by approving a transaction in which the director stands to gain financially. And *In re Fedders N. Am., Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) holds that the

23

allegation that a director violated his duty of care by failing to declare bankruptcy was insufficient "without more" to state a claim for breach of duty.

Mr. Modany also argues that the Trustee's claims against him fail because she filed an adversary complaint against the Department of Education alleging that the Department—not Mr. Modany—was to blame for ITT's collapse.  Dkt. 40-3 at 6-7.  But plaintiffs are allowed to plead alternative theories of liability.  Fed. R. Civ. P. 8(d)(2).  And in any event, the Court's holding here does not conflict with the Trustee's allegations in that case because the Court's holding does not relate to whether Mr. Modany's "actions caused ITT's shutdown."  Dkt. 40-3 at 7.  Rather, the Court's narrow holding is that the Trustee has alleged a claim for breach of the duty of loyalty because the allegations are sufficient to support the inference that the *purpose* behind Mr. Modany's decisions was something "other than that of advancing the best interests of the corporation."  *In re Walt Disney*, 906 A.2d at 67.

### 2.  Duty of care

Mr. Modany argues the complaint fails to allege that he breached his duty of care because even when its allegations are accepted as true, they do not amount to gross negligence.  Dkt. 40-1 at 5-6.  When acting on behalf of a corporation, a corporate officer must "use that amount of care which ordinarily careful and prudent men would use in similar circumstances."  *In re Walt Disney*, 907 A.2d at 749.  Before acting, a corporate officer must consider all material information reasonably available and "act on an informed basis."  *Cede*, 634 A.2d at 367.

A corporate officer can breach this duty by failing to adequately consider competing offers when attempting to sell or merge a corporation.  *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994) (holding that directors breached their fiduciary duties to a corporation when negotiating a merger by failing to adequately consider a competing offer).  For example, in *McPadden v. Sidhu*, 964 A.2d 1262, 1266 (Del. Ch. 2008), the directors of a corporation relied on their CEO to broker the sale of one of the corporation's subsidiaries.  The CEO violated his fiduciary duties to the corporation in part because he did not fairly consider competing offers for the sale or apprise the board of the other offers.  *Id.* at 1275-76.

Here, Mr. Modany was not covered by the exculpation provision that applied to the Former Directors.  Dkt. 39-1 at 12-13; *see id.* at 1275 (holding that a corporation's directors were exculpated from liability while the CEO was not).  The complaint sufficiently alleges that Mr. Modany breached his fiduciary duty of care by dismissing potential transactions without acting on an informed basis.  Mr. Modany informed the Former Directors that ITT needed to pursue a transaction "as soon as possible," and between April and August, ITT had several offers.  Dkt. 3 at 11-12 ¶ 29.  Mr. Modany rejected all of them.  U.S. Skills pursued a transaction with ITT, but Mr. Modany encouraged the board to "cease discussions" because he did not think the offer was serious.  *Id.* at 14 ¶ 35.  Next, Genki Capital suggested a possible transaction with ITT, but Mr. Modany dismissed the overture as "wild ass fishing."  *Id.* at 15-16 ¶ 39.  Then ITT received a letter of intent for a potential acquisition by Starcore Venture

25

Group, but Mr. Modany rejected this transaction because he thought it would leave little residual value for shareholders. *Id.* at 17-18 ¶ 44. And Mr. Modany eventually rejected the offer from Dream Center after the terms of the deal changed. *Id.* at 22 ¶ 55. In total, the complaint alleges sufficient facts to support the inference that Mr. Modany made these decisions without fairly considering the offers and thus states a claim for breach of the duty of care.

Mr. Modany argues that he acted with due care because "Delaware law does not require an officer to investigate every single potential offer" and that "a single determination not to investigate . . . does not constitute gross negligence." Dkt. 40-1 at 10. The complaint alleges, however, that Mr. Modany failed to investigate not just one possible transaction, but three. Of course, Mr. Modany may be able to demonstrate through development of the factual record that he fairly considered the transactions but when evaluating a motion to dismiss, the facts in the complaint are presumed true and all reasonable inferences are drawn in the Trustee's favor. Applying that standard as the Court must, the allegations are sufficient to a state claim for breach of the duty of care.

### 3.  Equitable subordination

The Trustee's complaint also includes a claim for equitable subordination of Mr. Modany's creditor claim seeking payment of his severance package. Dkt. 3 at 26-27 ¶¶ 68-73. Mr. Modany has moved to dismiss this claim. Dkt. 40-1 at 26-28.

Equitable subordination allows a bankruptcy court to reprioritize a claim in a bankruptcy if the court determines that the party making that claim is guilty of misconduct "that injures other creditors or confers an unfair advantage." *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008).  Equitable subordination generally requires that three conditions are met: (1) the claimant engaged in "some type of inequitable conduct," (2) the misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant," and (3) subordination is "not be inconsistent with the provisions of the Bankruptcy Act." *Id.* (quotation omitted).  The "type of conduct that has been considered inequitable" generally falls within specific categories including "fraud, illegality, breach of fiduciary duties." *Id.*

Mr. Modany challenges only the first condition, arguing that he did not engage in inequitable conduct.  Dkt. 40-1 at 27.  But as Mr. Modany concedes, a breach of fiduciary duties is one of the categories of conduct that support a finding of inequitable conduct for the purposes of equitable subordination.  *Id.*; *see also Kreisler*, 546 F.3d at 866.  Since the Trustee has alleged sufficient facts to state a claim that Mr. Modany breached his fiduciary duties, she has also alleged sufficient facts to state a claim for equitable subordination.

Mr. Modany's motion to dismiss Count II of the complaint is **DENIED.** Mr. Modany has twenty-one days from the date this Order is entered to respond to the complaint.

**IV.**
**Conclusion**

The Former Directors' motion to dismiss is **GRANTED**.  Dkt. [39].  The clerk shall remove John E. Dean, C. David Brown II, Joanna T. Lau, Thomas I. Morgan, John Vincent Weber, John F. Cozzi, Samuel L. Odel, and Jerry M. Cohen from the docket.  Mr. Modany's motion to dismiss is **DENIED**.  Dkt. [40].

**SO ORDERED.**

Date: 1/29/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Richard B. Allyn
ROBINS, KAPLAN LLP
rallyn@robinskaplan.com

Thomas Berndt
ROBINS KAPLAN LLP
TBerndt@RobinsKaplan.com

John Cannizzaro
ICE MILLER LLP (Columbus)
john.cannizzaro@icemiller.com

Michael Collyard
ROBINS KAPLAN LLP
mcollyard@robinskaplan.com

John C. Goodchild, III
MORGAN LEWIS & BOCKIUS, LLP
john.goodchild@morganlewis.com

Gregory Forrest Hahn
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
ghahn@boselaw.com

John C. Hoard
RUBIN & LEVIN, P.C.
johnh@rubin-levin.net

Jeffrey A. Hokanson
ICE MILLER LLP (Indianapolis)
jeff.hokanson@icemiller.com

Carly Kessler
ROBINS KAPLAN LLP
ckessler@robinskaplan.com

Vilda Samuel Laurin, III
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
slaurin@boselaw.com

Rachel Jaffe Mauceri
MORGAN, LEWIS & BOCKIUS
1701 Market Street
Philadelphia, PA 19013

James P. Moloy
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmoloy@boselaw.com

Ronald James Schutz
ROBINS, KAPLAN LLP
rschutz@robinskaplan.com

Paul D. Vink
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pvink@boselaw.com

Philip A. Whistler
ICE MILLER LLP (Indianapolis)
philip.whistler@icemiller.com