# EXHBIIT 43

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

Case No. 1:18-cv-02182-JPH-TAB

_____

DEBORAH J. CARUSO, the CHAPTER 7
TRUSTEES for ITT EDUCATIONAL
SERVICES, INC., ESI SERVICE CORP. and
DANIEL WEBSTER COLLEGE, INC.,

    Plaintiffs

V.

KEVIN MODANY,

    Defendant.

_____

-------------------------------------------------

VIDEOTAPED ZOOM VIDEOCONFERENCE DEPOSITION OF
RONALD HOLT

-------------------------------------------------

TAKEN JANUARY 4, 2021      BY CARA NASI-PINARDI, RPR

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 2

```
 1      APPEARANCES:
 2      ROBINS KAPLAN, LLP
        800 LaSalle Avenue
 3      Suite 2800
        Minneapolis, MN  55402
 4      Phone:  612-349-8500
        Email:  Mcollyard@robinskaplan.com
 5      By Mr. Michael A. Collyard, Esq. (Via Zoom)
           Ms. Valerie Stacey, Esq. (Via Zoom)
 6         Mr. Peter Ihrig, Esq. (Via Zoom)
           Carly A. Kessler, Esq. (Via Telephone)
 7         Counsel for Plaintiff
 8
        GREENBERG TRAURIG, LLP
 9      77 West Wacker Drive
        Suite 3100
10      Chicago, IL  60601
        Phone:  312-456-8419
11      Email:  Fingerk@gtlaw.com
        By Mr. Kevin D. Finger, Esq. (Via Zoom)
12         Mr. Kelyn Smith, Esq. (Via Zoom)
           Counsel for Defendant
13
14      ROUSE FRETS WHITE GOSS GENTILE RHODES, PC
        4510 Belleview Avenue
15      Suite 300
        Kansas City, MO  64111
16      Phone:  816-502-4731
        Email:  Mshaney@rousepc.com
17      By Ms. Mary Jo Shaney, Esq. (Via Zoom)
           Counsel for the Witness
18
19      Videographer:  Steven Smith
20
21
22
23
24
25
```

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 3

```
 1              I N D E X
 2   EXAMINATION BY MR. COLLYARD, PAGE 5
 3   EXAMINATION BY MR. FINGER, PAGE 64
 4
 5
 6           INDEX OF EXHIBITS
 7   NUMBER/DESCRIPTION
 8   Plaintiff's Exhibit 74 - Email Chain
     (Bates HOLT002114 - 2116), Page 57
 9
     Holt Exhibit 1 - Email Chain
10   (Bates HOLT002362 - 2364), Page 66
11   Holt Exhibit 2 - Email Chain
     (Bates HOLT002026 - 2031), Page 73
12
     Holt Exhibit 3 - Email Chain
13   (Bates HOLT002381 - 2383), Page 81
14
15   Previously Marked Exhibits Referenced:
16   Plaintiff's Exhibit 60
     (Bates S-ODLE_004110 - 4124)
17
     Plaintiff's Exhibit 67
18   (Bates J-DEAN_011185 - 11186)
19
20
21
22
23
24
25
```

Page 4

1    THE VIDEOTAPED DEPOSITION VIA ZOOM VIDEOCONFERENCE

2    OF RONALD HOLT IS TAKEN ON THIS 4TH DAY OF JANUARY,

3    2021, COMMENCING AT 9:02 A.M.

4

5              THE VIDEOGRAPHER:  Good morning.  We are

6         on the record.  Today's date is January 4, 2021, and

7         the time is 9:02 a.m. Central Time.  This is the

8         videotaped deposition of Ronald Holt in the matter

9         of Deborah J. Caruso, et al., versus Kevin Modany,

10        Case Number 18-cv-02182-JPH-TAB, filed in the United

11        States District Court, Southern District of Indiana,

12        Indianapolis Division.

13             The court reporter's name is Cara

14        Pinardi.  My name is Steven Smith, the legal

15        videographer.  We are both with Benchmark Reporting

16        Agency.

17             Would the attorneys present please

18        introduce themselves.

19             MR. COLLYARD:  Mike Collyard on behalf

20        of the Plaintiff, and with me as well is Valerie

21        Stacey and Peter Ihrig, and on the line as well is

22        Carly Kessler.

23             MR. FINGER:  My name is Kevin Finger

24        from the firm of Greenberg Traurig on behalf of the

25        Defendant, Kevin Modany.  Also on the call is Kelyn

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 5

1      Smith.

2            MS. SHANEY:  My name is Mary Jo Shaney.

3      I'm with the Rouse Frets law firm here representing

4      the witness, Ronald Holt.

5            THE VIDEOGRAPHER:  Thank you very much.

6      The court reporter will now swear in the witness,

7      and we may proceed.

8

9         (WHEREUPON, RONALD HOLT WAS DULY SWORN.)

10

11                  EXAMINATION

12    BY MR. COLLYARD:

13    Q   Good morning, Mr. Holt.

14            MR. COLLYARD:  I'm sorry.  Go ahead,

15      Mary Jo.

16            MS. SHANEY:  All right.  Thanks, Mike.

17      Mary Jo Shaney on behalf of the witness, Ronald

18      Holt.  Consistent with the protective order that's

19      in place in this case, we are asking that this

20      transcript be closed pursuant to the terms of that

21      order.

22    BY MR. COLLYARD:

23    Q   Okay.  Good morning, Mr. Holt.  Can you just please

24      state your name for the record?

25    A   Ronald L. Holt.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 6

1    Q   Just let me lay some foundation here.  I don't -- I

2        don't anticipate taking too much of your time here

3        today, but I do appreciate you spending this time

4        with us, so thank you -- thank you for doing this.

5            Mr. Holt, did you represent the Dream Center

6        Foundation in the 2016 timeframe with respect to a

7        proposed deal with ITT?

8    A   Yes, I did.

9    Q   And do you remember the proposal that the Dream

10       Center Foundation had made to do a transaction with

11       ITT?

12   A   I recall there were two types of proposals, and I do

13       have a general recollection of them, yes.

14   Q   Okay.  Let's just -- let's just start from a high

15       level on both of the types of proposals, and then

16       I'll break them down in some more detail, and we'll

17       go through a couple documents.  On the first type of

18       proposal, can you just describe generally what that

19       proposal was or what the terms of that proposal

20       were?

21   A   It involved a two step type of transaction.  Step

22       one would have been a donation by ITT of its

23       academic assets comprising its schools to a

24       subsidiary that was to be formed by DCF that would

25       run what had been the ITT school.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 7

1          Step two, which would have been entered at the

2          same closing, would have been the entry of a

3          long-term service agreement between the ITT

4          subsidiary -- I'm sorry, the DCF subsidiary and ITT,

5          and it was going to -- ITT was going to rebrand

6          itself.  I think the name was Lamplight or something

7          like that.

8          So it was a 15 year service agreement.  Various

9          activities necessary to the operation of a school

10          were going to be outsourced by the DCF subsidiary to

11          ITT under this contract.

12     Q   And when you say a services agreement, ITT would

13          remain involved in the eventual company as a

14          management services company.  Is that right?

15     A   Correct.  In fact, I think the document was called

16          an MSA, a master services agreement, and it was

17          supposed to be provided on market rates because

18          obviously DCF is a nonprofit and the DCF subsidiary

19          would be a nonprofit, so they had an obligation to

20          ensure that they were receiving fair equivalent

21          value.  So that was part of the bargaining that went

22          on in that transaction.

23     Q   As part of that, if you recall, as part of that

24          management services company that ITT was going to be

25          a part of, was ITT's management going to stay on and

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 8

1          be a part of that piece of the transaction?

2     A   Well, at this point in time I don't have a detailed

3          recollection of specifics like that, but I think

4          generally that was the expectation.  I don't think

5          there was bargaining between ITT and DCF about who

6          would be remaining in management at ITT after, you

7          know, the transaction was closed and put in place,

8          at least I don't recall that at this point in time.

9     Q   Did you have any conversations with the Department

10         of Education as to that particular concept of a

11         transaction with ITT?

12    A   I don't remember conversations in substance about

13         it.  I do recall an effort to communicate with them.

14         I believe I, you know, sent email messages and also

15         attempted to communicate by phone initially with

16         someone named Mike Frola, who I happened to know

17         pretty well by that point in time, and at some

18         point -- and this was all in the summer of 2016 --

19         at some point in time I learned, and I don't recall

20         how, but I learned that Mike Frola really wasn't the

21         guy calling the shots, so to speak, on what would or

22         wouldn't happen with ITT, and that, in fact, it had

23         been bumped up to people in the Office of General

24         Counsel, and that those individuals were Aaron Ament

25         and Dan Zibel.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 9

1              So I do remember making a phone call to them

2              trying to get their attention to consider the

3              proposal, but I don't have any recollection of any

4              substantive conversation with them, and I doubt that

5              there was much substantive conversation other than,

6              here is a concept that we're pursuing, we're

7              negotiating agreements, and we think this is a way

8              for the ITT schools to be perpetuated, saved, and

9              it's a good transaction from our point of view.

10             But, you know, beyond something like that, I

11             really don't recall what would have been said in

12             that call.

13    Q   Okay.  So and let's just call this -- let's just

14             call that first deal proposal the management

15             services proposal just so we have a frame of

16             reference.  With respect -- sticking on that same

17             management services proposal, do you have any idea

18             as to how long your involvement was with respect to

19             DCF trying to do a deal with ITT?  Was it only a

20             matter of a couple of months?

21    A   Well, so I have -- you know, in response to the

22             subpoena that you served, your office served on

23             behalf of the trustee, I personally led the effort

24             to go through our email files and our other digital

25             files to find responsive documents, and in the

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 10

1         course of doing that exercise, I ran through email

2         messages with people at DCF about this transaction

3         and when it first began to look like an idea and as

4         it progressed through the summer, and so it was a

5         big -- you know, as a consequence of that, I do have

6         a refreshed recollection that I otherwise wouldn't

7         have.  So I just kind of give you that as a

8         background.

9             To say that there was some contact by Randy

10        Barton who was -- I think his title was managing

11        director at DCF, and that was in the spring, I think

12        in April, he indicated that, you know, there -- and

13        I'm not going to get into specific conversations to

14        preserve the attorney-client privilege.  But just

15        generally that there was this potential opportunity

16        for a transaction, and at the outset that it might

17        involve, you know, the need for some financing, and

18        then I didn't hear anything for months.

19            There were some, I think some exchanges between

20        us about whether or not we would need to put some

21        special requirements in place or things like that,

22        but there wasn't anything going on for months

23        literally.  And then it was sometime in June that he

24        indicated to me that it looked like this transaction

25        might move forward.  I might be hearing from lawyers

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 11

1      representing ITT. And I couldn't tell you when that

2      was, but it was just, you know, a phone call

3      probably.

4          And then you've probably seen or someone on

5      your side has probably seen from the emails that we

6      produced that sometime in late June, I did receive a

7      draft, and I don't know which document came first.

8      There were two primary documents. So it was this

9      managed services agreement, and then secondly there

10      was a contribution agreement which was a -- in a

11      typical transaction, we would call that an asset

12      purchase agreement or an asset transfer agreement.

13      Here it was called a contribution agreement.

14          So I don't know which of those documents we got

15      first, but one of those documents was sent in late

16      June. And so that commenced my really substantive

17      involvement and more consistent involvement from

18      that point forward from late June through sometime

19      in the first week of September. But up until that

20      point in time, up until late June, there wasn't much

21      that I was doing. Just, you know, there was a phone

22      call, an email from Randy Barton saying something

23      might happen, and then it did happen by late June.

24   Q   Okay. Thank you for that. The managed services

25      agreement, where ITT would stay involved in the

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 12

1          transaction as a management services company, whose

2          idea was that?  Do you remember?

3     A    I sure don't.  I was told by somebody, whether it

4          was Randy Barton or Mike Goldstein at the Cooley law

5          firm representing ITT, one or the other, that this

6          is the concept that the parties have come up with.

7               I do recall hearing that Kevin Modany had

8          traveled to Los Angeles and had met with people at

9          the Dream Center to discuss a potential transaction.

10         So I don't know if it came up, you know, they -- the

11         parties reached that agreement in that meeting or

12         not, but by the time I was asked to look at

13         documents, somebody had already made that decision

14         that they would like to go down that path, here

15         is -- here is the approach we would like to use now.

16         You guys work it out in the documents.

17    Q    Okay.  So do you have -- do you have an

18         understanding if that was a proposal that ITT was

19         making to the Dream Center?

20    A    Yeah, I think that's the way I looked at it.  Now,

21         there was a, you know, a letter of intent that was

22         signed, and I have seen it in the course of looking

23         at materials to respond to the subpoena.  I don't

24         remember the exact date of it.  It seems to me it

25         was sometime in May of 2016, and I couldn't tell you

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 13

1          who drafted it.  I know I didn't draft it.  But,

2          yeah, I think that perhaps it was an ITT proposal,

3          but I'm not 100 percent sure of that.

4     Q   Okay.

5     A   And honestly that would be conjecture on my part to

6          tell you whose proposal it was.

7     Q   Okay.  Now, at some point in time did this concept

8          of the transaction that involved the managed

9          services agreement, did that get sent to the

10         Department of Education for approval?

11    A   I think it did, but I haven't, you know, found in

12         the course of looking at my saved emails and email

13         doing that, and I think that perhaps somebody at

14         Cooley did.  And this is, you know, I know it has

15         only been four or going on five years, so it seems

16         like it ought to be something I should be able to

17         recall, but I don't recall an exact email message or

18         phone call in which we said to the Department, will

19         you approve this approach?

20              I do think there was a phone call where I

21         finally made contact with these two guys, Zibel and

22         Ament, and tried to brief them on what we thought

23         was a good approach, namely this concept of the

24         donation and the service agreement, but I haven't

25         been able to find the, you know, something in

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 14

1    writing like a letter or an email that went to them

2    saying, here is the approach.

3        Because we were negotiating the documents, and

4    what counsel and I believe the parties thought was

5    best was to come up with drafts of these agreements

6    that we thought were close to final before we

7    presented a formal communication to the Department

8    of Education saying, here is a transaction that we

9    think you guys ought to approve, and it was sometime

10   in late August when we thought we were closing in on

11   having final drafts of these two documents.  There

12   were a couple of ancillary documents as well.  There

13   was a license agreement and something else, a

14   guaranty.

15       So I think that what happened was around the

16   time we were going to make that submission, the

17   formal submission, is when the Department issued

18   this what I call a sanction letter on August -- or

19   late August, August 25th, somewhere around there.

20   But I don't remember any specific communication that

21   I wrote about that saying, here is the two step

22   transaction, we would like you guys to approve it,

23   and I couldn't find one when I looked through, you

24   know, the emails that were part of what we produced

25   to you.  So I'm not sure if it ever happened.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 15

1    Q    And so you mentioned the sanction letter on

2         August 25th.  On August 25th, what you're

3         referring to there is when the Department of

4         Education increased ITT's surety on August 25 of

5         2016 to approximately $247 million.  Is that right?

6    A    Correct.

7    Q    And it was right after that date that a different

8         type of transaction or a different type of a concept

9         of a transaction began.  Is that right?

10   A    We on our side, the DCF side, started talking about

11        the possibility of some other way to salvage the

12        transaction.  DCF saw this as an opportunity from

13        the DCF side to expand the mission that they had for

14        their organization.  They were involved through

15        their main physical facility in LA and affiliates

16        around the country, they were involved in reaching

17        people that have been in tough spots in life and

18        trying to turn their lives around through

19        residential counseling programs, and a lot of these

20        people that literally come off the streets need job

21        training.  And so DCF had already been trying to

22        expand into postsecondary education, and they had an

23        affiliation with a college out on the West Coast,

24        but they were interested in trying to acquire and

25        operate a college of their own.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 16

1          So this was sort of like, no pun intended, like

2      a dream opportunity when this was presented to them

3      and how it got presented, and I don't know who

4      connected ITT to DCF back in the spring of 2016.  So

5      when, you know, this initial idea, the donation plus

6      the service agreement seemed to be rejected by the

7      Department, you know, with that letter coming out

8      with the demand for the very high letter of credit,

9      there was discussion on the DCF side, well, is there

10     some other way to still make this happen, you know,

11     to make it possible for DCF to acquire these

12     schools.

13          And, yeah, there were discussions, and

14     ultimately DCF made a different proposal to ITT.  So

15     I think the letter was interpreted by DCF, and I

16     can't speak for ITT, but it was interpreted as a

17     rejection of the initial proposal.

18  Q   And so after ITT received the surety increase on

19     August 25, DCF then made a proposal to acquire ITT.

20     Is that right?

21  A   They did.  It didn't happen until almost a week

22     later on September the 2nd, because it took time to

23     pull together the components of that proposal, and

24     it involved financing, and DCF had to get that

25     arranged as well.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 17

1    Q   And do you remember that DCF made an actual proposal

2        or a concept of a proposal to ITT, and Kevin Modany

3        rejected it?

4    A   I remember that after I extended that proposal in an

5        email message, it was rejected with an invitation to

6        negotiate further.  So, yes, it was rejected but not

7        like flat out, there is no way anything like this

8        could work, but it was basically, we have some

9        things that we need to address that your proposal

10       doesn't address, namely a term loan, and, you know,

11       we would be open to further negotiation.

12   Q   And can you just describe generally what you

13       remember the initial proposal that you made?

14   A   Yeah.  So although the proposal doesn't state this,

15       it references that DCF had financing, and I believe

16       there was something in a document that was updated

17       by counsel for ITT, the Cooley law firm.

18       Institutions have on file with the US Department of

19       Education something called an electronic

20       application.  So the E App or electronic application

21       for ITT was updated to reflect one aspect of this

22       proposal in Q 69, question 69, and it referred to

23       DCF getting financing from a company called Najafi

24       Companies based in Phoenix.

25           The proposal that I sent to Kevin Modany didn't

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 18

1          mention Najafi, but it mentioned the financing, and

2          it was the same thing.  So with the financing, what

3          DCF was proposing was that a DCF subsidiary would

4          purchase all of the assets that ITT had that it used

5          to operate its schools and would accept certain

6          liabilities, namely those associated with enrollment

7          contracts and other service contracts that the

8          school had but would not accept any fixed debt and

9          in exchange for that would pay 150 percent of the

10         then market value of ITT's stock, what it was

11         trading at.

12             So it was somewhere in the neighborhood of 14

13         to $15 million based on the stock price which had

14         been trending downward in the summer of 2016.  And,

15         of course, it was subject like all proposals are to

16         certain conditions and most particularly to approval

17         by the US Department of Ed and other regulators.

18    Q   Okay.  Let's -- maybe this will be helpful.  Let's

19         go to -- I'll call it Tab 143.  It's an email that

20         you're on dated August 26th of 2016, and it's ending

21         in Bates number on the first page 1185.

22    A   Okay.  That's a John Dean email on the first page?

23    Q   That's right.

24    A   Okay.  I've got it.

25    Q   All right.  Mr. Holt, I'm showing you what's been

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 19

1           marked as Plaintiff's Exhibit 67.  It's an email

2           exchange that you're on.  And if we just go to the

3           middle of the page there, you see there is an email

4           from you to Kevin Modany and others dated August 26

5           of 2016.  Do you see that?

6     A   Correct.

7     Q   Do you recall this email, Mr. Holt?

8     A   Well, I see the date is August 26, and so I don't

9           recall it being sent that early.  The one I recall

10          was in September, like a week later, but, yeah, this

11          is I think perhaps the early general concept.  So I

12          do recall it now.  The general concept was proposed

13          at that point in time, you know, right after the

14          sanction letter that we decided we would like to be

15          able to just come in with this plan and buy the

16          company, but we'll need time to put together the

17          terms.

18    Q   Right.  So this -- just to give this context, this

19          email that you're sending to Kevin Modany is dated

20          one day after the Department of Education increased

21          ITT's surety to $247 million.  Is that right?

22    A   Correct.

23    Q   Okay.  And you write and you say "Hi Kevin & ITT

24          Team:  DCF is proposing to acquire ITT with

25          financing to be provided by the Najafi Companies."

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 20

1          Do you see that?

2     A   Yes.

3     Q   And then down in that second paragraph you say "The

4          terms likely will need to include interim

5          involvement by DCF (Tom Snyder and perhaps others)

6          in management of ITT prior to closing, as the only

7          way this can work is if US Department of Education

8          will rescind the action it took yesterday, including

9          the increased letter of credit demand, and allow ITT

10         to enroll students at its next class starts in the

11         near term."  Do you see that?

12    A   Yes.

13    Q   Now, now let me just ask you -- I'll direct your

14         attention down to another sentence, and I'll come

15         back to this, and we'll unpack it.  But you say then

16         to the -- I think it's the third or second to last

17         sentence you say "We recognize this is a very big

18         ask, but we think it is possible with a proposal

19         that includes interim oversight measures and perhaps

20         some divine intervention as well."  Do you see that?

21    A   Yes.

22    Q   So let's just -- if you can just tell me just what

23         are you proposing here?

24    A   So this is something that we kicked around on our

25         side, the DCF side, after seeing that letter, the

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 21

1        sanction letter, the August 25th letter.  And just

2        based on the experience I had by that point in time

3        with the Department, the US Department of Education

4        and other people that were involved on our side, we

5        felt like it was going to be a tall order to get the

6        US Department of Education to reverse its position.

7            They had taken a very deliberative action in

8        that letter, and it had been made public, too, and

9        we felt like it obviously signified a great deal of

10       concern on their part about the company, the risk

11       that it posed to the Federal Student Aid programs.

12       That's usually what's involved in a letter of credit

13       demand, especially a very substantial one, and

14       implicitly a concern about management.  So it wasn't

15       like someone told me or told us, you know, if you

16       want any shot at your proposal working, you better

17       suggest all these other things.  It was just a

18       judgment we came to that we felt like we needed to

19       tell ITT they needed to be open to this, to interim

20       oversight measures.

21           We felt like to the extent that the Department

22       had doubts about the existing management, perhaps we

23       could overcome those doubts by offering something

24       like a monitor to step in right away and oversee

25       existing management and/or offer the possibility of

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 22

1            changes to existing management if the Department

2            insisted on it, and there was no telling that even

3            that would change that decision they had made, but

4            the idea was maybe it would.  So that's what we were

5            suggesting there.

6       Q   You said that the surety increase, the Department of

7            Education surety increase of $247 million implicitly

8            showed doubts about ITT's management.  What did

9            you -- what did you mean by that?

10      A   Well, it starts first with a judgment that there is

11           greater risk to the Title IV programs.  That's what

12           a letter of credit is designed to address.  It's a

13           security measure.  And for the Department to

14           increase the amount of the letter of credit in a

15           context like that is to say that we think we're

16           exposed to greater risk.

17               In this case I think that letter without having

18           it in front of me ties it back to the ACICS show

19           cause order and actions of other companies like -- I

20           mean other regulators.  The CFPB had a lawsuit that

21           they were pursuing against ITT, and I think the SEC

22           had a lawsuit against the management.

23               So when you have a regulator like the US

24           Department of Ed saying, we're worried about risk at

25           this company, risk to Title IV, that suggests that

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 23

1        whatever the reason for the risk is, the existing

2        management hasn't been able to manage the risk in a

3        way that gives the regulator some peace of mind,

4        some confidence that their risk is not too great.

5            And so part of risk management, of course, is

6        offering risk management measures, and the

7        Department came up with its own set of risk

8        management measures which were from our point of

9        view and certainly ITT's is very draconian.  So we

10       were on the other side of this possible deal, we

11       were saying, well, what are some other risk

12       management measures that could be offered that maybe

13       would persuade the Department to take away these

14       draconian measures especially in the context of a

15       new proposed buyer like us coming in.

16           So that's what I meant was just that although

17       we didn't have anyone from the Department telling

18       us, you know, we don't trust these people, you kind

19       of could read that between the lines if you wanted

20       to when they increased the amount of the letter of

21       credit so dramatically.

22    Q   You were using your judgment and your experience in

23       coming up with this type of concept for this type of

24       proposal.  Is that right?

25    A   Correct.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 24

1    Q  And what was your experience with respect to the

2         Department of Education in August of 2016?

3    A  Well, I had worked on transactions at that point in

4         time for around 15 years, worked in the higher ed

5         space for I guess around 20, close to 25 years.  I

6         started working in the space in late 1992.  I have

7         been practicing law since '81 initially in business

8         litigation and got involved in the higher ed space

9         in late '92 with litigation against the Department

10       on behalf of a group of private colleges challenging

11       what was then a new regulation dealing with student

12       loan default rates, and from that time forward

13       started concentrating more and more on my practice

14       in higher education.

15           So by 2016, I had worked on multiple

16       transactions and had also been involved in, you

17       know, litigation from time to time with the

18       Department over various actions they had taken

19       against schools.

20    Q  Okay.  Let's go back to Plaintiff's Exhibit 67.  I

21       do just want to unpack this a little bit, Mr. Holt.

22       I apologize, some of it is going to get a little bit

23       redundant, but I do want to get some of the details

24       here before we move into our next document.  Where

25       you say "The terms likely will need to include

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 25

1          interim involvement by DCF (Tom Snyder and perhaps

2          others)," who is Tom Snyder?

3     A   Tom Snyder was not anyone employed at that time by

4          DCF, because, as I mentioned in an earlier answer,

5          DCF did not own and operate at that point in time an

6          institution of higher education, but there was a

7          proposed contract that we, we on the DCF side had

8          with Mr. Snyder.

9               He had been the CEO of the very large community

10         college chain in Indiana called Ivy Tech and had

11         recently left Ivy Tech and was looking for an

12         opportunity to get involved in another higher

13         education setting and was very intrigued by this

14         possibility of the ITT schools becoming part of a

15         faith-based system, so he had somewhere along the

16         way been recruited by people on the DCF side.  I

17         can't tell you for sure when.  I don't remember

18         exactly when.

19              But I recall his name coming up sometime in the

20         summer of 2016, maybe in July, hearing about him

21         from Randy Barton, and then he more or less became

22         part of the DCF team somewhere along the way and

23         started contributing to the analysis of the

24         documents that we were negotiating for that first

25         steel structure that we talked about.  So that was

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 26

1        his background.

2              And it was envisioned that he, along with a

3        team that he would assemble, would run the new ITT

4        rebranded as -- there was a name that DCF had for

5        it, the Institute of something.  But he was going to

6        be the CEO and run it with other individuals he

7        would choose to engage.  He would run that

8        subsidiary.

9    Q   Why did -- why did DCF believe it was important to

10       include interim involvement by DCF in management of

11       ITT prior to closing the transaction?

12             MR. FINGER:  Objection to foundation.

13             THE WITNESS:  Well, you know, without

14       getting into detailed conversations again and to

15       preserve the attorney-client privilege, what I can

16       share at a high level is simply that judgment I

17       referred to earlier that we felt that if we made

18       that proposal and if ITT joined us in that proposal

19       and made it to the Department, it might be another

20       way to persuade them to change the action they had

21       taken in that August 25, 2016 letter.

22             I think that Tom was also interested and

23       beginning to learn the system internally.  He had

24       looked at it from the outside and had begun to do

25       some due diligence, but this would give him a chance

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 27

1        to be working on the inside.  And it's not uncommon

2        in an M&A transaction after you've signed an

3        agreement to have the buyer send some of their

4        personnel on-site to begin to work in a transition

5        process.  So there was that, you know, factor as

6        well involved.

7                But I think the primary thing was, you

8        know, this is a way to demonstrate to the Department

9        that we're going to have some of the DCF people

10       on-site working alongside the ITT management.

11   BY MR. COLLYARD:

12   Q   And was there a belief that doing that prior to the

13       closing of the transaction would encourage the US

14       Department of Education to rescind the letter of

15       credit?

16   A   I don't think that that factor alone was viewed as

17       being capable of accomplishing that goal.  I think

18       it was, you know, everything that's mentioned here

19       in the email message.  And again that's just the

20       perception and judgment that we on the DCF side had

21       as we looked at the August 25th letter and knew

22       what the Department had done to other large school

23       systems like Corinthian in the recent past and some

24       of my own personal experiences with other clients.

25               We just felt like that if there was a chance to

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 28

1          get them to change their mind, it was going to be a

2          package of things that would demonstrate that the

3          risk that they thought existed could be managed,

4          could be managed without these draconian conditions.

5          So it wouldn't have been just Tom Snyder coming in.

6          It would have been some of these other things, too,

7          as well.

8     Q    And when you're saying here in this concept or this

9          proposal of "will need to include interim

10         involvement by DCF in management of ITT prior to

11         closing," are you suggesting that ITT's management,

12         Kevin Modany, would no longer be involved in the

13         company prior to closing?

14    A    I don't know that we had come to that conclusion.

15         I -- I don't think we on our side had ever taken the

16         position that our deal required him to step down.  I

17         don't remember that ever being a decision made on

18         the DCF side.  I do recall us expressing this

19         general concept, and then I think there is another

20         email from me that where we suggested that there

21         should be a willingness on the part of ITT

22         management to be -- to express to the Department

23         that they would be open to change if the Department

24         wanted change, something like that, but I don't

25         think we ever took the position that Kevin Modany

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 29

1          had to step down or we weren't going to do a deal

2          with them.

3     Q   Let's go to I'll call it Tab 169 for your reference.

4          It's Plaintiff's Exhibit 60, and it's a string of

5          emails, Mr. Holt.  The first page is Bates ending in

6          4110.

7     A   Okay.  I have that.

8     Q   I'm showing you Plaintiff's Exhibit 60, and it's an

9          email string that you are on with the first in time

10         email, if you turn to the back there, you'll see

11         it's from you to Jay Vaughan and others dated

12         August 29 of 2016.  Just let me know when you're

13         there, Mr. Holt.

14    A   Yeah, I've got it.

15    Q   Okay.  If we take a look at this email from you to

16         Jay Vaughan and Michael Goldstein, you say "Jay &

17         Mike, we think the narrative in Q 69 needs to be

18         updated with some statements to the following

19         effect."  Q 69, is that that question 69 that you

20         were talking about earlier?

21    A   Yes.

22    Q   And then you say under number one "DCF plans to

23         acquire (whether by a stock purchase or an asset

24         acquisition) all components of the institution - to

25         eliminate any possible perception that the existing

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 30

1          company, ITT, will retain certain assets and be

2          involved in a service relationship with DCF."  Do

3          you see that?

4     A   Correct.

5     Q   And why were -- why were you proposing that?

6     A   Well, we interpreted the August 25 letter to be a

7          rejection of that prior deal structure, and in

8          particular a rejection of the continuing involvement

9          of ITT with the schools after they had been

10         transferred to a DCF subsidiary.  So it was our

11         belief that that part of the proposal made it

12         unacceptable to the Department.  So that's why we

13         said we want to make it very clear with this new

14         proposal that ITT is not going to be retaining any

15         assets and is not going to be involved in a service

16         relationship just like the parenthetical there says.

17    Q   And if you look at the parenthetical where you say

18         "I think US Department of Education's action last

19         Thursday, without any warning from it or any

20         favorable response in principle to the concept of

21         splitting ITT into two companies, effectively was a

22         rejection of the idea of current ITT management

23         remaining involved in any way with the institution's

24         operations going forward," that's a reference to

25         ITT's management.  Is that right?

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 31

1    A   Correct.

2    Q   And that would include Kevin Modany?

3    A   Correct.

4    Q   And so are you trying to make it clear here in this

5        proposed term that Kevin Modany would not be

6        involved in the institution going forward?

7    A   Well, certainly after the transaction closed, that's

8        right.  And so -- and the point was this proposal

9        that we have now, meaning back then in late August

10       of 2016, should be more attractive to the Department

11       because unlike the prior proposal, this proposal

12       results in the existing senior level management no

13       longer being involved.  That was the point of that

14       statement in the parenthetical, and that was our

15       perception on the DCF side, this should be a more

16       attractive proposal.  Certainly after the closing

17       that would be true if the transaction had closed.

18   Q   If you jump down to your third term there you say

19       "Subject to US Department of Education granting

20       relief from restrictive measures announced on August

21       25, as part of the transaction, ITT and DCF are in

22       agreement that the following actions will be taken

23       during the period leading up to a closing on the DCF

24       transaction."  Do you see that?

25   A   Yes.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 32

1    Q   And what you mean there is these actions will be
2        taken before the deal is closed; is that right, or
3        prior to closing?
4    A   Correct.
5    Q   And you say in the first one "ITT will accept
6        changes in its management team and DCF executives
7        will become involved in ITT management under a
8        management consulting agreement, acceptable to the
9        US Department of Education, ACICS and state
10       licensing agencies."  Do you see that?
11   A   Yes.
12   Q   And as part of that ITT accepting changes in
13       management, what you're suggesting there is that
14       ITT's management would no longer be involved,
15       correct?
16   A   Well, not necessarily.  Although, that would be one
17       possible way in which ITT would accept management
18       changes.  In the past, meaning prior to that point
19       in time, we, my firm and I, had done transactions
20       where an institution that was about to be acquired
21       was struggling in some way, and the prospective
22       buyer would enter into a management agreement with
23       the seller to provide consulting and/or management
24       services to help stabilize the operations of the
25       seller in some way, and that didn't mean displace or

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 33

1        supplant the existing management, but rather to come

2        alongside and help to stabilize something that

3        wasn't working quite so well, whether it was

4        marketing or whether it was internal management of

5        expenses, things like that.

6             So management agreements have been used in this

7        context in the higher education space, and the key

8        thing is that you have to make sure that the way

9        they are structured, they aren't perceived by the

10       regulators as transferring control of the

11       institution from its existing ownership and

12       management to the prospective buyer because a

13       pre-closing transfer of control without approval

14       would result in the forfeiture of all of the

15       regulatory approvals held by the institution.

16            So we wouldn't have necessarily proposed what

17       you suggested in your question.  A transfer of, you

18       know, control from the existing management to DCF

19       management would have been a real big ask for the

20       regulators, especially pre-closing.  You know, we

21       were really looking at I think, you know, being able

22       to come alongside and start to get involved with the

23       existing ITT team.

24    Q   And you thought that if the terms were clear that

25       the DCF management team would be able to get

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 34

1          involved before closing into the ITT company or

2          ITT's management that that would be helpful in

3          having the Department of Education approve the

4          transaction.  Is that right?

5     A   Yes, again, just based on judgment about past

6          dealings with the Department and what might be

7          persuasive in getting them to change this decision

8          they had made.

9     Q   And if we stick on term number three here, part (b),

10         it reads "ITT/DCF will remain bound by US Department

11         of Education's prohibitions against any changes in

12         compensation for ITT employees and any dividends or

13         distributions being made."  Can you explain what is

14         meant by that term?

15    A   Yes.  I believe there may have been some dispute

16         about this.  I believe I was under the impression

17         that there were prohibitions in place from the

18         Department in a prior letter against ITT changing

19         the compensation of senior management and making

20         dividends or distributions, and I was referring to

21         that.  And I seem to recall seeing an email where

22         there not only was some pushback from Kevin Modany

23         and ITT to the idea of this but also my statement

24         that there were existing prohibitions, but I thought

25         there were.  And so the idea was that to again try

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 35

1          to earn trust and gain confidence from the

2          Department will -- you know, ITT will agree to keep

3          these what I thought were existing prohibitions in

4          place.

5     Q   And when you said these prohibitions against senior

6          management, you meant prohibitions against bonuses

7          and additional compensation for Kevin Modany.  Is

8          that right?

9     A   Correct.  Certainly Kevin Modany was part of senior

10         management.

11    Q   If you look at term three (c), it reads "ITT/DCF

12         will accept (and bear the expense of) the

13         appointment of a monitor, acceptable to US

14         Department of Education, to oversee management of

15         the company prior to the DCF closing."  Do you see

16         that?

17    A   Yes.

18    Q   Can you explain what the purpose of a monitor is and

19         why you believed it was important to include this

20         term that a monitor would oversee management of the

21         company prior to the closing?

22    A   Yes.  It's a concept that's been used a lot I

23         believe in other settings with companies that are

24         subject to regulation and find themselves in

25         conflict with agencies that are overseeing them, and

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 36

1          certainly that's happened with the US Department of

2          Education, including at that point in time EDMC,

3          Education Management Corporation.  I think people in

4          the higher ed space were aware that it had entered

5          into an agreement with 39 states' Attorneys General

6          to require a monitor as part of a settlement that

7          would oversee certain aspects of EDMC's operation,

8          particularly marketing.

9               So the idea here was to provide a level of

10         trust to the Department confidence about how the

11         company would be operated pre-closing, because

12         pre-closing here can involve probably four to six

13         months.  So if the Department was willing to accept

14         a proposal that DCF was making to acquire the assets

15         with the financing provided by the Najafi Companies

16         but we needed this interim period where they would

17         roll back these what I call draconian measures that

18         frankly ITT didn't seem to be in a position to meet,

19         you know, taking that letter of credit up to almost

20         250 million and other things, if they were willing

21         to do that but they wanted something else in place

22         of it, this would be part of that something else.

23              They would have an outside monitor, a company

24         that is capable of providing oversight during that

25         interim period while the parties are getting the

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 37

1        approvals they need to close the transaction so that

2        the Department can have confidence about how the

3        school was being operated.  We'll have this monitor

4        out there reviewing the company on whatever

5        frequency you want whether it's weekly or monthly.

6        So that was the concept.

7            And again that was our judgment on the DCF side

8        about a measure that we knew had been used in other

9        settings that we thought might be persuasive to the

10       Department.

11   Q   So the concept of having a monitor in place to

12       oversee management prior to closing wasn't some

13       unusual concept, right?

14   A   Well, it is frankly in general.  I mean, when deals

15       are done in general in this space -- you know, when

16       a healthy, fairly successful school is being sold to

17       another well-regarded buyer with, you know, a sound

18       financial position and substantial management, you

19       usually don't have that sort of a measure being

20       imposed.  So it is unusual and something out of the

21       ordinary to be sure but not unusual in the sense of

22       being a remedy for an institution that is in a

23       difficult position financially and otherwise, and

24       certainly ITT at this point in time was in a

25       difficult position.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 38

1    Q   Thank you for that clarification.  And DCF believed

2        that this term of including a monitor to oversee

3        management of the company prior to the closing again

4        would have been something that would help get the

5        transaction approved by the Department of Education?

6    A   Yes.  We thought adding the proposal for a monitor

7        along with these other terms had the possibility of

8        persuading the Department to change its mind and

9        reverse its conditions.

10   Q   Mr. Holt, for all these terms that we just talked

11       about with respect to part three for (a), (b) and

12       (c), is it your understanding that Kevin Modany

13       rejected those terms?

14   A   Yes.  I believe he ultimately did reject those.

15   Q   Let's -- if we just take a look, that is actually in

16       this email string, and we'll get to this, but let's

17       just look at the next email that you send on August

18       29th.  It's on page Bates ending 4121.  It's at 4:26

19       p.m.  Do you see that, Mr. Holt?

20   A   Yes.

21   Q   And you write to Jay Vaughan and Michael Goldstein

22       again and you say "One other thing, I think item 3,

23       in talking about relief from restrictions, also

24       should state that ITT will not be required to make

25       any increases to the existing letter of credit on

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 39

1        file with the Department."  What did you mean by

2        that?

3    A   I think that I wasn't referring to the idea of an

4        increased letter of credit that met the demands of

5        the August 25 LC but rather the LC that had been

6        posted by ITT earlier in the summer.  I don't recall

7        the date when they posted it, but the Department of

8        Education had made a demand on ITT back in June I

9        believe to increase their letter of credit from

10       around 72 million up to around 92 or 100 million.

11       So that letter of credit, the one that had been

12       posted by ITT in response to that prior demand, that

13       was my reference there was that ITT should not have

14       to increase that existing letter of credit.  That

15       would be part of this proposal.

16   Q   Okay.  And then up above again you send another

17       email on August 29th at 5:50 p.m.  Do you see that?

18   A   Yes.

19   Q   And you sent this email to Jay Vaughan, Michael

20       Goldstein, and then this time you copied Kevin

21       Modany and Rocco Tarasi.  Do you see that?

22   A   Yes.

23   Q   And you say "Jay & Mike:  Based on what we

24       understand is an imminent deadline by which ITT will

25       have to start wind down efforts, we believe the E

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 40

1          App should be filed yet tonight."  Do you see that?

2     A   Yes.

3     Q   And why did you believe that there was an imminent

4          deadline by which ITT will have to start wind down

5          efforts?

6     A   Well, I don't personally recall what that was, and I

7          certainly didn't personally have the knowledge to

8          reach a judgment about that.  But, you know,

9          obviously that statement reflects a conclusion about

10         the amount of cash the company had on hand at that

11         point in time and how long they could operate.  I

12         recall that the letter sent on August 25, which at

13         this point in time now is about, what, four days

14         earlier, had the effect of immediately turning off

15         the TAP, the federal TAP.

16              When a school is transferred to HCM2 funding,

17         you don't get any more money until you operate for a

18         30 day period, teach your students that are in

19         school, advance disbursements out of your own money

20         for those that earn disbursements and then complete

21         the 30 day period, put together an onerous package

22         of documentation, create a spreadsheet, send it into

23         a payment analyst at the Department and wait

24         sometimes as much as 60 days.  So you have like a 90

25         day float on your money, which becomes very

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 41

1          crippling for a lot of schools and deadly for many.

2              So they weren't getting any more federal money

3          by this point in time.  They also had been

4          instructed to cease enrolling new students.  That

5          was a conclusion that someone on the DCF side had

6          made that there was an imminent deadline by which

7          ITT would have to start wind down efforts, and I

8          think people on the DCF side had felt like the

9          chance for the DCF proposal to work required urgent

10         action, that we needed to get this proposal in front

11         of the Department immediately, and we needed to get

12         the onerous restrictions removed as soon as possible

13         and get the DCF proposal, if it were to be accepted,

14         accepted as soon as possible.  So I think that's why

15         that sentence is written the way it is.

16    Q    Then Mr. Modany responds to you later that night.

17         Do you see that?

18    A    Is that up higher on the page?

19    Q    Yeah, just go to the next email, please.  If you

20         look there is an email from Kevin Modany to you on

21         the page with Bates ending 4120.

22    A    Okay.  I've got it.

23    Q    Mr. Modany writes to you and says "Ron, We have

24         material issues with the suggested changes."  Do you

25         see that?

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 42

1    A   Yes.

2    Q   And what Mr. Modany is referring to are the terms

3        that you had proposed.  Is that right?

4    A   It appears to be the case, yes.

5    Q   And then you write Mr. Modany back, if you look up

6        to the next email, it's the email at the very top of

7        Bates ending in 4120 at 6:37 p.m. on August 29 of

8        2016.  Do you see that?

9    A   Yes.

10   Q   And you say "Kevin, we will await your proposed

11       changes but we hope you and ITT will agree in

12       principle with the concepts set out in my draft of

13       proposed new narrative for Question 69 on the E

14       Apps."  Do you see that?

15   A   Yes.

16   Q   You say "We believe some version of what I have

17       outlined is going to be needed to get ED to roll

18       back the ED measures announced last Thursday that

19       threaten the ability of ITT to operate much longer

20       without relief."  Do you see that?

21   A   Yes.

22   Q   And again why did you believe that some version of

23       what you had proposed or outlined was needed to get

24       the Department of Education to roll back the

25       measures that it announced with respect to its

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 43

1              August 25 surety increase?

2       A   Well, you know, I hate to be redundant, but that

3              action taken by the Department on August 25, I've

4              got to believe and did believe at that time wasn't

5              taken lightly.  It was a very dramatic action from

6              anybody that viewed it.  People that were

7              knowledgeable and servers in the industry regarded

8              it as a truly unusual reaction by the Department to

9              the circumstances that they read about in the press

10            that existed at ITT.

11                  And, you know, it was apparent that the

12            Department had given some considerable amount of

13            thought to issues that it believed that existed,

14            problems that existed at ITT, and decided that this

15            was the correct response for the federal government

16            to make with respect to the federal government's

17            interest in federal student aid.  So if you think

18            you're going to get the gatekeeper to change their

19            mind after they've put together this type of a

20            letter and this set of measures, you better come up

21            with something that's pretty compelling on the risk

22            management side, because from my perspective, and

23            again just based on judgment from experience, these

24            measures are all about risk management.

25                  And the Department would tell you that if you

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 44

1          sat down and talked with them that a letter of

2          credit is a risk management measure, that HCM2

3          funding is a risk management measure.  Temporary

4          interruption of enrollment of students is also from

5          their point of view a risk management measure,

6          because if you don't enroll students, then students

7          aren't -- additional students aren't going to be

8          certified for and won't receive federal student aid.

9          So those were all risk management measures.

10               So that's why we again wrote, and I wrote on

11          behalf of the DCF side we think some version of my

12          proposals are necessary to try to get ED to change

13          its mind and roll back these measures.

14     Q   And you believe that the terms that you had proposed

15          gave the Dream Center Foundation and ITT the best

16          chance of getting the transaction approved by the

17          Department of Education.  Is that right?

18     A   You know, I think the reality is we all knew it was

19          a long shot at that point in time, but we felt like

20          if we had any prospect of getting it done, we needed

21          to have some risk management measures in the

22          proposal, interim risk management measures.  So,

23          yes, we on the DCF side felt like our chances would

24          be better if we had risk management measures for the

25          interim period.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 45

1   Q   And when you say "Kevin, we hope you and ITT will
2       agree in principle with the concepts set out in my
3       draft of proposed new narrative for Question 69,"
4       Mr. Modany did not agree in principle with the
5       concepts that you had set out, correct?
6   A   That's correct.  I think that's his next email
7       response.
8   Q   Mr. Modany, if you'll look on Bates ending in 4119,
9       Mr. Modany does indeed respond to you at 5:47 p.m.,
10      correct?
11  A   Correct.
12  Q   And he says, Mr. Modany says, "Ron, Essentially, DCF
13      can agree to whatever they want post acquisition but
14      ITT isn't agreeing to do anything that was suggested
15      in your summary."  And then he, he lists some -- he
16      lists the things that were suggested in your
17      summary, right?
18  A   Correct.
19  Q   And he lists out "change management."  Do you see
20      that?
21  A   Yes.
22  Q   And he lists "give ED authority over our
23      compensation."  Do you see that?
24  A   Yes.
25  Q   And he lists "accept a monitor," and then he says

Page 46

1         "etc, etc, etc."  Do you see that?

2    A   Yes.

3    Q   So Mr. Modany is telling you that he's not going to

4         agree to anything that you proposed, right?

5    A   That is correct, at least those three terms.  I

6         think the other terms -- there were a couple of

7         other terms that were in my proposal that he didn't

8         seem to push back on, the E and F, but I forget what

9         those were.

10   Q   And then Mr. Modany says down below, he says, "Of

11        course you can do all of these things and you can

12        commit to doing all of them as the new owners of the

13        company post transaction."  Do you see that?

14   A   Yes.

15   Q   And then down below that he says "The issue is that

16        ITT isn't going to do these things pre acquisition,

17        DCF can do them post acquisition."

18   A   Yes.

19   Q   You had an understanding that what Mr. Modany is

20        telling you is he's not agreeing to any terms

21        pre-acquisition?

22   A   Yes.  He was communicating that ITT was not willing

23        to express a willingness to accept these interim

24        risk management measure proposals, aren't willing --

25   Q   I'm sorry, Ron.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 47

1    A   They weren't willing to join us in making those
2        proposals to the Department.
3    Q   And in particular he was not going to accept any
4        proposal that changed him as management.  Is that
5        right?
6    A   Well, I think that's implicit in the idea that they
7        weren't willing to accept the change in management,
8        correct.
9    Q   Then if you take a look, you respond to him at 7:02
10       that same night.  Do you see that?
11   A   Yes.
12   Q   You write him and you say "We have communicated what
13       we think should be in that application.  You have
14       indicated you do not agree with much of what we have
15       proposed."  Do you see that?
16   A   Yes.
17   Q   And you say "So, in order to move forward, I think
18       you and the ITT team need to draft what kind of
19       update language you believe to be appropriate and
20       send that to us for our review prior to the Cooley
21       firm filing the updates.  I have been told twice by
22       Zibel and Ament that no meeting/discussion will
23       occur without updated E Apps, so time is of the
24       essence on this."  Do you see that?
25   A   Yes.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 48

1    Q   And then you say "I suppose we can defer until later

2        what kind of interim changes, if any, might be

3        acceptable to ITT and its board."  Do you see that?

4    A   Yes.

5    Q   And just what were you suggesting there, Mr. Holt?

6    A   Well, I wanted to get something on file, the E App

7        update, to reflect the broad proposal that DCF was

8        making to acquire the assets of ITT with the Najafi

9        financing and at least take that step and perhaps

10       come back later after further discussion and make

11       some proposal about interim risk management

12       measures.

13   Q   Were you also trying to get a meeting at this point

14       with the Department of Education and ITT?

15   A   We were hopeful that would happen, yes.  We were

16       told that if we got the E App updates on file, then

17       there might be a communication meeting by phone or

18       otherwise with them, correct.

19   Q   And in this email what you meant by "We have

20       communicated what we think should be in the best" --

21       or "should be in that application," you're telling

22       Mr. Modany that DCF has told you how we think the

23       best way to get ED to approve the transactions,

24       right?

25   A   Again that was our judgment, my personal judgment,

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 49

1        along with other people on the DCF side of what we

2        thought might reverse that onerous decision made by

3        the Department, correct.

4    Q   In the last sentence of that email that we were just

5        talking about you say "And, perhaps independent of

6        the DCF/Najafi proposal, ITT has other plans it

7        wishes to pursue for addressing the DOE measures in

8        the short term and in continuing to operate its

9        institutions in the long term as for-profit

10       institutions; and, if that is the case, just let us

11       know, and we at DCF/Najafi can move on."  Do you see

12       that?

13   A   Yes.

14   Q   And what are you suggesting there?

15   A   Well, I think in part that was an attempt to be

16       polite in responding to the rejection of our risk

17       management interim measure proposal and perhaps to

18       read between the lines, like, well, maybe you guys

19       have something else in mind, you have some other

20       ideas or proposals for saving the company and they

21       don't involve us, and that's fine, just tell us, and

22       we won't waste any more time holding discussions

23       with you.  So that's what that sentence was

24       attempting to convey.

25   Q   And do you have an understanding, Mr. Holt, that

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 50

```
 1              what Kevin Modany and ITT did was take out any of

 2              the pre-closing terms and turn them into

 3              post-closing terms?

 4        A     Well, if you're talking about the proposal that

 5              originally I sent suggesting that there should be

 6              pre-closing interim risk management measures, yes,

 7              they essentially took those and said we're not

 8              accepting those as pre-closing measures.  If you

 9              want those, you can propose them to the Department

10              as post-closing risk management measures.  And, in

11              fact, we did do some version of that.  I don't

12              recall exactly what it read like, but we did suggest

13              I think a monitor so that they could track how well

14              DCF was operating in its first year, something like

15              that.

16        Q     If you take a look at the email on Bates ending in

17              4115, it's from you to Kevin Modany and Jay Vaughan,

18              August 29 at 8:22 p.m.

19        A     8:25 p.m.?

20        Q     8:22 p.m.

21        A     Okay.  I've got it.

22        Q     If you take a look at your email what you're doing

23              is you're responding from an email from Jay Vaughan

24              of the Cooley law firm where Mr. Vaughan lays out

25              the proposed terms that essentially take your terms
```

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 51

1          including involvement or displacement of ITT

2          management and turning them into post-transaction

3          terms.  Do you see that?

4     A   Yes.

5     Q   And you write and you say to Kevin Modany and Mr.

6          Vaughan, you say "Jay, the first and second bullet

7          points are fine, but, since ITT wants to revise all

8          of our proposals for interim changes into

9          post-closing measures, then some changes need to be

10         made to the third bullet point."  Do you see that?

11    A   Yes.

12    Q   And then down below you say "Subject to US

13         Department of Education granting relief from

14         restrictive measures announced on August 25,

15         following the closing of the transaction, DCF would

16         agree to the following conditions."  Do you see

17         that?

18    A   Yes.

19    Q   And the conditions listed below were essentially the

20         conditions that you had proposed that take place

21         before the closing of the transaction, but now they

22         would take place after the closing of the

23         transaction.  Is that right?

24    A   That's correct, except item three was changed into a

25         quarterly audit instead of a prohibition on

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 52

1          compensation increases since -- or distributions and

2          dividends, excuse me, since nonprofits don't have

3          distributions and dividends.

4     Q   And if you look down after the fifth term there is a

5          paragraph that reads "And these bullet points should

6          be added after the foregoing items."  Do you see

7          that?

8     A   Yes.

9     Q   And then you have a first bullet point that says "To

10         be clear, the proposed DCF acquisition of ITT's

11         institutions will not result in any ITT managed

12         services company working with DCF."  Do you see

13         that?

14    A   Yes.

15    Q   Why did you believe it was important to include that

16         specific term?

17    A   Well, that's the point that was made in the earlier

18         email we looked it on I think the same date, on

19         August 29th, to emphasize that there is going to be

20         separation from ITT and what remains of the company.

21         They'll sell off the assets comprising the school,

22         and whatever remains of the company, we're not going

23         to be doing anything with it.

24    Q   If you look, Mr. Holt, on the page with Bates ending

25         in 4114, there is an email from you dated

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 53

1              August 30th at 3:56 p.m.

2        A   Yes, I've got that.

3        Q   You write and you say "Hi Jay, since it is now

4              almost 4 p.m., should we assume you will not be

5              getting the updated ITT E Apps on file today?  I

6              would like to notify Dan Zibel and Aaron Ament as to

7              where we are with our plans to file updated E Apps,

8              but I cannot do that until I hear from you.

9              Yesterday, I told them time was of the essence and

10             now we may appear to be acting somewhat inconsistent

11             with that statement."  Do you see that?

12       A   Yes.

13       Q   Do you recall having further conversations with Mr.

14             Zibel or Mr. Ament about the concepts in DCF's

15             initial proposal?

16       A   No, I don't think so.  I think that I really felt

17             like we needed to get the E Apps updated per their

18             direction and get that basic information in front of

19             them and then try to follow up and see if we can

20             persuade them to have a phone call at least with us,

21             if not a meeting with the principals.

22       Q   Do you know Dan Zibel personally, Mr. Holt?

23       A   No.  I really didn't know either one of these

24             individuals prior to getting I think directed to

25             them is probably the best word by I think Mike

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 54

1      Frola.  I think somehow or other, and I don't recall

2      when, I got an email or something or a phone call

3      from Mike Frola in August when I was trying to make

4      contact with him, and he indicated he really wasn't

5      the guy to talk to about ITT.  I needed to be

6      talking to these two lawyers, and that's how I got

7      directed to them.

8         The lawyer that I normally would have reached

9      out to and dealt with at the US Department of

10     Education Office of General Counsel is someone named

11     Steve Finley, and so I really didn't have experience

12     with either Zibel or Ament.  They were more in the

13     level of political appointees in the Obama

14     Administration at a much higher level than somebody

15     like Steve Finley who I had a lot of experience

16     with.

17   Q   Did you ever have the occasion to talk with Mr.

18       Finley or Mr. Frola about their opinion of Kevin

19       Modany, for example?

20   A   I did not.  In fact, I don't recall having any

21       substantive communication with either one of them

22       about these attempts that DCF was making to strike a

23       transaction with ITT.

24   Q   Do you remember talking with -- have you ever spoken

25       with Mr. Frola, for example, about anything

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 55

1          pertaining to ITT other than just who you should be

2          directed to?

3      A   I don't recall.  If I did, I don't remember it

4          today.  You know, I might have had a conversation

5          with him where I told him I was working with DCF and

6          we were putting together a proposal to, you know,

7          make an acquisition.  I might have informed him of

8          that.  But beyond the possibility that I had a call

9          like that, I don't remember anything else.

10              He would have been an initial start for me

11         because he was the head at that time of what's

12         called the multiregional team.  The US Department of

13         Ed office of Federal Student Aid has something

14         called a school eligibility team that manages

15         institutions, their participation in Title IV, and

16         then within that school eligibility team, they have

17         different regional offices.

18              And then when you have a school like ITT that

19         has campuses all around the country, they have a

20         multiregional team and Frola headed it up.  So I

21         would have started with him, and I'm pretty sure I

22         did try to talk to him and never heard back from him

23         except to say, you know, you shouldn't be trying to

24         talk to me, try to talk to these guys.  That's all I

25         remember today.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 56

1    Q   Mr. Holt, do you have an understanding as to what,

2        if anything, happened with the application that was

3        filed sometime around September 2016 for the

4        proposed transaction between DCF and ITT?

5    A   You know, I do not.  To -- I don't know if your

6        question intends to ask this, but that application I

7        believe was submitted around the point in time that

8        we also, we being DCF, made a more formal proposal.

9        It was still an email message, but a proposal from

10       DCF through me to Kevin Modany and ITT on Friday,

11       September the 2nd.  And I do recall sending an email

12       message about that proposal to these two lawyers,

13       Zibel and Ament, and never hearing back from them,

14       and I think following it up maybe with another email

15       saying, hey, we really need to hear from you guys,

16       there's still a chance to save ITT's schools and

17       make this work.  And to this day, I don't believe

18       I've ever been able to locate any response that we

19       got back from them or anyone else at the Department

20       to that proposal.

21           So from my point of view, their silence was

22       effectively a rejection.  I do know that at some

23       point, whether it was Saturday, the next day or

24       Sunday, at some point not shortly after that, ITT

25       filed bankruptcy, and that effectively ended the

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 57

1        conversation.

2                MR. COLLYARD:  I probably have about 15,

3        20 more minutes with you.  Would you like to take a

4        short break?

5                THE WITNESS:  Yeah, that would be fine.

6                MR. COLLYARD:  Okay.  Let's just take a

7        five minute break since we've been going almost an

8        hour and a half.

9                THE WITNESS:  Okay.

10               THE VIDEOGRAPHER:  Very good.  We are

11       going off the record, and the time is 10:24 a.m.

12         (Off the record at 10:24 a.m.)

13         (Back on the record at 10:31 a.m.)

14               THE VIDEOGRAPHER:  We are back on the

15       record, and the time is 10:31 a.m. Central Time.

16    BY MR. COLLYARD:

17    Q   Mr. Holt, go to the third email that I had sent you.

18        I'll call it Tab 373.

19    A   All right.  I've got that.  It's an email dated

20        September 1, 2016.

21         (Plaintiff's Exhibit 74 marked for

22        identification.)

23    Q   That's right.  So let me just back up, Mr. Holt.

24        I'm showing you what's been marked as Plaintiff's

25        Exhibit 74.  It's an email from Tom Snyder to Ted

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 58

1          Mitchell dated September 1st of 2016.  Do you see

2          that?

3    A   Yes.

4    Q   And this, Mr. Holt, was produced -- you produced

5          this document to us in response to a subpoena.  Do

6          you recall that?

7    A   Yes.

8    Q   And I'm just wanting to know, you're not listed on

9          this email, but is this an email that you had access

10          to or that you were Bc:'d on?

11    A   It was forwarded to me by Tom.  So, yeah, I had

12          access to it because he provided it to me, and I

13          think it was sent -- you can see there is an email

14          below it from me to Dan Zibel and Aaron Ament and a

15          number of other people, which was dated September

16          the 1st.  So that's the email I made reference to

17          about reaching out to all these people at the

18          Department and trying to get them to respond to this

19          proposal that we had, we being DCF, to acquire ITT's

20          assets.

21              And I think Tom Snyder had made us aware, us

22          being other members of the DCF team, that he had

23          made contact with Ted Mitchell and was going to

24          follow it up with an email, and so this was part of

25          the documents that I had on file, and your subpoena

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 59

1          asked for any documents relating to contacts that

2          were made between DCF and the US Department of

3          Education.  So it's responsive to the subpoena.

4          That's why we produced it.

5               And, yeah, I think it was forwarded to me at

6          some point.  I don't remember when but by Tom

7          Snyder.

8     Q   Do you have an understanding as to why Tom Snyder

9          sent this email to Ted Mitchell?

10    A   Yeah, you know, at a high level without getting into

11         the conversation that we had, that was an effort by

12         Tom like the effort I was making in my September 1

13         email to Aaron Ament and Dan Zibel to keep the hope

14         alive, to try to get somebody at the Department to

15         respond to our proposal, which we still believed was

16         a really good one.

17              We thought that DCF coupled with the knowledge

18         and experience that Snyder had, the team he could

19         put together would be able to run the ITT schools.

20         We thought the schools were fundamentally sound and,

21         you know, had great programs.  And while the

22         Department might have doubted the management of ITT,

23         the existing management, and there might have been

24         regulatory problems from things that happened in the

25         past, that DCF could turn it around.  So we were

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 60

1      just trying to find some way to get through to

2      people at the Department.

3          And Tom in some way had managed to come up with

4      a way to reach out to the Deputy Secretary.  That's

5      who Ted Mitchell was.  So that's what I understood

6      was his reason for sending it.  It was just a

7      last-ditch effort.

8   Q   Okay.  Well, if we take a look at what Tom Snyder

9      says to Mr. Mitchell, he says "I am working directly

10     with a board member and will soon speak to the board

11     chair.  The board is not seeing the proposal from us

12     to take over the school and resolve all the open

13     financial issues.  Our first proposal last Friday

14     offered to take over the school before closing.

15     Kevin rejected.  The board chair was told by Kevin

16     it was not practical."  Do you see that?

17  A   Yeah.

18  Q   What is -- what is your understanding as to what

19     happened there?

20  A   So Tom's relating apparently things that he learned

21     from the board member he talked to.  And quite

22     honestly all of this that I see in this email, which

23     I've produced for you, is something that I learned

24     about, you know, after the fact.  So I don't really

25     have an understanding beyond what I can read in the

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 61

1    letter.

2         I was aware that at some point that Tom had

3    informed the other members of the DCF team that he

4    knew somebody that was on the board, and he was

5    going to make contact with that person.  In terms of

6    these specific things that he relates here that he

7    heard from that board member, I really don't

8    remember that, and I can't comment on it.  But I

9    think if you talk to Tom, take his deposition, he

10   can clarify it for you.

11   Q   When you say a board member, you're talking about an

12       ITT board member.  Is that right?

13   A   Correct.

14   Q   Do you have an understanding that that ITT board

15       member was Sam Odle?

16   A   Well, that name sounds familiar now, I mean, and it

17       sounded familiar when I went back through all of my

18       emails and ran across this one, and I think his name

19       is mentioned somewhere in this email or another one.

20       But apart from that, I wouldn't have recalled it.

21       The name John Dean, which I saw on another email,

22       who was the board chair, I recall that now.  That's

23       more familiar to me than Sam Odle.  But, yeah,

24       apparently that's who Tom knew and had spoken to.

25   Q   And do you recall Tom Snyder telling you or other

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 62

1          members of DCF that it was his belief from these

2          conversations with the ITT board member that Kevin

3          Modany had not shared the proposal that you had made

4          with the ITT board?

5     A   Well, you know, this is where I'm in a bit of a

6          struggle in terms of like getting into general --

7          going beyond generalities and getting into specific

8          details.  A, I really can't recall those specific

9          details.  B, though, I think it would invade the

10         attorney-client privilege of conversations that

11         occurred in phone calls with Tom and Randy Barton

12         and somebody else perhaps from the DCF board or DCF

13         management, like Danny Ovando being on the phone at

14         the same time.  So, you know, if I heard it, I don't

15         remember it today.

16              But I do remember the general idea that Tom

17         shared with us that he had a board member friend and

18         that he was going to talk to him and urge them to

19         consider our proposal.  I do remember that.  And I

20         can't tell you about the rest of this that's written

21         in here that Kevin wasn't telling the board about

22         our proposals and that they hadn't heard about it.

23         I don't remember whether or not he shared all of

24         that with our team or not, he may have, with the DCF

25         team.  But again, if I did recall it, I think then

Page 63

1          sharing it with you would get into attorney-client

2          privilege.

3    Q   Okay.  If we take a look towards the bottom there

4          where Mr. Snyder says "We are hopeful your team

5          would agree to a meeting in DC tomorrow.  You would

6          need to get ITT to cooperate."  Do you see that?

7    A   Yes.

8    Q   Do you have an understanding as to what Mr. Snyder

9          was conveying there?

10   A   Once again, I didn't consult with him either before

11         or after he wrote this letter.  I do remember I

12         think I -- and apparently it's not in the email

13         production to you, but I think I responded, and it's

14         probably a privileged document.  I shared some

15         response back to Tom about being surprised, A, that

16         I wrote directly to Ted Mitchell, and, B, about how

17         frank he was in some of his observations.

18              But I -- so, you know, I could speculate as to

19         what he means, but apparently he was of the opinion

20         that maybe they weren't going to be willing to go to

21         Washington and meet with Ted Mitchell if it involved

22         things like -- there's a middle sentence in the

23         letter about "We would accept all conditions," we

24         being DCF, "including a monitor."  So apparently

25         he's addressing that part of it.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 64

1          MR. COLLYARD:  I have no further

2     questions, Mr. Holt.  I thank you for your time.  I

3     reserve the rest of my time for reexamination.

4          MR. FINGER:  Ms. Shaney and Mr. Holt, I

5     do have some questions.

6          THE WITNESS:  Sure.

7               EXAMINATION

8     BY MR. FINGER:

9     Q   Let's go back to Plaintiff's 67 if we can.

10    A   All right.

11    Q   It's the first exhibit we talked about today or you

12        talked about today.  And you testified earlier, am I

13        correct, that the first proposal of the nature of

14        where DCF would acquire all of ITT's assets was made

15        on September 2, 2016.  Is that correct?

16    A   Not the first proposal.  The first proposal was the

17        concept of a donation of assets plus a service

18        agreement, and the second proposal was the idea of

19        buying the assets outright.  I'm sorry, maybe I

20        misunderstood your question.

21    Q   It was probably because my question wasn't good.

22        Subsequent to the August 25, 2016 letter, DCF made a

23        revised proposal, you called the second proposal,

24        and the date of that proposal was September 2, 2016.

25        Is that right?

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 65

1    A   That's correct.  The formal proposal that we

2        extended in writing was on September the 2nd.  I

3        think the concept was one that was presented earlier

4        and just raised in an August 26 email that counsel

5        for the plaintiff had mentioned in my earlier

6        examination.

7    Q   And that concept is presented in Plaintiff's Exhibit

8        67.  Is that right?

9    A   Correct.

10   Q   And in that proposal, you refer to it requiring

11       divine intervention.  Do you see that?

12   A   Yes.

13   Q   Is this a reflection of DCF's perspective that it

14       was highly unlikely that the Department of Education

15       would approve this concept?

16   A   I think I would translate my own language to mean it

17       was a long shot.

18   Q   Okay.  Fair enough.  Now, bear with me, please.  My

19       internet just went out and the document is not in

20       front of me.

21           Now, in fact, no one from DCF management or

22       Mr. Najafi was willing to meet with ITT and Cooley

23       during the week of August 29th.  Isn't that correct?

24   A   I'm not aware of that being a fact.  You know, there

25       were things that happened that didn't involve

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 66

1          counsel, you know, conversations that probably

2          occurred between Randy Barton and Kevin Modany and

3          maybe even Jahm Najafi as well that I wasn't a party

4          to, but I don't remember being made aware that they

5          were unwilling to meet.

6    Q   Let me show you a document that is at Tab 106 that

7          I'll mark as Holt Deposition Exhibit Number 1.

8    A   All right.

9          (Holt Exhibit 1 marked for identification.)

10                    MR. FINGER:  Kelyn, would you put that

11          on the screen, please.

12                    MR. SMITH:  Yes.

13                    MR. FINGER:  Kelyn --

14                    MR. SMITH:  Yes.  Is it showing now?

15                    MR. FINGER:  Yes.

16                    MR. SMITH:  Okay.

17    BY MR. FINGER:

18    Q   And if you go down to the bottom of the screen, it's

19          an email from you, Mr. Holt, to -- well, it's

20          unclear to whom it is -- but here we go.  Right

21          there on August 26, 2016, at 6:42 p.m.

22    A   Okay.

23    Q   That's the concept proposal that we've looked at

24          earlier in another exhibit.  Is that right?

25    A   Right.

Page 67

1    Q   Okay.  And if you go up a little bit, and then you

2        see a response from both Mr. Vaughan that Cooley is

3        ready to meet on Monday and from Mr. Modany prepared

4        to meet Monday in their offices.  Do you see that?

5    A   Yes.

6    Q   Now, if you go to the top of the screen, and there's

7        a response both from Mr. Najafi and from Mr. Barton.

8        I'll give you a moment to read those.

9    A   All right.  I have seen them.

10   Q   Okay.  So does that refresh your recollection that

11       neither Mr. Najafi nor Mr. Barton was willing to

12       meet with ITT and Cooley on that Monday, August 29,

13       2016?

14   A   It does, and I see the reasons they expressed for

15       the --

16   Q   And you're copied on this email.  Is that right?

17   A   I am, correct.

18   Q   Let me go back to Plaintiff's 67, if I may.  You

19       said earlier you know who Mr. Dean is?

20   A   Correct.

21   Q   Do you know him as a chairman of the board of

22       directors of ITT?

23   A   That's how I understood what his role was, yes.

24   Q   And do you see that Mr. Snyder was clearly mistaken

25       that Mr. Dean had not seen your proposal because

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 68

1          here in this email Mr. Modany forwarded it to

2          Mr. Dean?

3                    MR. COLLYARD:  Object to form.

4                    THE WITNESS:  Is that part of this email

5          below?

6                    MR. FINGER:  Kelyn, could you scroll

7          down, please.

8                    THE WITNESS:  Okay.  Yes, I do see that

9          now.

10     BY MR. FINGER:

11     Q   So that's your email, right, that we're looking at

12          right now on the bottom of page one?

13     A   Correct.

14                    MR. FINGER:  And, Kelyn, if you could go

15          to show the middle email.

16                    THE WITNESS:  Correct.

17     BY MR. FINGER:

18     Q   So Mr. Modany, in fact, forwarded that to Mr. Dean.

19          Do you see that?

20                    MR. COLLYARD:  Object to form.

21                    THE WITNESS:  I do see that.  I think

22          that's his email above there that says "God bless

23          Najafi."

24     BY MR. FINGER:

25     Q   Yes.

Page 69

1    A   Correct.

2    Q   Thank you.  Now, if you'd go to Plaintiff's 60,

3        please, and your very first email at the bottom of

4        Plaintiff's 60.  And that's addressed to Mr.

5        Goldstein and Mr. Vaughan.  Is that correct?

6    A   Correct.

7    Q   And before your -- before you being engaged to

8        represent DCF, did you -- were you familiar with Mr.

9        Goldstein?

10   A   Yes.

11   Q   And how were you familiar with him?

12   A   We met each other at some point in the past at a

13       conference, and I believe we've worked together on

14       opposite sides of matters, transactions, and I know

15       the same is true with Mr. Vaughan.

16   Q   Did you think that they were good lawyers?

17   A   Yes.

18   Q   Cooley was representing ITT in the negotiations with

19       you on behalf of DCF.  Is that right?

20   A   Correct.

21   Q   So you sent this email to Mr. Goldstein and Mr.

22       Vaughan but not ITT management on August 29th.  Is

23       that correct?

24   A   Correct.

25   Q   Did you -- were you of the opinion that Mr.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 70

1        Goldstein and Mr. Vaughan were advising ITT's

2        management in the negotiations at this point in

3        time?

4    A   Well, they started out representing ITT, you know,

5        back in June when I earlier in my testimony referred

6        to how I got involved and received the draft of the

7        document for that earlier structure of the

8        transaction, a donation of assets and a service

9        agreement.  That was from the Cooley firm.

10           So, yes, they had been the people I was dealing

11        with throughout all of July and August, and it was

12        my impression and understanding at this point in

13        time that they were still representing the company

14        and that that meant they were also representing

15        management of the company as well.

16    Q   And the Cooley firm filed the E App in the question

17        69.  Is that right?

18    A   Correct.  That's who -- Jay Vaughan in particular,

19        that's who I was talking to about what should be in

20        question 69.

21    Q   And did the Department of Education ever express to

22        you that it sought a change in ITT management?

23    A   No.  As I mentioned earlier, I never had a

24        substantive conversation about that topic with

25        anybody at the Department, at least not that I can

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 71

1          recall.

2     Q   Do you know whether anyone from the Department

3          expressed that view to anyone involved with the

4          potential ITT/DCF transaction?

5     A   Not that I can recall.  I think if it had happened,

6          I would recall it.

7              MR. FINGER:  Kelyn, if you can put Tab

8          127 on the screen, please.

9              MR. SMITH:  All right.

10             MR. FINGER:  I'd ask to go to the fifth

11         page of the exhibit.  Make it a little bigger,

12         please.  Thank you.  Go to the top of the email

13         there, please.  I guess even further on the prior

14         page to show Mr. Holt there.

15             MR. SMITH:  Okay.

16    BY MR. FINGER:

17    Q   Mr. Holt, is this the proposal that you made to ITT

18         on DCF's behalf on September 2, 2016?

19    A   It is.

20    Q   And you testified earlier that the proposal was, I

21         think you said it was rejected with an intention to

22         address certain issues.  Is that right?

23    A   Correct.

24    Q   And what were those issues?

25    A   Well, I think the primary issue that I recall Kevin

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 72

1          Modany expressing was a term loan that the company

2          had for roughly 35 million in principal for which

3          there was a security interest that extended to all

4          the assets that DCF was proposing to acquire.

5               There may have been some other related issues

6          relating to the real property leases.  I know that

7          there was campus property that was owned by ITT.  We

8          weren't proposing to acquire that for the amount of

9          money that was proposed here.  We were simply

10         proposing to take over leases.  So I guess there

11         were going to need to be negotiations on leases for

12         the real estate that was owned by the company.  But

13         I think those were the primary issues.

14    Q    And if you go to the very top of this document,

15         there's an email from Mr. Modany to you.  I'll give

16         us a chance to get there and for you to look at it.

17         Do you recall what prompted Mr. Modany to write you

18         this email?

19    A    I don't recall whether we had any telephone

20         conversation after this email.  I do recall seeing

21         it in the review that I did of my files and to

22         respond to the subpoena issued by plaintiff in this

23         matter.  And, you know, I think the implicit message

24         here is that in some way the company was notified by

25         the Department that the Department wasn't going to

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 73

1          change its mind regardless of what kind of proposal

2          was made.

3     Q   Did you become aware that the Department sent a

4          letter on September 2, 2016 to ITT notifying them

5          that the Department was not interested in

6          considering alternative transactions?

7     A   I don't remember that today, and I don't recall

8          being aware of that back on September the 2nd.  I

9          just recall becoming aware through this message that

10         the Department was not willing to entertain further

11         discussions, and I know that we had been pushing, we

12         on the DCF side, for them to reconsider, you know,

13         as that email from Tom Snyder to Ted Mitchell

14         suggests.  So I'm not sure I have ever seen that

15         letter, counsel.  If I had it, I think it would be

16         in my file, but I do certainly remember this email

17         that you're showing me now from Kevin that was sent

18         to me and others.

19    Q   Thank you.  Is this what effectively ended the

20         negotiations between ITT and DCF?

21    A   Yes.

22              MR. FINGER:  I'll mark this, Ms. Court

23         Reporter, as Holt Deposition Exhibit Number 2.

24         (Holt Exhibit 2 marked for identification.)

25    BY MR. FINGER:

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 74

1    Q   Mr. Holt, do you recall that a change of control

2        application was filed by ITT with the Department of

3        Education in regards to the DCF transaction?

4    A   Yes.  That was what we were discussing earlier

5        today.

6    Q   And was that change of control application filed in

7        early June 2016?

8    A   I don't remember it being done back then.  There

9        was -- it's possible it happened then.  There was a

10       change of control application filed or, you know, an

11       E App filed in connection with the original

12       structure that we've discussed here on the call

13       today or in my deposition, I mean, you know, with

14       the donation and service agreement concept.  There

15       was one filed, but I can't recall the exact date

16       whether it was in early July or late June.

17   Q   And you testified earlier that you got the first

18       draft document to review in late June.  Is that

19       correct?

20   A   That's my recollection, yes.

21   Q   And how would you describe the activity regarding

22       the negotiations between late June and September 2,

23       2016?

24   A   Well, I think it went back and forth on a weekly

25       basis with, you know, I prepare a markup of a draft

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 75

1          furnished by the Cooley firm, send it to them, and a

2          week or 10 days later they send another turn of the

3          document to me, and I review it, mark it up, send it

4          to the DCF team, get their input, and then, you

5          know, we finalize our markup of the revised draft

6          and send it back to the Cooley team.

7              It's pretty much typical transaction practice,

8          which is, you know, you negotiate over these terms

9          back and forth, and so there were two primary

10         documents.  There was the MSA, the master services

11         agreement, and then this contribution agreement.  As

12         I mentioned earlier today, there was -- there were

13         some ancillary documents as well.

14     Q   And did the parties consider time to be of the

15         essence?

16     A   They did.  I think we were all trying to keep things

17         moving along.  I don't recall whether schedules of

18         any of the lawyers, you know, like someone being off

19         on vacation became a factor at all along the way.

20     Q   Okay.  Turning your attention back to Plaintiff's

21         74, and again it's Mr. Snyder's email to Mr.

22         Mitchell.  In the fourth paragraph, I'll ask you to

23         read -- well, I'll read it.  The very first sentence

24         "Were it not for a handful of entrenched executives

25         we would have been before DOE weeks if not months

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 76

1        earlier."  Do you agree with that statement?

2                MS. SHANEY:  Object to the form and

3        foundation.

4                THE WITNESS:  Well, that's an opinion

5        obviously expressed by Mr. Snyder, and I think you,

6        as I said earlier, should talk to him about it in

7        his deposition.  I think that we, the counsel, were

8        trying to keep negotiations moving along.  I will

9        say this, without getting the drafts out and looking

10       at them, there were a few points that -- and this

11       happens in a lot of deals.  You know, you'll have a

12       few points where one party just kind of stands their

13       ground and becomes intransigent in some way, and I

14       felt that happened with ITT, that they were taking

15       some positions on the MSA that were unreasonable.

16               You know, a 15 year contract is a lot of

17       time for services and especially with a nonprofit

18       being the recipient of those services, and we were

19       asking for some things to assure that the services

20       would evolve with the state of art and that the

21       terms of what we were being charged would

22       consistently reflect fair market value.  So I just

23       have this general recollection that we felt that the

24       company's bargaining position was too aggressive on

25       some of those things, the pushback that we were

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 77

1   getting without going into the drafts and pointing

2   to it.  And some of the drafts do have my comments

3   in the margins so you could pick through it and see

4   it probably.

5          But I don't know if Tom's thinking of

6   that like, you know, that we had a hard time getting

7   ITT to back off of some of these positions that were

8   taken and could we have gotten to a final document

9   sooner, perhaps.  I mean, you know, we only had two

10  documents here.  We had an MSA and a contribution

11  agreement.  In one way it's a complicated deal and

12  in another way it's not because they were making a

13  donation of all of these assets.

14          And so the real issue is the service

15  agreement for 15 years, and that's where you get

16  into -- at least from the DCF side, you want to make

17  sure that you're being responsible as a sort of

18  public entity, you know, that you're making sure

19  you're getting fair market value and you're getting

20  services that reflect ongoing state of the art.  So

21  I just have that general recollection that maybe Tom

22  is referring to that, but it would be best to ask

23  him.  I do recall being frustrated a few times, but

24  it's not like I hadn't been frustrated in other

25  negotiations either.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 78

1      BY MR. FINGER:

2      Q   Did you observe any delays brought by either ITT or

3           its advisers during the course of the two months'

4           negotiation?

5      A   Well, as I just alluded, you know, we had -- and

6           without going back and looking at emails and looking

7           at the time between when we sent them a turn of the

8           document and when we heard back, was it 10 days?

9           Was it two weeks?  Was it reasonable, unreasonable?

10          You know, I can't answer that question better for

11          you other than to say that I think we were both

12          trying to get to final documents that we could

13          present to the Department as soon as possible.

14              But I also think we butted heads on a couple of

15          these points in the MSA.  And, you know, my general

16          recollection as I sit here today is that a few of

17          these points should not have been as contentious as

18          they were because, you know, they knew that they

19          were dealing with a nonprofit.  It's a 15 year

20          agreement.  It's a lot of time, and it's not

21          unreasonable for a recipient of services who is

22          committing to 15 years to expect the things we were

23          asking for.

24              So I just have that recollection today of that

25          frustration I had then.  I still remember it today.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 79

1           So was that a cause for some delay?  Yeah, it was.

2           Can I quantify it for you?  No, I really can't.

3     Q   And over the course of these two months, the

4           executives or the business representatives met

5           themselves frequently without lawyers present.  Is

6           that right?

7     A   I think they had some communications at least by

8           phone.  Whether they met frequently, I really can't

9           answer that question.  Randy Barton and Tom Snyder I

10          know had communications from time to time with Kevin

11          and didn't always tell me about it.  You know, if it

12          dealt with like what we're going to do with the

13          company once this deal is closed and all that, what

14          our vision is for going forward, yeah, they probably

15          had discussions offline without involving me or

16          telling me about it.

17    Q   Mr. Holt, were you aware of a side deal between DCF

18          and Mr. Modany as being part of the transaction?

19    A   No, I was not.  I mean, I -- again what I'm aware of

20          is what I've just described, the two part structure,

21          which was the contribution of assets and then this

22          15 year service agreement.  And the way it was set

23          up, the 15 year service agreement would have kept

24          ITT in place.  I mean, it was a public company.  It

25          had its shareholders.

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 80

1          That was also you might say one of the -- sort

2          of the genius or one of the benefits of the

3          structure was that we were told by ITT that they

4          thought it would be easier to get approval because

5          they weren't selling assets of the company.  Even

6          though they were donating them, they had this

7          long-term service agreement that would offer value

8          for the shareholders, and so it would be easier to

9          get it approved.

10          But I don't recall any side deal.  I mean,

11          inherently if ITT was going to remain involved along

12          with its management, I guess that meant Kevin Modany

13          in theory would continue to be employed.  That would

14          be up to the board of ITT.  But we, DCF, weren't

15          telling ITT that they had to get rid of him, and

16          conversely we weren't trying to do any side deal

17          that I remember with ITT or Kevin Modany either.

18     Q   Do you know one way or the other whether Mr. Modany

19          would be involved with ITT post closing?

20     A   Under the original structure or the other one?

21     Q   Yes, under the original structure.

22     A   Under the original structure, I don't remember, but

23          I think I assumed he would be, that the company was

24          going to rebrand itself.  I remember seeing

25          documents.  There was a slide deck that had been

Page 81

1          prepared, a proposal that I do have in my file that

2          was just sent to me I think by Randy Barton to make

3          me generally aware of what the companies were

4          talking about, and I recall that it had a new name

5          in it, Lamplighter or something like that that ITT

6          would rebrand itself as.  I think my general belief

7          was that Kevin Modany would stay employed by the

8          company after this transaction.

9      Q   Going to the August 25, 2016 letter, I think you

10         called it the sanctions letter earlier in your

11         deposition.  Did you consider that an assault on

12         ITT?

13              MS. SHANEY:  Object to the form of the

14         question, vague.

15              THE WITNESS:  I'm sorry, counsel.  What

16         was your word, "assault"?

17              MR. COLLYARD:  Object to form.

18              MR. FINGER:  Well, let me do it this

19         way.  Kelyn, would you go to Tab 103, please.

20              MR. SMITH:  Yes, one moment.

21              MR. FINGER:  If you could go to the

22         bottom of page two, please.

23         (Holt Exhibit 3 marked for identification.)

24     BY MR. FINGER:

25     Q   I'll just direct your attention to the email there

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 82

1            that starts from the bottom of page two and goes to

2            the bottom of page three, and I'll give you a moment

3            to read it.

4        A   Oh, I see it now.

5        Q   Are you referring to the August 25, 2016 letter in

6            your email here?

7        A   Yes, most definitely.

8        Q   What did you mean by "USDOE assault on ITT"?

9        A   Well, it was a pretty dramatic action that was taken

10           by the Department in that August 25, 2016 letter, as

11           I mentioned in my testimony earlier today.  You

12           could think of Corinthian Colleges, which I believe

13           suffered, you know, a similar action by the

14           Department in 2015.  I may have my dates wrong, but

15           I'm pretty sure it was in that year.

16              But this was something that really stood out in

17           the for-profit industry.  It was something that had

18           not happened quite like this before where you had a

19           combination of call them sanctions, call them risk

20           management measures, but they were very severe

21           measures.  And so just doing all of that all at once

22           and without, from what we knew at least on the DCF

23           side, any prior warning or advanced notification

24           that we're going to be -- we're contemplating some

25           serious actions here and we have serious concerns,

Page 83

1      can you respond to our serious concerns to try to

2      put us at ease so that maybe we'll reconsider,

3      without a dialogue like that occurring, to just come

4      in and drop us on the company looks like an assault.

5          So it was a figurative word, but that's what it

6      meant because it was almost unprecedented in the

7      for-profit sector.

8              MR. FINGER:  Thank you.  I have no more

9      questions, Mr. Holt.

10             MR. COLLYARD:  Thank you, Mr. Holt.

11             THE WITNESS:  Thank you all.

12             MR. COLLYARD:  You're on mute, Steve.

13     You're on mute.

14             THE VIDEOGRAPHER:  I apologize.  We are

15     going off the record, and the time is 11:11 a.m.

16     Central Time.  Thank you.

17         (The deposition adjourned at 11:11 a.m.)

18             *END OF RECORD*

19

20

21

22

23

24

25

Page 84

1                    ERRATA SHEET

2     PAGE/LN    CORRECTION     REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 85

1          I, RONALD HOLT, HAVE READ THIS

2    DEPOSITION TRANSCRIPT PAGES 1 - 83 AND ACKNOWLEDGE

3    HEREIN ITS ACCURACY EXCEPT AS NOTED ON THE ERRATA

4    SHEET.

5

6

7

8              _____

                         SIGNATURE

9

10

11

                 _____

12                     NOTARY PUBLIC

13

14

15

16

17

18

19

20

21

22

23

24

25

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 86

1    STATE OF MINNESOTA
2                              CERTIFICATE
3    COUNTY OF WASHINGTON
4
5        I, CARA NASI-PINARDI, HEREBY CERTIFY THAT I
     REPORTED THE DEPOSITION VIA ZOOM VIDEOCONFERENCE OF
6    RONALD HOLT ON THE 4TH DAY OF JANUARY, 2021, AND
     THAT THE WITNESS WAS BY ME FIRST DULY SWORN TO TELL
7    THE TRUTH AND NOTHING BUT THE TRUTH CONCERNING THE
     MATTER IN CONTROVERSY AFORESAID;
8
         THAT I WAS THEN AND THERE A NOTARY PUBLIC IN
9    AND FOR THE COUNTY OF WASHINGTON, STATE OF
     MINNESOTA; THAT BY VIRTUE THEREOF I WAS DULY
10   AUTHORIZED TO ADMINISTER AN OATH;
11       THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
     CORRECT TRANSCRIPT OF MY STENOGRAPHIC NOTES IN SAID
12   MATTER, TRANSCRIBED UNDER MY DIRECTION AND CONTROL;
13       THAT THE COST OF THE ORIGINAL HAS BEEN CHARGED
     TO THE PARTY WHO NOTICED THE DEPOSITION AND THAT ALL
14   PARTIES WHO ORDERED COPIES HAVE BEEN CHARGED AT THE
     SAME RATE FOR SUCH COPIES;
15
         THAT THE READING AND SIGNING OF THE DEPOSITION
16   WAS NOT WAIVED;
17       THAT I AM NOT RELATED TO ANY OF THE PARTIES
     HERETO, NOR INTERESTED IN THE OUTCOME OF THE ACTION
18   AND HAVE NO CONTRACT WITH ANY PARTIES, ATTORNEYS OR
     PERSONS WITH AN INTEREST IN THE ACTION THAT HAS A
19   SUBSTANTIAL TENDENCY TO AFFECT MY IMPARTIALITY;
20       WITNESS MY HAND AND SEAL THIS 7TH DAY OF
     JANUARY, 2021.
21
22
23       _____
                         NOTARY PUBLIC
24
25

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 87

**A**

a.m 4:3,7
  57:11,12
  57:13,15
  83:15,17
Aaron 8:24
  53:6 58:14
  59:13
ability 42:19
able 13:16
  13:25
  19:15 23:2
  33:21,25
  56:18
  59:19
academic
  6:23
accept 18:5
  18:8 32:5
  32:17
  35:12
  36:13
  45:25
  46:23 47:3
  47:7 63:23
acceptable
  32:8 35:13
  48:3
accepted
  41:13,14
accepting
  32:12 50:8
access 58:9
  58:12
accomplis...
  27:17
ACCURACY
  85:3
ACICS 22:18
  32:9
ACKNOW...
  85:2
acquire
  15:24
  16:11,19
  19:24
  29:23
  36:14 48:8
  58:19
  64:14 72:4
  72:8

acquired
  32:20
acquisition
  29:24
  45:13
  46:16,17
  52:10 55:7
acting 53:10
action 20:8
  21:7 26:20
  30:18
  41:10 43:3
  43:5 82:9
  82:13
  86:17,18
actions
  22:19
  24:18
  31:22 32:1
  82:25
activities
  7:9
activity
  74:21
actual 17:1
added 52:6
adding 38:6
additional
  35:7 44:7
address
  17:9,10
  22:12
  71:22
addressed
  69:4
addressing
  49:7 63:25
adjourned
  83:17
ADMINIS...
  86:10
Administr...
  54:14
advance
  40:19
advanced
  82:23
advisers
  78:3
advising
  70:1

AFFECT
  86:19
affiliates
  15:15
affiliation
  15:23
AFORESAID
  86:7
agencies
  32:10
  35:25
Agency 4:16
aggressive
  76:24
agree 35:2
  42:11 45:2
  45:4,13
  46:4 47:14
  51:16 63:5
  76:1
agreeing
  45:14
  46:20
agreement
  7:3,8,12
  7:16 11:9
  11:10,12
  11:12,13
  11:25
  12:11 13:9
  13:24
  14:13 16:6
  27:3 31:22
  32:8,22
  36:5 64:18
  70:9 74:14
  75:11,11
  77:11,15
  78:20
  79:22,23
  80:7
agreements
  9:7 14:5
  33:6
ahead 5:14
aid 21:11
  43:17 44:8
  55:13
al 4:9
alive 59:14
allow 20:9

alluded 78:5
alongside
  27:10 33:2
  33:22
alternative
  73:6
Ament 8:24
  13:22
  47:22 53:6
  53:14
  54:12
  56:13
  58:14
  59:13
amount
  22:14
  23:20
  40:10
  43:12 72:8
analysis
  25:23
analyst
  40:23
ancillary
  14:12
  75:13
and/or
  21:25
  32:23
Angeles
  12:8
announced
  31:20
  42:18,25
  51:14
answer 25:4
  78:10 79:9
anticipate
  6:2
anybody
  43:6 70:25
apart 61:20
apologize
  24:22
  83:14
App 17:20
  40:1 48:6
  48:16
  70:16
  74:11
apparent

43:11
apparently
  60:20
  61:24
  63:12,19
  63:24
appear
  53:10
APPEARA...
  2:1
appears
  42:4
application
  17:20,20
  47:13
  48:21 56:2
  56:6 74:2
  74:6,10
appointees
  54:13
appointm...
  35:13
appreciate
  6:3
approach
  12:15
  13:19,23
  14:2
appropriate
  47:19
approval
  13:10
  18:16
  33:13 80:4
approvals
  33:15 37:1
approve
  13:19 14:9
  14:22 34:3
  48:23
  65:15
approved
  38:5 44:16
  80:9
approxim...
  15:5
Apps 42:14
  47:23 53:5
  53:7,17
April 10:12
arranged

16:25
art 76:20
  77:20
asked 12:12
  59:1
asking 5:19
  76:19
  78:23
aspect
  17:21
aspects
  36:7
assault
  81:11,16
  82:8 83:4
assemble
  26:3
asset 11:11
  11:12
  29:23
assets 6:23
  18:4 30:1
  30:15
  36:14 48:8
  52:21
  58:20
  64:14,17
  64:19 70:8
  72:4 77:13
  79:21 80:5
associated
  18:6
assume
  53:4
assumed
  80:23
assure
  76:19
attempt
  49:15
attempted
  8:15
attempting
  49:24
attempts
  54:22
attention
  9:2 20:14
  75:20
  81:25
attorney-...

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 88

| | | | | | |
|---|---|---|---|---|---|
| 10:14 | back 16:4 | bear 35:12 | 78:10 | 64:19 | 57:15 |
| 26:15 | 20:15 | 65:18 | beyond 9:10 | | 83:16 |
| 62:10 63:1 | 22:18 | becoming | 55:8 60:25 | **C** | CEO 25:9 |
| attorneys | 24:20 | 25:14 73:9 | 62:7 | c 35:11 | 26:6 |
| 4:17 36:5 | 29:10 31:9 | began 10:3 | big 10:5 | 38:12 | certain 18:5 |
| 86:18 | 36:17 39:8 | 15:9 | 20:17 | call 4:25 9:1 | 18:16 30:1 |
| attractive | 42:5,18,24 | beginning | 33:19 | 9:12,13,14 | 36:7 71:22 |
| 31:10,16 | 44:13 46:8 | 26:23 | bigger | 11:2,11,22 | certainly |
| audit 51:25 | 48:10 | begun 26:24 | 71:11 | 13:18,20 | 23:9 31:7 |
| August | 55:22 | behalf 4:19 | bit 24:21,22 | 14:18 | 31:16 35:9 |
| 14:10,18 | 56:13,19 | 4:24 5:17 | 62:5 67:1 | 18:19 29:3 | 36:1 37:24 |
| 14:19,19 | 57:13,14 | 9:23 24:10 | bless 68:22 | 36:17 | 40:7 73:16 |
| 15:2,2,4 | 57:23 | 44:11 | board 48:3 | 53:20 54:2 | CERTIFIC... |
| 16:19 | 61:17 | 69:19 | 60:10,10 | 55:8 57:18 | 86:2 |
| 18:20 19:4 | 63:15 64:9 | 71:18 | 60:11,15 | 74:12 | certified |
| 19:8 21:1 | 67:18 70:5 | belief 27:12 | 60:21 61:4 | 82:19,19 | 44:8 |
| 24:2 26:21 | 73:8 74:8 | 30:11 62:1 | 61:7,11,12 | called 7:15 | CERTIFY |
| 27:21 | 74:24 75:6 | 81:6 | 61:14,22 | 11:13 | 86:5 |
| 29:12 30:6 | 75:9,20 | believe 8:14 | 62:2,4,12 | 17:19,23 | CFPB 22:20 |
| 31:9,20 | 77:7 78:6 | 14:4 17:15 | 62:17,21 | 25:10 | chain 3:8,9 |
| 38:17 39:5 | 78:8 | 26:9 34:15 | 67:21 | 55:12,14 | 3:11,12 |
| 39:17 | background | 34:16 | 80:14 | 64:23 | 25:10 |
| 40:12 42:7 | 10:8 26:1 | 35:23 | bonuses | 81:10 | chair 60:11 |
| 43:1,3 | bankruptcy | 38:14 39:9 | 35:6 | calling 8:21 | 60:15 |
| 50:18 | 56:25 | 39:25 40:3 | bottom 63:3 | calls 62:11 | 61:22 |
| 51:14 | bargaining | 42:16,22 | 66:18 | campus | chairman |
| 52:19 53:1 | 7:21 8:5 | 43:4,4 | 68:12 69:3 | 72:7 | 67:21 |
| 54:3 64:22 | 76:24 | 44:14 | 81:22 82:1 | campuses | challenging |
| 65:4,23 | **Barton** | 47:19 | 82:2 | 55:19 | 24:10 |
| 66:21 | 10:10 | 52:15 56:7 | bound 34:10 | capable | chance |
| 67:12 | 11:22 12:4 | 56:17 | break 6:16 | 27:17 | 26:25 |
| 69:22 | 25:21 | 69:13 | 57:4,7 | 36:24 | 27:25 41:9 |
| 70:11 81:9 | 62:11 66:2 | 82:12 | brief 13:22 | Cara 1:25 | 44:16 |
| 82:5,10 | 67:7,11 | believed | broad 48:7 | 4:13 86:5 | 56:16 |
| authority | 79:9 81:2 | 35:19 38:1 | brought | Carly 2:6 | 72:16 |
| 45:22 | based 17:24 | 43:13 | 78:2 | 4:22 | chances |
| AUTHORI... | 18:13 21:2 | 59:15 | bullet 51:6 | Caruso 1:5 | 44:23 |
| 86:10 | 34:5 39:23 | Belleview | 51:10 52:5 | 4:9 | change 22:3 |
| Avenue 2:2 | 43:23 | 2:14 | 52:9 | case 1:3 | 26:20 28:1 |
| 2:14 | basic 53:18 | Benchmark | bumped | 4:10 5:19 | 28:23,24 |
| await 42:10 | basically | 4:15 | 8:23 | 22:17 42:4 | 34:7 38:8 |
| aware 36:4 | 17:8 | benefits | business | 49:10 | 43:18 |
| 58:21 61:2 | basis 74:25 | 80:2 | 24:7 79:4 | cash 40:10 | 44:12 |
| 65:24 66:4 | Bates 3:8,10 | best 14:5 | butted | cause 22:19 | 45:19 47:7 |
| 73:3,8,9 | 3:11,13,16 | 44:15 | 78:14 | 79:1 | 70:22 73:1 |
| 79:17,19 | 3:18 18:21 | 48:20,23 | buy 19:15 | cease 41:4 | 74:1,6,10 |
| 81:3 | 29:5 38:18 | 53:25 | buyer 23:15 | Center 6:5 | changed |
| | 41:21 42:7 | 77:22 | 27:3 32:22 | 6:10 12:9 | 47:4 51:24 |
| **B** | 45:8 50:16 | better 21:16 | 33:12 | 12:19 | changes |
| b 34:9 38:11 | 52:24 | 43:20 | 37:17 | 44:15 | 22:1 32:6 |
| 62:9 63:16 | Bc:'d 58:10 | 44:24 | buying | Central 4:7 | 32:12,18 |

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 89

| | | | | | |
|---|---|---|---|---|---|
| 42:11 48:2 | 82:12 | 25:9 | 13:23 15:8 | 73:6 | conversat... |
| 51:8,9 | Collyard 2:5 | companies | 17:2 19:11 | consistent | 8:9,12 |
| changing | 3:2 4:19 | 17:24 | 19:12 | 5:18 11:17 | 10:13 |
| 34:18 | 4:19 5:12 | 19:25 | 23:23 28:8 | consistently | 26:14 |
| CHAPTER | 5:14,22 | 22:19 | 28:19 | 76:22 | 53:13 62:2 |
| 1:5 | 27:11 57:2 | 30:21 | 30:20 | consult | 62:10 66:1 |
| charged | 57:6,16 | 35:23 | 35:22 37:6 | 63:10 | conversely |
| 76:21 | 64:1 68:3 | 36:15 81:3 | 37:11,13 | consulting | 80:16 |
| 86:13,14 | 68:20 | company | 64:17 65:3 | 32:8,23 | convey |
| Chicago | 81:17 | 7:13,14,24 | 65:7,15 | contact 10:9 | 49:24 |
| 2:10 | 83:10,12 | 12:1 17:23 | 66:23 | 13:21 54:4 | conveying |
| choose 26:7 | combinati... | 19:16 | 74:14 | 58:23 61:5 | 63:9 |
| circumsta... | 82:19 | 21:10 | concepts | contacts | Cooley 12:4 |
| 43:9 | come 12:6 | 22:25 | 42:12 45:2 | 59:1 | 13:14 |
| City 2:15 | 14:5 15:20 | 28:13 30:1 | 45:5 53:14 | contempl... | 17:17 |
| clarification | 19:15 | 34:1 35:15 | concern | 82:24 | 47:20 |
| 38:1 | 20:14 | 35:21 | 21:10,14 | contentious | 50:24 |
| clarify 61:10 | 28:14 33:1 | 36:11,23 | CONCERN... | 78:17 | 65:22 67:2 |
| class 20:10 | 33:22 | 37:4 38:3 | 86:7 | context | 67:12 |
| clear 30:13 | 43:20 | 40:10 | concerns | 19:18 | 69:18 70:9 |
| 31:4 33:24 | 48:10 60:3 | 46:13 | 82:25 83:1 | 22:15 | 70:16 75:1 |
| 52:10 | 83:3 | 49:20 | conclusion | 23:14 33:7 | 75:6 |
| clearly | coming 16:7 | 52:12,20 | 28:14 40:9 | continue | cooperate |
| 67:24 | 23:15,23 | 52:22 | 41:5 | 80:13 | 63:6 |
| clients | 25:19 28:5 | 70:13,15 | conditions | continuing | copied |
| 27:24 | commenced | 72:1,12,24 | 18:16 28:4 | 30:8 49:8 | 39:20 |
| close 14:6 | 11:16 | 79:13,24 | 38:9 51:16 | contract | 67:16 |
| 24:5 37:1 | COMMEN... | 80:5,23 | 51:19,20 | 7:11 25:7 | COPIES |
| closed 5:20 | 4:3 | 81:8 83:4 | 63:23 | 76:16 | 86:14,14 |
| 8:7 31:7 | comment | company's | conference | 86:18 | Corinthian |
| 31:17 32:2 | 61:8 | 76:24 | 69:13 | contracts | 27:23 |
| 79:13 | comments | compelling | confidence | 18:7,7 | 82:12 |
| closing 7:2 | 77:2 | 43:21 | 23:4 35:1 | contributi... | CORP 1:6 |
| 14:10 20:6 | commit | compensa... | 36:10 37:2 | 25:23 | Corporation |
| 26:11 | 46:12 | 34:12,19 | conflict | contributi... | 36:3 |
| 27:13 | committing | 35:7 45:23 | 35:25 | 11:10,13 | correct 7:15 |
| 28:11,13 | 78:22 | 52:1 | conjecture | 75:11 | 15:6 19:6 |
| 31:16,23 | communi... | complete | 13:5 | 77:10 | 19:22 |
| 32:3 34:1 | 8:13,15 | 40:20 | connected | 79:21 | 23:25 30:4 |
| 35:15,21 | communi... | complicated | 16:4 | control | 31:1,3 |
| 37:12 38:3 | 47:12 | 77:11 | connection | 33:10,13 | 32:4,15 |
| 51:15,21 | 48:20 | compone... | 74:11 | 33:18 74:1 | 35:9 43:15 |
| 51:22 | communi... | 16:23 | conseque... | 74:6,10 | 45:5,6,10 |
| 60:14 | 46:22 | 29:24 | 10:5 | 86:12 | 45:11,18 |
| 80:19 | communi... | comprising | consider 9:2 | CONTROV... | 46:5 47:8 |
| Coast 15:23 | 14:7,20 | 6:23 52:21 | 62:19 | 86:7 | 48:18 49:3 |
| college 1:6 | 48:17 | concentra... | 75:14 | conversat... | 51:24 |
| 15:23,25 | 54:21 | 24:13 | 81:11 | 9:4,5 55:4 | 61:13 |
| 25:10 | communi... | concept | considera... | 57:1 59:11 | 64:13,15 |
| colleges | 79:7,10 | 8:10 9:6 | 43:12 | 70:24 | 65:1,9,23 |
| 24:10 | community | 12:6 13:7 | considering | 72:20 | 67:17,20 |

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 90

68:13,16
69:1,5,6
69:20,23
69:24
70:18
71:23
74:19
86:11
CORRECT...
84:2
COST 86:13
counsel 2:7
2:12,17
8:24 14:4
17:17
54:10 65:4
66:1 73:15
76:7 81:15
counseling
15:19
country
15:16
55:19
COUNTY
86:3,9
couple 6:17
9:20 14:12
46:6 78:14
coupled
59:17
course 10:1
12:22
13:12
18:15 23:5
46:11 78:3
79:3
court 1:1
4:11,13
5:6 73:22
create 40:22
credit 16:8
20:9 21:12
22:12,14
23:21
27:15
36:19
38:25 39:4
39:9,11,14
44:2
crippling
41:1

current
30:22

—————
D
—————
D 2:11 3:1
Dan 8:25
53:6,22
58:14
59:13
DANIEL 1:6
Danny 62:13
date 4:6
12:24 15:7
19:8 39:7
52:18
64:24
74:15
dated 18:20
19:4,19
29:11
52:25
57:19 58:1
58:15
dates 82:14
day 4:2
19:20
40:18,21
40:25
56:17,23
86:6,20
days 40:13
40:24 75:2
78:8
DC 63:5
DCF 6:24
7:4,10,18
7:18 8:5
9:19 10:2
10:11
15:10,12
15:13,21
16:4,9,11
16:14,15
16:19,24
17:1,15,23
18:3,3
19:24 20:5
20:25 25:1
25:4,5,7
25:16,22
26:4,9,10

27:9,20
28:10,18
29:22 30:2
30:10
31:15,21
31:23 32:6
33:18,25
35:15
36:14 37:7
38:1 41:5
41:8,9,13
44:11,23
45:12
46:17 48:7
48:22 49:1
50:14
51:15
52:10,12
54:22 55:5
56:4,8,10
58:19,22
59:2,17,25
61:3 62:1
62:12,12
62:24
63:24
64:14,22
65:21 69:8
69:19 72:4
73:12,20
74:3 75:4
77:16
79:17
80:14
82:22
DCF's 53:14
65:13
71:18
DCF/Najafi
49:6,11
deadline
39:24 40:4
41:6
deadly 41:1
deal 6:7
9:14,19
21:9 23:10
28:16 29:1
30:7 32:2
77:11
79:13,17

80:10,16
dealing
24:11
70:10
78:19
dealings
34:6
deals 37:14
76:11
dealt 54:9
79:12
Dean 18:22
61:21
67:19,25
68:2,18
Deborah 1:5
4:9
debt 18:8
decided
19:14
43:14
decision
12:13 22:3
28:17 34:7
49:2
deck 80:25
default
24:12
Defendant
1:10 2:12
4:25
defer 48:1
definitely
82:7
delay 79:1
delays 78:2
deliberative
21:7
demand
16:8 20:9
21:13 39:8
39:12
demands
39:4
demonstr...
27:8 28:2
Department
8:9 13:10
13:18 14:7
14:17 15:3
16:7 17:18

18:17
19:20 20:7
21:3,3,6
21:21 22:1
22:6,13,24
23:7,13,17
24:2,9,18
26:19 27:8
27:14,22
28:22,23
30:12,18
31:10,19
32:9 34:3
34:6,10,18
35:2,14
36:1,10,13
37:2,10
38:5,8
39:1,7
40:23
41:11
42:24 43:3
43:8,12,25
44:17 47:2
48:14 49:3
50:9 51:13
54:9 55:12
56:19
58:18 59:2
59:14,22
60:2 65:14
70:21,25
71:2 72:25
72:25 73:3
73:5,10
74:2 78:13
82:10,14
deposition
1:17 4:1,8
61:9 66:7
73:23
74:13 76:7
81:11
83:17 85:2
86:5,13,15
Deputy 60:4
describe
6:18 17:12
74:21
described
79:20

designed
22:12
detail 6:16
detailed 8:2
26:14
details
24:23 62:8
62:9
dialogue
83:3
different
15:7,8
16:14
55:17
difficult
37:23,25
digital 9:24
diligence
26:25
direct 20:13
81:25
directed
53:24 54:7
55:2
direction
53:18
86:12
directly
60:9 63:16
director
10:11
directors
67:22
disburse...
40:19,20
discuss 12:9
discussed
74:12
discussing
74:4
discussion
16:9 48:10
discussions
16:13
49:22
73:11
79:15
displace
32:25
displacem...
51:1

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 91

dispute
34:15
distributi...
34:13,20
52:1,3
District 1:1
1:1 4:11
4:11
dividends
34:12,20
52:2,3
divine 20:20
65:11
Division 1:2
4:12
document
7:15 11:7
17:16
24:24 58:5
63:14
65:19 66:6
70:7 72:14
74:18 75:3
77:8 78:8
document...
40:22
documents
6:17 9:25
11:8,14,15
12:13,16
14:3,11,12
25:24
58:25 59:1
75:10,13
77:10
78:12
80:25
DOE 49:7
75:25
doing 6:4
10:1 11:21
13:13
27:12
46:12
50:22
52:23
82:21
donating
80:6
donation
6:22 13:24

16:5 64:17
70:8 74:14
77:13
doubt 9:4
doubted
59:22
doubts
21:22,23
22:8
downward
18:14
draconian
23:9,14
28:4 36:17
draft 11:7
13:1 42:12
45:3 47:18
70:6 74:18
74:25 75:5
drafted 13:1
drafts 14:5
14:11 76:9
77:1,2
dramatic
43:5 82:9
dramatica...
23:21
dream 6:5,9
12:9,19
16:2 44:15
Drive 2:9
drop 83:4
due 26:25
DULY 5:9
86:6,9

_____ E _____

E 3:1 17:20
39:25
42:13 46:8
47:23 48:6
48:16 53:5
53:7,17
70:16
74:11
earlier 25:4
26:17
29:20 39:6
40:14
52:17
64:12 65:3

65:5 66:24
67:19 70:5
70:7,23
71:20 74:4
74:17
75:12 76:1
76:6 81:10
82:11
early 19:9
19:11 74:7
74:16
earn 35:1
40:20
ease 83:2
easier 80:4
80:8
ed 18:17
22:24 24:4
24:8 36:4
42:17,18
44:12
45:22
48:23
55:13
EDMC 36:2
EDMC's 36:7
education
8:10 13:10
14:8 15:4
15:22
17:19
19:20 20:7
21:3,6
22:7 24:2
24:14 25:6
25:13
27:14
31:19 32:9
33:7 34:3
35:14 36:2
36:3 38:5
39:8 42:24
44:17
48:14
51:13
54:10 59:3
65:14
70:21 74:3
Education's
30:18
34:11

EDUCATI...
1:5
effect 29:19
40:14
effectively
30:21
56:22,25
73:19
effort 8:13
9:23 59:11
59:12 60:7
efforts
39:25 40:5
41:7
either 53:23
54:12,21
63:10
77:25 78:2
80:17
electronic
17:19,20
eligibility
55:14,16
eliminate
29:25
email 2:4,11
2:16 3:8,9
3:11,12
8:14 9:24
10:1 11:22
13:12,17
14:1 17:5
18:19,22
19:1,3,7
19:19
27:19
28:20 29:9
29:10,15
34:21
38:16,17
39:17,19
41:19,20
42:6,6
45:6 48:19
49:4 50:16
50:22,23
52:18,25
54:2 56:9
56:11,14
57:17,19
57:25 58:9

58:9,13,16
58:24 59:9
59:13
60:22
61:19,21
63:12 65:4
66:19
67:16 68:1
68:4,11,15
68:22 69:3
69:21
71:12
72:15,18
72:20
73:13,16
75:21
81:25 82:6
emails 11:5
13:12
14:24 29:5
61:18 78:6
emphasize
52:19
employed
25:3 80:13
81:7
employees
34:12
encourage
27:13
ended 56:25
73:19
engage 26:7
engaged
69:7
enroll 20:10
44:6
enrolling
41:4
enrollment
18:6 44:4
ensure 7:20
enter 32:22
entered 7:1
36:4
entertain
73:10
entity 77:18
entrenched
75:24
entry 7:2

envisioned
26:2
equivalent
7:20
ERRATA
84:1 85:3
ESI 1:6
especially
21:13
23:14
33:20
76:17
Esq 2:5,5,6
2:6,11,12
2:17
essence
47:24 53:9
75:15
essentially
45:12 50:7
50:25
51:19
estate 72:12
et 4:9
eventual
7:13
evolve
76:20
exact 12:24
13:17
74:15
exactly
25:12
50:12
examinati...
3:2,3 5:11
64:7 65:6
example
54:19,25
exchange
18:9 19:2
exchanges
10:19
excuse 52:2
executives
32:6 75:24
79:4
exercise
10:1
exhibit 3:8
3:9,11,12

Case 1:18-cv-02182-JPH-TAB   Document 123-43   Filed 06/18/21   Page 93 of 105 PageID #:
4987
Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 92

| | | | | | |
|---|---|---|---|---|---|
| 3:16,17 | expressed | 71:10 | 83:8 | formed 6:24 | 40:16 44:3 |
| 19:1 24:20 | 67:14 71:3 | figurative | Fingerk@... | forth 74:24 | furnished |
| 29:4,8 | 76:5 | 83:5 | 2:11 | 75:9 | 75:1 |
| 57:21,25 | expressing | file 17:18 | Finley 54:11 | forward | further 17:6 |
| 64:11 65:7 | 28:18 72:1 | 39:1 48:6 | 54:15,18 | 10:25 | 17:11 |
| 66:7,9,24 | extended | 48:16 53:5 | firm 4:24 | 11:18 | 48:10 |
| 71:11 | 17:4 65:2 | 53:7 58:25 | 5:3 12:5 | 24:12 | 53:13 64:1 |
| 73:23,24 | 72:3 | 73:16 81:1 | 17:17 | 30:24 31:6 | 71:13 |
| 81:23 | extent | filed 4:10 | 32:19 | 47:17 | 73:10 |
| **Exhibits** 3:6 | 21:21 | 40:1 56:3 | 47:21 | 79:14 | |
| 3:15 | | 56:25 | 50:24 70:9 | forwarded | **G** |
| existed 28:3 | **F** | 70:16 74:2 | 70:16 75:1 | 58:11 59:5 | gain 35:1 |
| 43:10,13 | F 46:8 | 74:6,10,11 | first 6:17 | 68:1,18 | gatekeeper |
| 43:14 | facility | 74:15 | 9:14 10:3 | found 13:11 | 43:18 |
| existing | 15:15 | files 9:24,25 | 11:7,15,19 | foundation | general |
| 21:22,25 | fact 7:15 | 72:21 | 18:21,22 | 6:1,6,10 | 6:13 8:23 |
| 22:1 23:1 | 8:22 50:11 | filing 47:21 | 22:10 | 26:12 | 19:11,12 |
| 29:25 | 54:20 | final 14:6,11 | 25:24 29:5 | 44:15 76:3 | 28:19 36:5 |
| 31:12 33:1 | 60:24 | 77:8 78:12 | 29:9 32:5 | four 13:15 | 37:14,15 |
| 33:11,18 | 65:21,24 | finalize 75:5 | 50:14 51:6 | 36:12 | 54:10 62:6 |
| 33:23 | 68:18 | finally 13:21 | 52:9 60:13 | 40:13 | 62:16 |
| 34:24 35:3 | factor 27:5 | financial | 64:11,13 | fourth 75:22 | 76:23 |
| 38:25 | 27:16 | 37:18 | 64:16,16 | frame 9:15 | 77:21 |
| 39:14 | 75:19 | 60:13 | 69:3 74:17 | frank 63:17 | 78:15 81:6 |
| 59:23 | fair 7:20 | financially | 75:23 86:6 | frankly | generalities |
| expand | 65:18 | 37:23 | five 13:15 | 36:18 | 62:7 |
| 15:13,22 | 76:22 | financing | 57:7 | 37:14 | generally |
| expect | 77:19 | 10:17 | fixed 18:8 | frequency | 6:18 8:4 |
| 78:22 | fairly 37:16 | 16:24 | flat 17:7 | 37:5 | 10:15 |
| expectation | faith-based | 17:15,23 | float 40:25 | frequently | 17:12 81:3 |
| 8:4 | 25:15 | 18:1,2 | follow 53:19 | 79:5,8 | genius 80:2 |
| expense | familiar | 19:25 | 58:24 | Frets 2:14 | GENTILE |
| 35:12 | 61:16,17 | 36:15 48:9 | following | 5:3 | 2:14 |
| expenses | 61:23 69:8 | find 9:25 | 29:18 | Friday 56:10 | getting |
| 33:5 | 69:11 | 13:25 | 31:22 | 60:13 | 17:23 |
| experience | favorable | 14:23 | 51:15,16 | friend 62:17 | 26:14 34:7 |
| 21:2 23:22 | 30:20 | 35:24 60:1 | 56:14 | Frola 8:16 | 36:25 41:2 |
| 24:1 43:23 | federal | fine 49:21 | for-profit | 8:20 54:1 | 44:16,20 |
| 54:11,15 | 21:11 | 51:7 57:5 | 49:9 82:17 | 54:3,18,25 | 53:5,24 |
| 59:18 | 40:15 41:2 | Finger 2:11 | 83:7 | 55:20 | 59:10 62:6 |
| experiences | 43:15,16 | 3:3 4:23 | foregoing | front 22:18 | 62:7 76:9 |
| 27:24 | 43:17 44:8 | 4:23 26:12 | 52:6 86:11 | 41:10 | 77:1,6,19 |
| explain | 55:13 | 64:4,8 | forfeiture | 53:18 | 77:19 |
| 34:13 | felt 21:5,9 | 66:10,13 | 33:14 | 65:20 | give 10:7 |
| 35:18 | 21:18,21 | 66:15,17 | forget 46:8 | frustrated | 19:18 |
| exposed | 26:17 | 68:6,10,14 | form 68:3 | 77:23,24 | 26:25 |
| 22:16 | 27:25 41:8 | 68:17,24 | 68:20 76:2 | frustration | 45:22 67:8 |
| express | 44:19,23 | 71:7,10,16 | 81:13,17 | 78:25 | 72:15 82:2 |
| 28:22 | 53:16 | 73:22,25 | formal 14:7 | fundamen... | given 43:12 |
| 46:23 | 76:14,23 | 78:1 81:18 | 14:17 56:8 | 59:20 | gives 23:3 |
| 70:21 | fifth 52:4 | 81:21,24 | 65:1 | funding | go 5:14 6:17 |

9:24 12:14
18:19 19:2
24:20 29:3
41:19
57:17
63:20 64:9
66:18,20
67:1,6,18
68:14 69:2
71:10,12
72:14
81:19,21
**goal** 27:17
**God** 68:22
**goes** 82:1
**going** 7:5,5
7:10,24,25
10:13,22
13:15
14:16 21:5
24:22 26:5
27:9 28:1
29:1 30:14
30:15,24
31:6 42:17
43:18 44:7
46:3,16
47:3 52:19
52:22 57:7
57:11
58:23 61:5
62:7,18
63:20
72:11,25
77:1 78:6
79:12,14
80:11,24
81:9 82:24
83:15
**Goldstein**
12:4 29:16
38:21
39:20 69:5
69:9,21
70:1
**good** 4:5
5:13,23
9:9 13:23
57:10
59:16
64:21

69:16
**GOSS** 2:14
**gotten** 77:8
**government**
43:15
**governme...**
43:16
**granting**
31:19
51:13
**great** 21:9
23:4 59:21
**greater**
22:11,16
**Greenberg**
2:8 4:24
**ground**
76:13
**group** 24:10
**guaranty**
14:14
**guess** 24:5
71:13
72:10
80:12
**guy** 8:21
54:5
**guys** 12:16
13:21 14:9
14:22
49:18
55:24
56:15

_____
**H**
**half** 57:8
**hand** 40:10
86:20
**handful**
75:24
**happen** 8:22
11:23,23
16:10,21
48:15
**happened**
8:16 14:15
14:25 36:1
56:2 59:24
60:19
65:25 71:5
74:9 76:14

82:18
**happens**
76:11
**hard** 77:6
**hate** 43:2
**HCM2** 40:16
44:2
**head** 55:11
**headed**
55:20
**heads** 78:14
**healthy**
37:16
**hear** 10:18
53:8 56:15
**heard** 55:22
61:7 62:14
62:22 78:8
**hearing**
10:25 12:7
25:20
56:13
**held** 33:15
**help** 32:24
33:2 38:4
**helpful**
18:18 34:2
**HERETO**
86:17
**hey** 56:15
**Hi** 19:23
53:3
**high** 6:14
16:8 26:16
59:10
**higher** 24:4
24:8,14
25:6,12
33:7 36:4
41:18
54:14
**highly** 65:14
**holding**
49:22
**Holt** 1:18
3:9,11,12
4:2,8 5:4,9
5:13,18,23
5:25 6:5
18:25 19:7
24:21 29:5

29:13
38:10,19
48:5 49:25
52:24
53:22 56:1
57:17,23
58:4 64:2
64:4 66:7
66:9,19
71:14,17
73:23,24
74:1 79:17
81:23 83:9
83:10 85:1
86:6
**HOLT002...**
3:11
**HOLT002...**
3:8
**HOLT002...**
3:10
**HOLT002...**
3:13
**honestly**
13:5 60:22
**hope** 42:11
45:1 59:13
**hopeful**
48:15 63:4
**hour** 57:8

_____
**I**
**idea** 9:17
10:3 12:2
16:5 22:4
30:22
34:23,25
36:9 39:3
47:6 62:16
64:18
**ideas** 49:20
**identificat...**
57:22 66:9
73:24
81:23
**Ihrig** 2:6
4:21
**IL** 2:10
**immediat...**
40:14
41:11

**imminent**
39:24 40:3
41:6
**IMPARTI...**
86:19
**implicit** 47:6
72:23
**implicitly**
21:14 22:7
**important**
26:9 35:19
52:15
**imposed**
37:20
**impression**
34:16
70:12
**include** 20:4
24:25
26:10 28:9
31:2 35:19
52:15
**includes**
20:19
**including**
20:8 36:2
38:2 51:1
63:24
**inconsiste...**
53:10
**increase**
16:18 22:6
22:7,14
39:9,14
43:1
**increased**
15:4 19:20
20:9 23:20
39:4
**increases**
38:25 52:1
**independ...**
49:5
**INDEX** 3:6
**Indiana** 1:1
4:11 25:10
**Indianapo...**
1:2 4:12
**indicated**
10:12,24
47:14 54:4

**individuals**
8:24 26:6
53:24
**industry**
43:7 82:17
**information**
53:18
**informed**
55:7 61:3
**inherently**
80:11
**initial** 16:5
16:17
17:13
53:15
55:10
**initially** 8:15
24:7
**input** 75:4
**inside** 27:1
**insisted**
22:2
**Institute**
26:5
**institution**
25:6 29:24
31:6 32:20
33:11,15
37:22
**institution's**
30:23
**institutions**
17:18 49:9
49:10
52:11
55:15
**instructed**
41:4
**intended**
16:1
**intends** 56:6
**intent** 12:21
**intention**
71:21
**interest**
43:17 72:3
86:18
**interested**
15:24
26:22 73:5
86:17

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 94

| | | | | | |
|---|---|---|---|---|---|
| interim 20:4 20:19 21:19 25:1 26:10 28:9 36:16,25 44:22,25 46:23 48:2 48:11 49:17 50:6 51:8 | 63:21 70:6 71:3 80:11 80:19 involvem... 9:18 11:17 11:17 20:5 25:1 26:10 28:10 30:8 51:1 | 34:23 35:2 36:18 37:24 38:24 39:6 39:8,12,13 39:24 40:4 41:7 42:11 42:19 43:10,14 44:15 45:1 | 55:15 Ivy 25:10,11 _____ J _____ J 1:5 4:9 J-DEAN_0... 3:18 Jahm 66:3 January 1:25 4:2,6 | Kelyn 2:12 4:25 66:10 66:13 68:6 68:14 71:7 81:19 kept 79:23 Kessler 2:6 4:22 Kevin 1:9 | 13:11,14 13:14,25 14:24 16:3 16:5,7,10 17:10 19:13 21:15 23:18 24:17 |
| internal 33:4 internally 26:23 internet 65:19 interpreted 16:15,16 30:6 interruption 44:4 interventi... 20:20 65:11 intransige... 76:13 intrigued 25:13 introduce 4:18 invade 62:9 invitation 17:5 involve 10:17 36:12 49:21 65:25 involved 6:21 7:13 11:25 13:8 15:14,16 16:24 21:4 21:12 24:8 24:16 25:12 27:6 28:12 30:2 30:15,23 31:6,13 32:7,14 33:22 34:1 | involving 79:15 issue 46:15 71:25 77:14 issued 14:17 72:22 issues 41:24 43:13 60:13 71:22,24 72:5,13 item 38:22 51:24 items 52:6 ITT 1:5 6:7 6:11,22,25 7:3,4,5,11 7:12,24 8:5,6,11 8:22 9:8 9:19 11:1 11:25 12:5 12:18 13:2 16:4,14,16 16:18,19 17:2,17,21 18:4 19:23 19:24 20:6 20:9 21:19 22:21 25:14 26:3 26:11,18 27:10 28:10,21 30:1,9,14 30:21,22 31:21 32:5 32:7,12,17 33:23 34:1 34:12,18 | 45:14 46:16,22 47:18 48:3 48:8,14 49:6 50:1 51:1,7 52:11,20 53:5 54:5 54:23 55:1 55:18 56:4 56:10,24 59:19,22 61:12,14 62:2,4 63:6 65:22 67:12,22 69:18,22 70:4,22 71:17 72:7 73:4,20 74:2 76:14 77:7 78:2 79:24 80:3 80:11,14 80:15,17 80:19 81:5 81:12 82:8 ITT's 7:25 15:4 18:10 19:21 22:8 23:9 28:11 30:25 32:14 34:2 52:10 56:16 58:19 64:14 70:1 ITT/DCF 34:10 35:11 71:4 IV 22:11,25 | 86:6,20 Jay 29:11,16 29:16 38:21 39:19,23 50:17,23 51:6 53:3 70:18 Jo 2:17 5:2 5:15,17 job 15:20 John 18:22 61:21 join 47:1 joined 26:18 judgment 21:18 22:10 23:22 26:16 27:20 34:5 37:7 40:8 43:23 48:25,25 July 25:20 70:11 74:16 jump 31:18 June 10:23 11:6,16,18 11:20,23 39:8 70:5 74:7,16,18 74:22 _____ K _____ Kansas 2:15 KAPLAN 2:2 keep 35:2 59:13 75:16 76:8 | 2:11 4:9 4:23,25 12:7 17:2 17:25 19:4 19:19,23 28:12,25 31:2,5 34:22 35:7 35:9 38:12 39:20 41:20 42:10 45:1 50:1,17 51:5 54:18 56:10 60:15,15 62:2,21 66:2 71:25 73:17 79:10 80:12,17 81:7 key 33:7 kicked 20:24 kind 10:7 23:18 47:18 48:2 73:1 76:12 75:8,18 knew 27:21 37:8 44:18 61:4,24 78:18 82:22 know 8:7,14 8:16 9:10 9:21 10:5 10:12,17 11:2,7,14 11:21 12:10,10 12:21 13:1 | 26:13 27:5 27:8,18 28:14 29:12 33:18,20 33:21 35:2 36:19 37:15,17 40:8 43:2 43:11 44:18 49:11 53:22,23 55:4,6,23 56:5,5,22 58:8 59:10 59:21 60:24 62:5 62:14 63:18 65:24 66:1 67:19,21 69:14 70:4 71:2 72:6 72:23 73:11,12 74:10,13 74:25 75:5 76:11,16 77:5,6,9 77:18 78:5 78:10,15 78:18 79:10,11 80:18 82:13 knowledge 40:7 59:17 knowledg... 43:7 |

Benchmark Reporting Agency
612.338.3376

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 95

---

**L**

L 5:25
LA 15:15
Lamplight 7:6
Lamplighter 81:5
language 47:19 65:16
large 25:9 27:22
LaSalle 2:2
last-ditch 60:7
late 11:6,15 11:18,20 11:23 14:10,19 24:6,9 31:9 74:16 74:18,22
law 5:3 12:4 17:17 24:7 50:24
lawsuit 22:20,22
lawyer 54:8
lawyers 10:25 54:6 56:12 69:16 75:18 79:5
lay 6:1
lays 50:24
LC 39:5,5
leading 31:23
learn 26:23
learned 8:19,20 60:20,23
leases 72:6 72:10,11
led 9:23
left 25:11
legal 4:14
let's 6:14,14 9:13,13 18:18,18 20:22

24:20 29:3
38:15,16
57:6 64:9
letter 12:21 14:1,18 15:1 16:7 16:8,15 19:14 20:9 20:25 21:1 21:1,8,12 22:12,14 22:17 23:20 26:21 27:14,21 30:6 34:18 36:19 38:25 39:4 39:9,11,14 40:12 43:20 44:1 61:1 63:11 63:23 64:22 73:4 73:15 81:9 81:10 82:5 82:10
level 6:15 26:16 31:12 36:9 54:13,14 59:10
liabilities 18:6
license 14:13
licensing 32:10
life 15:17
lightly 43:5
line 4:21
lines 23:19 49:18
listed 51:19 58:8
lists 45:15 45:16,19 45:22,25
literally 10:23 15:20

litigation 24:8,9,17
little 24:21 24:22 67:1 71:11
lives 15:18
LLP 2:2,8
loan 17:10 24:12 72:1
locate 56:18
long 9:18 40:11 44:19 49:9 65:17
long-term 7:3 80:7
longer 28:12 31:13 32:14 42:19
look 10:3 12:12 29:15 30:17 35:11 38:15,17 41:20 42:5 45:8 47:9 50:16,22 52:4,24 60:8 63:3 72:16
looked 10:24 12:20 14:23 26:24 27:21 52:18 66:23
looking 12:22 13:12 25:11 33:21 68:11 76:9 78:6,6
looks 83:4
Los 12:8
lot 15:19

35:22 41:1
54:15
76:11,16
78:20

---

**M**

M&A 27:2
main 15:15
making 9:1 12:19 34:19 36:14 47:1 48:8 54:22 59:12 77:12,18
manage 23:2
managed 11:9,24 13:8 28:3 28:4 52:11 60:3
managem... 7:14,24,25 8:6 9:14 9:17 12:1 20:6 21:14 21:22,25 22:1,8,22 23:2,5,6,8 23:12 26:10 27:10 28:10,11 28:22 30:22,25 31:12 32:6 32:7,8,13 32:14,17 32:22,23 33:1,4,6 33:12,18 33:19,25 34:2,19 35:6,10,14 35:20 36:3 37:12,18 38:3 43:22 43:24 44:2 44:3,5,9 44:21,22

44:24
45:19
46:24 47:4
47:7 48:11
49:17 50:6
50:10 51:2
59:22,23
62:13
65:21
69:22 70:2
70:15,22
80:12
82:20
manages 55:14
managing 10:10
margins 77:3
mark 66:7 73:22 75:3
marked 3:15 19:1 57:21,24 66:9 73:24 81:23
market 7:17 18:10 76:22 77:19
marketing 33:4 36:8
markup 74:25 75:5
Mary 2:17 5:2,15,17
master 7:16 75:10
material 41:24
materials 12:23
matter 4:8 9:20 72:23 86:7,12
matters 69:14
Mcollyard... 2:4
mean 22:9 22:20 32:1

32:25
37:14 39:1
61:16
65:16
74:13 77:9
79:19,24
80:10 82:8
meaning 31:9 32:18
means 63:19
meant 23:16 34:14 35:6 48:19 70:14 80:12 83:6
measure 22:13 37:8 37:19 44:2 44:3,5 46:24 49:17
measures 20:19 21:20 23:6 23:8,12,14 31:20 36:17 42:18,25 43:20,24 44:9,13,21 44:22,24 48:12 49:7 50:6,8,10 51:9,14 82:20,21
meet 36:18 63:21 65:22 66:5 67:3,4,12
meeting 12:11 48:13,17 53:21 63:5
meeting/... 47:22
member 60:10,21 61:7,11,12 61:15 62:2 62:17

---

**Benchmark Reporting Agency**
**612.338.3376**

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 96

members
58:22 61:3
62:1
mention
18:1
mentioned
15:1 18:1
25:4 27:18
61:19 65:5
70:23
75:12
82:11
message
13:17 17:5
27:19 56:9
56:12
72:23 73:9
messages
8:14 10:2
met 12:8
39:4 69:12
79:4,8
Michael 2:5
29:16
38:21
39:19
middle 19:3
63:22
68:15
Mike 4:19
5:16 8:16
8:20 12:4
29:17
39:23
53:25 54:3
million 15:5
18:13
19:21 22:7
36:20
39:10,10
72:2
mind 23:3
28:1 38:8
43:19
44:13
49:19 73:1
Minneapolis
2:3
MINNESO...
86:1,9
minute 57:7

minutes
57:3
mission
15:13
mistaken
67:24
misunder...
64:20
Mitchell
58:1,23
59:9 60:5
60:9 63:16
63:21
73:13
75:22
MN 2:3
MO 2:15
Modany 1:9
4:9,25
12:7 17:2
17:25 19:4
19:19
28:12,25
31:2,5
34:22 35:7
35:9 38:12
39:21
41:16,20
41:23 42:2
42:5 45:4
45:8,9,12
46:3,10,19
48:22 50:1
50:17 51:5
54:19
56:10 62:3
66:2 67:3
68:1,18
72:1,15,17
79:18
80:12,17
80:18 81:7
moment
67:8 81:20
82:2
Monday
67:3,4,12
money
40:17,19
40:25 41:2
72:9

monitor
21:24
35:13,18
35:20 36:6
36:23 37:3
37:11 38:2
38:6 45:25
50:13
63:24
monthly
37:5
months
9:20 10:18
10:22
36:13
75:25 79:3
months'
78:3
morning 4:5
5:13,23
move 10:25
24:24
47:17
49:11
moving
75:17 76:8
MSA 7:16
75:10
76:15
77:10
78:15
Mshaney...
2:16
multiple
24:15
multiregi...
55:12,20
mute 83:12
83:13

_____
      N
_____
N 3:1
Najafi 17:23
18:1 19:25
36:15 48:8
65:22 66:3
67:7,11
68:23
name 4:13
4:14,23
5:2,24 7:6

25:19 26:4
61:16,18
61:21 81:4
named 8:16
54:10
narrative
29:17
42:13 45:3
NASI-PIN...
1:25 86:5
nature
64:13
near 20:11
necessarily
32:16
33:16
necessary
7:9 44:12
need 10:17
10:20
15:20 17:9
19:16 20:4
24:25 28:9
37:1 47:18
51:9 56:15
63:6 72:11
needed
21:18,19
36:16
41:10,11
42:17,23
44:20
53:17 54:5
needs 29:17
negotiate
17:6 75:8
negotiating
9:7 14:3
25:24
negotiation
17:11 78:4
negotiatio...
69:18 70:2
72:11
73:20
74:22 76:8
77:25
neighborh...
18:12
neither
67:11

never 55:22
56:13
70:23
new 23:15
24:11 26:3
30:13 41:4
42:13 45:3
46:12 81:4
night 41:16
47:10
nonprofit
7:18,19
76:17
78:19
nonprofits
52:2
normally
54:8
NOTARY
85:12 86:8
86:23
NOTED 85:3
NOTES
86:11
NOTICED
86:13
notification
82:23
notified
72:24
notify 53:6
notifying
73:4
number
4:10 18:21
29:22 34:9
58:15 66:7
73:23
NUMBER/...
3:7

_____
      O
_____
OATH 86:10
Obama
54:13
Object 68:3
68:20 76:2
81:13,17
Objection
26:12
obligation

7:19
observati...
63:17
observe
78:2
obviously
7:18 21:9
40:9 76:5
occasion
54:17
occur 47:23
occurred
62:11 66:2
occurring
83:3
Odle 61:15
61:23
offer 21:25
80:7
offered
23:12
60:14
offering
21:23 23:6
office 8:23
9:22 54:10
55:13
offices
55:17 67:4
offline
79:15
Oh 82:4
Okay 5:23
6:14 9:13
11:24
12:17 13:4
13:7 18:18
18:22,24
19:23
24:20 29:7
29:15
39:16
41:22
50:21 57:6
57:9 60:8
63:3 65:18
66:16,22
67:1,10
68:8 71:15
75:20
on-site 27:4

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 97

27:10
once 63:10
79:13
82:21
onerous
40:21
41:12 49:2
ongoing
77:20
open 17:11
21:19
28:23
60:12
operate
15:25 18:5
25:5 40:11
40:17
42:19 49:8
operated
36:11 37:3
operating
50:14
operation
7:9 36:7
operations
30:24
32:24
opinion
54:18
63:19
69:25 76:4
opportunity
10:15
15:12 16:2
25:12
opposite
69:14
order 5:18
5:21 21:5
22:19
47:17
ORDERED
86:14
ordinary
37:21
organizati...
15:14
original
74:11
80:20,21
80:22

86:13
originally
50:5
ought 13:16
14:9
OUTCOME
86:17
outlined
42:17,23
outright
64:19
outset 10:16
outside
26:24
36:23
outsourced
7:10
Ovando
62:13
overcome
21:23
oversee
21:24
35:14,20
36:7 37:12
38:2
overseeing
35:25
oversight
20:19
21:20
36:24
owned 72:7
72:12
owners
46:12
ownership
33:11
_____P_____
p.m 38:19
39:17 42:7
45:9 50:18
50:19,20
53:1,4
66:21
package
28:2 40:21
page 3:2,3,8
3:10,11,13
18:21,22

19:3 29:5
38:18
41:18,21
52:24
68:12
71:11,14
81:22 82:1
82:2
PAGE/LN
84:2
PAGES 85:2
paragraph
20:3 52:5
75:22
parenthet...
30:16,17
31:14
part 7:21,23
7:23,25
8:1 13:5
14:24
21:10 23:5
25:14,22
28:21
30:11
31:21
32:12 34:9
35:9 36:6
36:22
38:11
39:15
49:15
58:24
63:25 68:4
79:18,20
participat...
55:15
particular
8:10 30:8
47:3 70:18
particularly
18:16 36:8
parties 12:6
12:11 14:4
36:25
75:14
86:14,17
86:18
party 66:3
76:12
86:13

path 12:14
pay 18:9
payment
40:23
PC 2:14
peace 23:3
people 8:23
10:2 12:8
15:17,20
21:4 23:18
25:16 27:9
36:3 41:8
43:6 49:1
58:15,17
60:2 70:10
perceived
33:9
percent
13:3 18:9
perception
27:20
29:25
31:15
period
31:23
36:16,25
40:18,21
44:25
perpetuat...
9:8
person 61:5
personal
27:24
48:25
personally
9:23 40:6
40:7 53:22
personnel
27:4
PERSONS
86:18
perspective
43:22
65:13
persuade
23:13
26:20
53:20
persuading
38:8
persuasive

34:7 37:9
pertaining
55:1
Peter 2:6
4:21
Phoenix
17:24
phone 2:4
2:10,16
8:15 9:1
11:2,21
13:18,20
48:17
53:20 54:2
62:11,13
79:8
physical
15:15
pick 77:3
piece 8:1
Pinardi 4:14
place 5:19
8:7 10:21
34:17 35:4
36:21
37:11
51:20,22
79:24
plaintiff 2:7
4:20 65:5
72:22
Plaintiff's
3:8,16,17
19:1 24:20
29:4,8
57:21,24
64:9 65:7
67:18 69:2
69:4 75:20
Plaintiffs
1:7
plan 19:15
plans 29:22
49:6 53:7
please 4:17
5:23 41:19
65:18
66:11 68:7
69:3 71:8
71:12,13
81:19,22

plus 16:5
64:17
point 8:2,8
8:17,18,19
9:9 11:18
11:20 13:7
19:13 21:2
23:8 24:3
25:5 31:8
31:13
32:18 36:2
37:24
40:11,13
41:3 44:5
44:19
48:13
51:10 52:9
52:17 56:7
56:21,23
56:24 59:6
61:2 69:12
70:2,12
pointing
77:1
points 51:7
52:5 76:10
76:12
78:15,17
polite 49:16
political
54:13
posed 21:11
position
21:6 28:16
28:25
36:18
37:18,23
37:25
76:24
positions
76:15 77:7
possibility
15:11
21:25
25:14 38:7
55:8
possible
16:11
20:18
23:10
29:25

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 98

32:17
41:12,14
74:9 78:13
post 45:13
46:13,17
80:19
post-closi...
50:3,10
51:9
post-tran...
51:2
posted 39:6
39:7,12
postsecon...
15:22
potential
10:15 12:9
71:4
practical
60:16
practice
24:13 75:7
practicing
24:7
pre 46:16
pre-acqui...
46:21
pre-closing
33:13,20
36:11,12
50:2,6,8
prepare
74:25
prepared
67:3 81:1
present
4:17 78:13
79:5
presented
14:7 16:2
16:3 65:3
65:7
preserve
10:14
26:15
press 43:9
pretty 8:17
43:21
55:21 75:7
82:9,15
Previously

3:15
price 18:13
primary
11:8 27:7
71:25
72:13 75:9
principal
72:2
principals
53:21
principle
30:20
42:12 45:2
45:4
prior 20:6
26:11
27:12
28:10,13
30:7 31:11
32:3,18
34:18
35:15,21
37:12 38:3
39:12
47:20
53:24
71:13
82:23
private
24:10
privilege
10:14
26:15
62:10 63:2
privileged
63:14
probably
11:3,4,5
36:12
53:25 57:2
63:14
64:21 66:1
77:4 79:14
problems
43:14
59:24
proceed 5:7
process
27:5
produced
11:6 14:24

58:4,4
59:4 60:23
production
63:13
programs
15:19
21:11
22:11
59:21
progressed
10:4
prohibition
51:25
prohibitions
34:11,17
34:24 35:3
35:5,6
prompted
72:17
property
72:6,7
proposal
6:9,18,19
6:19 9:3
9:14,15,17
12:18 13:2
13:6 16:14
16:17,19
16:23 17:1
17:2,4,9
17:13,14
17:22,25
20:18
21:16
23:24
26:18,18
28:9 30:11
30:14 31:8
31:11,11
31:16
36:14 38:6
39:15 41:9
41:10,13
44:22 46:7
47:4 48:7
48:11 49:6
49:17 50:4
53:15 55:6
56:8,9,12
56:20
58:19

59:15
60:11,13
62:3,19
64:13,16
64:16,18
64:23,23
64:24 65:1
65:10
66:23
67:25
71:17,20
73:1 81:1
proposals
6:12,15
18:15
44:12
46:24 47:2
49:20 51:8
62:22
propose
50:9
proposed
6:7 19:12
23:15 25:7
31:5 33:16
42:3,10,13
42:23
44:14 45:3
46:4 47:15
50:25
51:20
52:10 56:4
72:9
proposing
18:3 19:24
20:23 30:5
72:4,8,10
prospect
44:20
prospective
32:21
33:12
protective
5:18
provide
32:23 36:9
provided
7:17 19:25
36:15
58:12
providing

36:24
public 21:8
77:18
79:24
85:12 86:8
86:23
pull 16:23
pun 16:1
purchase
11:12 18:4
29:23
purpose
35:18
pursuant
5:20
pursue 49:7
pursuing
9:6 22:21
push 46:8
pushback
34:22
76:25
pushing
73:11
put 8:7
10:20
19:16
40:21
43:19
59:19
66:10 71:7
83:2
putting 55:6

_____

Q

quantify
79:2
quarterly
51:25
question
17:22
29:19
33:17
42:13 45:3
56:6 64:20
64:21
70:16,20
78:10 79:9
81:14
questions
64:2,5

83:9
quite 33:3
60:21
82:18

_____

R

raised 65:4
ran 10:1
61:18
Randy 10:9
11:22 12:4
25:21
62:11 66:2
79:9 81:2
RATE 86:14
rates 7:17
24:12
reach 40:8
60:4
reached
12:11 54:8
reaching
15:16
58:17
reaction
43:8
read 23:19
43:9 49:18
50:12
60:25 67:8
75:23,23
82:3 85:1
READING
86:15
reads 34:10
35:11 52:5
ready 67:3
real 33:19
72:6,12
77:14
reality
44:18
really 8:20
9:11 11:16
33:21
53:16,23
54:4,11
56:15
59:16
60:24 61:7
62:8 79:2

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 99

79:8 82:16
**reason** 23:1
60:6 84:2
**reasonable**
78:9
**reasons**
67:14
**rebrand** 7:5
80:24 81:6
**rebranded**
26:4
**recall** 6:12
7:23 8:8
8:13,19
9:11 12:7
13:17,17
19:7,9,9
19:12
25:19
28:18
34:21 39:6
40:6,12
50:12
53:13 54:1
54:20 55:3
56:11 58:6
61:22,25
62:8,25
71:1,5,6
71:25
72:17,19
72:20 73:7
73:9 74:1
74:15
75:17
77:23
80:10 81:4
**recalled**
61:20
**receive** 11:6
44:8
**received**
16:18 70:6
**receiving**
7:20
**recipient**
76:18
78:21
**recognize**
20:17
**recollection**

6:13 8:3
9:3 10:6
67:10
74:20
76:23
77:21
78:16,24
**reconsider**
73:12 83:2
**record** 4:6
5:24 57:11
57:12,13
57:15
83:15,18
**recruited**
25:16
**redundant**
24:23 43:2
**reexamin...**
64:3
**refer** 65:10
**reference**
9:16 29:3
30:24
39:13
58:16
**Referenced**
3:15
**references**
17:15
**referred**
17:22
26:17 70:5
**referring**
15:3 34:20
39:3 42:2
77:22 82:5
**reflect**
17:21 48:7
76:22
77:20
**reflection**
65:13
**reflects**
40:9
**refresh**
67:10
**refreshed**
10:6
**regarded**
43:7

**regarding**
74:21
**regardless**
73:1
**regards**
74:3
**regional**
55:17
**regulation**
24:11
35:24
**regulator**
22:23 23:3
**regulators**
18:17
22:20
33:10,20
**regulatory**
33:15
59:24
**reject** 38:14
**rejected**
16:6 17:3
17:5,6
38:13
60:15
71:21
**rejection**
16:17 30:7
30:8,22
49:16
56:22
**related** 72:5
86:17
**relates** 61:6
**relating**
59:1 60:20
72:6
**relationship**
30:2,16
**relief** 31:20
38:23
42:20
51:13
**remain** 7:13
34:10
80:11
**remaining**
8:6 30:23
**remains**
52:20,22

**remedy**
37:22
**remember**
6:9 8:12
9:1 12:2
12:24
14:20 17:1
17:4,13
25:17
28:17
54:24 55:3
55:9,25
59:6 61:8
62:15,16
62:19,23
63:11 66:4
73:7,16
74:8 78:25
80:17,22
80:24
**removed**
41:12
**REPORTED**
86:5
**reporter** 5:6
73:23
**reporter's**
4:13
**Reporting**
4:15
**represent**
6:5 69:8
**represent...**
79:4
**represent...**
5:3 11:1
12:5 69:18
70:4,13,14
**require** 36:6
**required**
28:16
38:24 41:9
**requirem...**
10:21
**requiring**
65:10
**rescind** 20:8
27:14
**reserve**
64:3
**residential**

15:19
**resolve**
60:12
**respect** 6:6
9:16,18
24:1 38:11
42:25
43:16
**respond**
12:23 45:9
47:9 58:18
59:15
72:22 83:1
**responded**
63:13
**responding**
49:16
50:23
**responds**
41:16
**response**
9:21 30:20
39:12
43:15 45:7
56:18 58:5
63:15 67:2
67:7
**responsible**
77:17
**responsive**
9:25 59:3
**rest** 62:20
64:3
**restrictions**
38:23
41:12
**restrictive**
31:20
51:14
**result** 33:14
52:11
**results**
31:12
**retain** 30:1
**retaining**
30:14
**reverse**
21:6 38:9
49:2
**review**
47:20

72:21
74:18 75:3
**reviewing**
37:4
**revise** 51:7
**revised**
64:23 75:5
**RHODES**
2:14
**rid** 80:15
**right** 5:16
7:14 15:5
15:7,9
16:20
18:23,25
19:13,18
19:21
21:24
23:24
30:25 31:8
32:2 34:4
35:8 37:13
42:3 44:17
45:17 46:4
47:5 48:24
51:23
57:19,23
61:12
64:10,25
65:8 66:8
66:20,24
66:25 67:9
67:16
68:11,12
69:19
70:17 71:9
71:22 79:6
**risk** 21:10
22:11,16
22:24,25
23:1,2,4,5
23:6,7,11
28:3 43:21
43:24 44:2
44:3,5,9
44:21,22
44:24
46:24
48:11
49:16 50:6
50:10

82:19
ROBINS 2:2
Rocco 39:21
role 67:23
roll 36:17
  42:17,24
  44:13
Ron 41:23
  45:12
  46:25
Ronald 1:18
  4:2,8 5:4,9
  5:17,25
  85:1 86:6
roughly
  72:2
Rouse 2:14
  5:3
RPR 1:25
run 6:25
  26:3,6,7
  59:19

_____ S _____
S-ODLE_0...
  3:16
salvage
  15:11
Sam 61:15
  61:23
sanction
  14:18 15:1
  19:14 21:1
sanctions
  81:10
  82:19
sat 44:1
Saturday
  56:23
save 56:16
saved 9:8
  13:12
saving
  49:20
saw 15:12
  61:21
saying
  11:22 14:2
  14:8,21
  22:24
  23:11 28:8

56:15
says 30:16
  41:23
  45:12,12
  45:25
  46:10,10
  46:15 52:9
  60:9,9
  63:4 68:22
schedules
  75:17
school 6:25
  7:9 18:8
  27:22 37:3
  37:16
  40:16,19
  52:21
  55:14,16
  55:18
  60:12,14
schools 6:23
  9:8 16:12
  18:5 24:19
  25:14 30:9
  41:1 56:16
  59:19,20
screen
  66:11,18
  67:6 71:8
scroll 68:6
SEAL 86:20
SEC 22:21
second 20:3
  20:16 51:6
  64:18,23
secondly
  11:9
Secretary
  60:4
sector 83:7
security
  22:13 72:3
see 19:3,5,8
  20:1,11,20
  29:10 30:3
  31:24
  32:10
  35:15
  38:19
  39:17,21
  40:1 41:17

41:25 42:8
  42:14,20
  45:19,23
  46:1,13
  47:10,15
  47:24 48:3
  49:11 51:3
  51:10,16
  52:6,12
  53:11,19
  58:1,13
  60:16,22
  63:6 65:11
  67:2,4,14
  67:24 68:8
  68:19,21
  77:3 82:4
seeing
  20:25
  34:21
  60:11
  72:20
  80:24
seen 11:4,5
  12:22 67:9
  67:25
  73:14
sell 52:21
seller 32:23
  32:25
selling 80:5
send 27:3
  38:17
  39:16
  40:22
  47:20 75:1
  75:2,3,6
sending
  19:19
  56:11 60:6
senior 31:12
  34:19 35:5
  35:9
sense 37:21
sent 8:14
  11:15 13:9
  17:25 19:9
  39:19
  40:12 50:5
  57:17
  58:13 59:9

69:21 73:3
  73:17 78:7
  81:2
sentence
  20:14,17
  41:15 49:4
  49:23
  63:22
  75:23
separation
  52:20
September
  11:19
  16:22
  19:10 56:3
  56:11
  57:20 58:1
  58:15
  59:12
  64:15,24
  65:2 71:18
  73:4,8
  74:22
serious
  82:25,25
  83:1
served 9:22
  9:22
servers 43:7
service 1:6
  7:3,8
  13:24 16:6
  18:7 30:2
  30:15
  64:17 70:8
  74:14
  77:14
  79:22,23
  80:7
services 1:6
  7:12,14,16
  7:24 9:15
  9:17 11:9
  11:24 12:1
  13:9 32:24
  52:12
  75:10
  76:17,18
  76:19
  77:20
  78:21

set 23:7
  42:12
  43:20 45:2
  45:5 79:22
setting
  25:13
settings
  35:23 37:9
settlement
  36:6
severe
  82:20
Shaney 2:17
  5:2,2,16
  5:17 64:4
  76:2 81:13
share 26:16
shared 62:3
  62:17,23
  63:14
sharehold...
  79:25 80:8
sharing 63:1
SHEET 84:1
  85:4
short 49:8
  57:4
shortly
  56:24
shot 21:16
  44:19
  65:17
shots 8:21
show 22:18
  66:6 68:15
  71:14
showed
  22:8
showing
  18:25 29:8
  57:24
  66:14
  73:17
side 11:5
  15:10,10
  15:13 16:9
  20:25,25
  21:4 23:10
  25:7,16
  27:20
  28:15,18

31:15 37:7
  41:5,8
  43:22
  44:11,23
  49:1 73:12
  77:16
  79:17
  80:10,16
  82:23
sides 69:14
SIGNATURE
  85:8
signed
  12:22 27:2
signified
  21:9
SIGNING
  86:15
silence
  56:21
similar
  82:13
simply
  26:16 72:9
sit 78:16
six 36:12
slide 80:25
Smith 2:12
  2:19 4:14
  5:1 66:12
  66:14,16
  71:9,15
  81:20
Snyder 20:5
  25:1,2,3,8
  28:5 57:25
  58:21 59:7
  59:8,18
  60:8 61:25
  63:4,8
  67:24
  73:13 76:5
  79:9
Snyder's
  75:21
sold 37:16
somebody
  12:3,13
  13:13
  54:14
  59:14 61:4

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 101

62:12
**somewhat**
53:10
**soon** 41:12
41:14
60:10
78:13
**sooner** 77:9
**sorry** 5:14
7:4 46:25
64:19
81:15
**sort** 16:1
37:19
77:17 80:1
**sought**
70:22
**sound** 37:17
59:20
**sounded**
61:17
**sounds**
61:16
**Southern**
1:1 4:11
**space** 24:5,6
24:8 33:7
36:4 37:15
**speak** 8:21
16:16
60:10
**special**
10:21
**specific**
10:13
14:20
52:16 61:6
62:7,8
**specifics** 8:3
**speculate**
63:18
**spending**
6:3
**splitting**
30:21
**spoken**
54:24
61:24
**spots** 15:17
**spreadsh…**
40:22

**spring** 10:11
16:4
**stabilize**
32:24 33:2
**Stacey** 2:5
4:21
**stands**
76:12
**start** 6:14
33:22
39:25 40:4
41:7 55:10
**started**
15:10 24:6
24:13
25:23
55:21 70:4
**starts** 20:10
22:10 82:1
**state** 5:24
17:14 32:9
38:24
76:20
77:20 86:1
86:9
**statement**
31:14
34:23 40:9
53:11 76:1
**statements**
29:18
**States** 1:1
4:11
**states'** 36:5
**stay** 7:25
11:25 81:7
**steel** 25:25
**STENOGR…**
86:11
**step** 6:21,21
7:1 14:21
21:24
28:16 29:1
48:9
**Steve** 54:11
54:15
83:12
**Steven** 2:19
4:14
**stick** 34:9
**sticking**

9:16
**stock** 18:10
18:13
29:23
**stood** 82:16
**streets**
15:20
**strike** 54:22
**string** 29:4
29:9 38:16
**structure**
25:25 30:7
70:7 74:12
79:20 80:3
80:20,21
80:22
**structured**
33:9
**struggle**
62:6
**struggling**
32:21
**student**
21:11
24:11
43:17 44:8
55:13
**students**
20:10
40:18 41:4
44:4,6,6,7
**subject**
18:15
31:19
35:24
51:12
**submission**
14:16,17
**submitted**
56:7
**subpoena**
9:22 12:23
58:5,25
59:3 72:22
**Subsequent**
64:22
**subsidiary**
6:24 7:4,4
7:10,18
18:3 26:8
30:10

**substance**
8:12
**substantial**
21:13
37:18
86:19
**substantive**
9:4,5
11:16
54:21
70:24
**successful**
37:16
**suffered**
82:13
**suggest**
21:17
50:12
**suggested**
28:20
33:17
41:24
45:14,16
**suggesting**
22:5 28:11
32:13 48:5
49:14 50:5
**suggests**
22:25
73:14
**Suite** 2:3,9
2:15
**summary**
45:15,17
**summer**
8:18 10:4
18:14
25:20 39:6
**Sunday**
56:24
**supplant**
33:1
**suppose**
48:1
**supposed**
7:17
**sure** 12:3
13:3 14:25
25:17 33:8
37:21
55:21 64:6

73:14
77:17,18
82:15
**surety** 15:4
16:18
19:21 22:6
22:7 43:1
**surprised**
63:15
**swear** 5:6
**SWORN** 5:9
86:6
**system**
25:15
26:23
**systems**
27:23

――――― T ―――――
**Tab** 18:19
29:3 57:17
66:6 71:7
81:19
**take** 23:13
29:15
38:15 47:9
48:9 50:1
50:16,22
50:25
51:20,22
57:3,6
60:8,12,14
61:9 63:3
72:10
**taken** 1:25
4:2 21:7
24:18
26:21
28:15
31:22 32:2
43:3,5
77:8 82:9
**talk** 54:5,17
55:22,24
55:24 61:9
62:18 76:6
**talked** 25:25
38:10 44:1
60:21
64:11,12
**talking**

15:10
29:20
38:23 49:5
50:4 54:6
54:24
61:11
70:19 81:4
**tall** 21:5
**TAP** 40:15
40:15
**Tarasi** 39:21
**teach** 40:18
**team** 19:24
25:22 26:3
32:6 33:23
33:25
47:18
55:12,14
55:16,20
58:22
59:18 61:3
62:24,25
63:4 75:4
75:6
**Tech** 25:10
25:11
**Ted** 57:25
58:23 59:9
60:5 63:16
63:21
73:13
**telephone**
2:6 72:19
**tell** 11:1
12:25 13:6
20:22
21:19
25:17
43:25
49:21
62:20
79:11 86:6
**telling** 22:2
23:17 46:3
46:20
48:21
61:25
62:21
79:16
80:15
**Temporary**

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 102

44:3
TENDENCY
  86:19
term 17:10
  20:11 31:5
  31:18 34:9
  34:14
  35:11,20
  38:2 49:8
  49:9 52:4
  52:16 72:1
terms 5:20
  6:19 19:17
  20:4 24:25
  33:24 38:7
  38:10,13
  42:2 44:14
  46:5,6,7
  46:20 50:2
  50:3,25,25
  51:3 61:5
  62:6 75:8
  76:21
testified
  64:12
  71:20
  74:17
testimony
  70:5 82:11
thank 5:5
  6:4,4
  11:24 38:1
  64:2 69:2
  71:12
  73:19 83:8
  83:10,11
  83:16
Thanks 5:16
theory
  80:13
THEREOF
  86:9
thing 18:2
  27:7 33:8
  38:22
things 10:21
  17:9 21:17
  28:2,6
  33:5 36:20
  45:16
  46:11,16

59:24
60:20 61:6
63:22
65:25
75:16
76:19,25
78:22
think 7:6,15
  8:3,4 9:7
  10:10,11
  10:19
  12:20 13:2
  13:11,13
  13:20 14:9
  14:15
  16:15
  19:11
  20:16,18
  22:15,17
  22:21
  26:22 27:7
  27:16,17
  28:15,19
  28:25
  29:17
  30:18
  33:21 36:3
  38:22 39:3
  41:8,14
  43:17
  44:11,18
  45:6 46:6
  47:6,13,17
  48:20,22
  49:15
  50:13
  52:18
  53:16,16
  53:24,25
  54:1 56:14
  58:13,21
  59:5 61:9
  61:18 62:9
  62:25
  63:12,13
  65:3,16
  68:21
  69:16 71:5
  71:21,25
  72:13,23
  73:15

74:24
75:16 76:5
76:7 78:11
78:14 79:7
80:23 81:2
81:6,9
82:12
thinking
  77:5
third 20:16
  31:18
  51:10
  57:17
thought
  13:22 14:4
  14:6,10
  28:3 33:24
  34:24 35:3
  37:9 38:6
  43:13 49:2
  59:17,20
  80:4
threaten
  42:19
three 34:9
  35:11
  38:11 46:5
  51:24 82:2
Thursday
  30:19
  42:18
ties 22:18
time 4:7,7
  6:2,3 8:2,8
  8:17,19
  11:20
  12:12 13:7
  14:16
  16:22
  19:13,16
  21:2 24:4
  24:12,17
  24:17 25:3
  25:5 29:9
  32:19 36:2
  37:24
  39:20
  40:11,13
  41:3 43:4
  44:19
  47:23

49:22 53:9
55:11 56:7
57:11,15
57:15
62:14 64:2
64:3 70:3
70:13
75:14
76:17 77:6
78:7,20
79:10,10
83:15,16
timeframe
  6:6
times 77:23
title 10:10
  22:11,25
  55:15
today 6:3
  53:5 55:4
  55:25
  62:15
  64:11,12
  73:7 74:5
  74:13
  75:12
  78:16,24
  78:25
  82:11
Today's 4:6
told 12:3
  21:15,15
  47:21
  48:16,22
  53:9 55:5
  60:15 80:3
Tom 20:5
  25:1,2,3
  26:22 28:5
  57:25
  58:11,21
  59:6,8,12
  60:3,8
  61:2,9,24
  61:25
  62:11,16
  63:15
  73:13
  77:21 79:9
Tom's 60:20
  77:5

tomorrow
  63:5
tonight 40:1
top 42:6
  67:6 71:12
  72:14
topic 70:24
tough 15:17
track 50:13
trading
  18:11
training
  15:21
transaction
  6:10,21
  7:22 8:1,7
  8:11 9:9
  10:2,16,24
  11:11 12:1
  12:9 13:8
  14:8,22
  15:8,9,12
  26:11 27:2
  27:13 31:7
  31:17,21
  31:24 34:4
  37:1 38:5
  44:16
  46:13
  51:15,21
  51:23
  54:23 56:4
  70:8 71:4
  74:3 75:7
  79:18 81:8
transactio...
  24:3,16
  32:19
  48:23
  69:14 73:6
TRANSCR...
  86:12
transcript
  5:20 85:2
  86:11,11
transfer
  11:12
  33:13,17
transferred
  30:10
  40:16

transferring
  33:10
transition
  27:4
translate
  65:16
Traurig 2:8
  4:24
traveled
  12:8
trending
  18:14
tried 13:22
true 31:17
  69:15
  86:11
truly 43:8
trust 23:18
  35:1 36:10
trustee 9:23
TRUSTEES
  1:5
TRUTH 86:7
  86:7
try 34:25
  44:12
  53:19
  55:22,24
  59:14 83:1
trying 9:2
  9:19 15:18
  15:21,24
  31:4 48:13
  54:3 55:23
  58:18 60:1
  75:16 76:5
  78:12
  80:16
turn 15:18
  29:10 50:2
  59:25 75:2
  78:7
turning
  40:14 51:2
  75:20
twice 47:21
two 6:12,21
  7:1 11:8
  13:21
  14:11,21
  30:21 54:6

Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021
Deborah J. Caruso, et al. v. Kevin Modany

Page 103

77:9 78:3
78:9 79:3
79:20
81:22 82:1
**type** 6:17,21
15:8,8
23:23,23
43:19
**types** 6:12
6:15
**typical**
11:11 75:7

___ **U** ___
**ultimately**
16:14
38:14
**unaccept...**
30:12
**unclear**
66:20
**uncommon**
27:1
**understand**
39:24
**understan...**
12:18
38:12
46:19
49:25 56:1
59:8 60:18
60:25
61:14 63:8
70:12
**understood**
60:5 67:23
**United** 1:1
4:10
**unpack**
20:15
24:21
**unpreced...**
83:6
**unreason...**
76:15 78:9
78:21
**unusual**
37:13,20
37:21 43:8
**unwilling**
66:5

**update**
47:19 48:7
83:14
**updated**
17:16,21
29:18
47:23 53:5
53:7,17
**updates**
47:21
48:16
**urge** 62:18
**urgent** 41:9
**USDOE** 82:8
**use** 12:15
**usually**
21:12
37:19

___ **V** ___
**V** 1:8
**vacation**
75:19
**vague** 81:14
**Valerie** 2:5
4:20
**value** 7:21
18:10
76:22
77:19 80:7
**various** 7:8
24:18
**Vaughan**
29:11,16
38:21
39:19
50:17,23
50:24 51:6
67:2 69:5
69:15,22
70:1,18
**version**
42:16,22
44:11
50:11
**versus** 4:9
**VIDEOCO...**
1:17 4:1
86:5
**videograp...**
2:19 4:5
4:15 5:5

57:10,14
83:14
**videotaped**
1:17 4:1,8
**view** 9:9
23:9 44:5
56:21 71:3
**viewed**
27:16 43:6
**VIRTUE**
86:9
**vision** 79:14

___ **W** ___
**Wacker** 2:9
**wait** 40:23
**WAIVED**
86:16
**want** 21:16
24:21,23
30:13 37:5
45:13 50:9
77:16
**wanted**
23:19
28:24
36:21 48:6
**wanting**
58:8
**wants** 51:7
**warning**
30:19
82:23
**Washington**
63:21 86:3
86:9
**wasn't** 8:20
10:22
11:20
21:14 33:3
37:12 39:3
43:4 54:4
62:21
64:21 66:3
72:25
**waste** 49:22
**way** 9:7
12:20
15:11
16:10 17:7
20:7 23:3

25:16,22
26:20 27:8
30:23
32:17,21
32:25 33:8
41:15
48:23 60:1
60:3,4
72:24
75:19
76:13
77:11,12
79:22
80:18
81:19
**we'll** 6:16
19:16
20:15 37:3
38:16 83:2
**we're** 9:6,6
22:15,24
27:9 50:7
52:22
68:11
79:12
82:24,24
**we've** 57:7
66:23
69:13
74:12
**WEBSTER**
1:6
**week** 11:19
16:21
19:10
65:23 75:2
**weekly** 37:5
74:24
**weeks** 75:25
78:9
**well-rega...**
37:17
**went** 7:21
14:1 61:17
65:19
74:24
**weren't**
29:1 41:2
47:1,7
63:20 72:8
80:5,14,16

**West** 2:9
15:23
**WHITE** 2:14
**willing**
36:13,20
46:22,24
47:1,7
63:20
65:22
67:11
73:10
**willingness**
28:21
46:23
**wind** 39:25
40:4 41:7
**wishes** 49:7
**witness**
2:17 5:4,6
5:17 26:13
57:5,9
64:6 68:4
68:8,16,21
76:4 81:15
83:11 86:6
86:20
**word** 53:25
81:16 83:5
**work** 12:16
17:8 20:7
27:4 41:9
56:17
**worked** 24:3
24:4,15
69:13
**working**
21:16 24:6
27:1,10
33:3 52:12
55:5 60:9
**worried**
22:24
**wouldn't**
8:22 10:6
28:5 33:16
61:20
**write** 19:23
38:21 42:5
47:12 51:5
53:3 72:17
**writes** 41:23

**writing** 14:1
65:2
**written**
41:15
62:20
**wrong** 82:14
**wrote** 14:21
44:10,10
63:11,16

___ **X** ___
**X** 3:1

___ **Y** ___
**yeah** 12:20
13:2 16:13
17:14
19:10
29:14
41:19 57:5
58:11 59:5
59:10
60:17
61:23 79:1
79:14
**year** 7:8
50:14
76:16
78:19
79:22,23
82:15
**years** 13:15
24:4,5
77:15
78:22
**yesterday**
20:8 53:9

___ **Z** ___
**Zibel** 8:25
13:21
47:22 53:6
53:14,22
54:12
56:13
58:14
59:13
**Zoom** 1:17
2:5,5,6,11
2:12,17
4:1 86:5

**Videotaped Zoom Videoconference Deposition of Ronald Holt 1/4/2021**
**Deborah J. Caruso, et al. v. Kevin Modany**

Page 104

**0**

**1**
**1** 3:9 57:20
59:12 66:7
66:9 85:2
**1:18-cv-0...**
1:3
**10** 75:2 78:8
**10:24** 57:11
57:12
**10:31** 57:13
57:15
**100** 13:3
39:10
**103** 81:19
**106** 66:6
**11:11** 83:15
83:17
**11186** 3:18
**1185** 18:21
**127** 71:8
**14** 18:12
**143** 18:19
**15** 7:8 18:13
24:4 57:2
76:16
77:15
78:19,22
79:22,23
**150** 18:9
**169** 29:3
**18-cv-02...**
4:10
**1992** 24:6
**1st** 58:1,16

**2**
**2** 3:11 64:15
64:24
71:18 73:4
73:23,24
74:22
**20** 24:5 57:3
**2015** 82:14
**2016** 6:6
8:18 12:25
15:5 16:4
18:14,20
19:5 24:2
24:15

25:20
26:21
29:12
31:10 42:8
56:3 57:20
58:1 64:15
64:22,24
66:21
67:13
71:18 73:4
74:7,23
81:9 82:5
82:10
**2021** 1:25
4:3,6 86:6
86:20
**2031** 3:11
**2116** 3:8
**2364** 3:10
**2383** 3:13
**247** 15:5
19:21 22:7
**25** 15:4
16:19 24:5
26:21 30:6
31:21 39:5
40:12 43:1
43:3 51:14
64:22 81:9
82:5,10
**250** 36:20
**25th** 14:19
15:2,2
21:1 27:21
**26** 19:4,8
65:4 66:21
**26th** 18:20
**2800** 2:3
**29** 29:12
42:7 50:18
67:12
**29th** 38:18
39:17
52:19
65:23
69:22
**2nd** 16:22
56:11 65:2
73:8

**3**

**3** 3:12 38:22
81:23
**3:56** 53:1
**30** 40:18,21
**300** 2:15
**30th** 53:1
**3100** 2:9
**312-456-...**
2:10
**35** 72:2
**373** 57:18
**39** 36:5

**4**
**4** 1:25 4:6
53:4
**4:26** 38:18
**4110** 29:6
**4114** 52:25
**4115** 50:17
**4119** 45:8
**4120** 41:21
42:7
**4121** 38:18
**4124** 3:16
**4510** 2:14
**4TH** 4:2
86:6

**5**
**5** 3:2
**5:47** 45:9
**5:50** 39:17
**55402** 2:3
**57** 3:8

**6**
**6:37** 42:7
**6:42** 66:21
**60** 3:16 29:4
29:8 40:24
69:2,4
**60601** 2:10
**612-349-...**
2:4
**64** 3:3
**64111** 2:15
**66** 3:10
**67** 3:17 19:1
24:20 64:9
65:8 67:18

**69** 17:22,22
29:17,19
29:19
42:13 45:3
70:17,20

**7**
**7** 1:5
**7:02** 47:9
**72** 39:10
**73** 3:11
**74** 3:8 57:21
57:25
75:21
**77** 2:9
**7TH** 86:20

**8**
**8:22** 50:18
50:20
**8:25** 50:19
**800** 2:2
**81** 3:13 24:7
**816-502-...**
2:16
**83** 85:2

**9**
**9:02** 4:3,7
**90** 40:24
**92** 24:9
39:10

**Benchmark Reporting Agency**
**612.338.3376**