UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEBORAH CARUSO the Chapter 7 )
Trustee for ITT Educational Services Inc., )
ESI Service Corp., and Daniel Webster )
College, INC., )
                           )
             Plaintiff, )
                           )
             v. )       No. 1:18-cv-02182-JPH-TAB
                           )
KEVIN MODANY, )
                           )
            Defendant. )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ITT Educational Services Inc. operated a nationwide chain of higher education institutions until September of 2016, when it declared bankruptcy and closed its schools. Thereafter, the United States Department of Education ("the ED") released thousands of former students from their student loan obligations and filed a claim in ITT's bankruptcy seeking reimbursement of over $230 million for former-student debt. ITT's Bankruptcy Trustee filed this adversary action against ITT's former CEO, Kevin Modany, and former Board of Directors, alleging that they breached their fiduciary duties and caused ITT to become liable for the ED's claim.

The former directors and Mr. Modany moved to dismiss the complaint under Rule 12(b)(6). The Court granted the directors' motion and denied Mr. Modany's. Dkt. 69. Mr. Modany has moved for summary judgment. Dkt [108]. For the following reasons, that motion is **GRANTED.**

1

# I.
# Facts and Background

Because Mr. Modany has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

The Trustee limits her breach of fiduciary duty claims to the time between April 20 and September 16 of 2016—the "Crisis Period", dkt. 3 at 10 (Adversary Compl. at 2 ¶ 1).

## A. Background facts

ITT was a for-profit, publicly traded corporation that offered college-degree programs at schools it operated nationwide. Dkt. 119 at 7 ¶ 1.[1] ITT's Board of Directors managed its business affairs and elected corporate officers. Dkt. 108-3 at 13, 16. From August 2014 through the time of ITT's closure, David Brown II, Jerry Cohen, John Cozzi, Joanna Lau, Thomas Morgan, Samuel Odle, Vincent Weber, and John Dean[2] served as Board members. Dkt. 108-2 at 13.

Kevin Modany served as ITT's CEO and Chairman of the Board, and as a board member. Dkt. 108-2 at 13, 26. ITT's By-laws required that Mr. Modany

---

[1] All citations to the record reflect the page number assigned by the Court's CM/ECF system.

[2] Beginning in August of 2014, Mr. Dean served as both a board member and as Executive Chairman of the Board, which made him an ITT employee. Dkt. 108-4 at 3; dkt. 108-2 at 13.

report to the Board on "major problems and activities of the Corporation" and "see that all orders and resolutions of the Board [were] carried into effect." Dkt. 108-3 at 17.

### 1. Regulatory environment

On August 19, 2014, the ED cited ITT for late submission of its compliance audit and audited financial statements. Dkt. 123-49 at 2. Because of this "financial responsibility failure", the ED required ITT to post a $79 million surety to remain eligible for federal student loan programs. *Id.* The purpose of the surety was to preserve funds to pay out refunds to students, facilitate teach-outs,[3] and meet other obligations that ITT might have to the ED if the corporation closed its schools in the future. Dkt. 111-8 at 5.

By May of 2015, companies in the postsecondary education sector faced decreased enrollment, financial challenges, and "increased regulatory scrutiny." Dkt. 108-8 at 3–4. ITT's former directors understood this. Dkt. 115-3 at 9 (Dean Dep. II at 68). For example, Mr. Cozzi testified that the government had "an end game to try and eradicate" for-profit education companies, that ITT's Board had "numerous conversations" about pressure from regulators, and that he knew Mr. Modany shared this understanding. Dkt. 143-21 at 9–11, 20–21.

---

[3] A teach-out can take two forms. An "internal teach-out" or "self teach-out" "allows students to finish their education at the location where they enrolled, and graduate with a certificate or degree from that school." Dkt. 123-14 at 20. In an "external teach-out, the closing institution enters into teach-out agreements with other accredited institutions that allow students from the closing institution to complete their program of study at the partnering institution." *Id.* In either scenario, a teach-out of ITT would only occur in conjunction with ITT closing its schools. *Id.*; *infra* at 38–39.

Mr. Cohen testified that the Board discussed how the regulatory environment could impact ITT and believed the ED "could make it very difficult" for ITT to remain in business.  Dkt. 123-5 at 45–47.  Mr. Dean testified that the Board was aware that "a shoe could drop at any time" through an ED enforcement action against ITT.  Dkt. 143-22 at 25–26.

At a May 2015 special meeting of ITT's Board of Directors, the Board discussed "that there were significant risks in [ITT] continuing on a stand-alone basis, and that the environment seemed to be getting worse rather than improving."  Dkt. 108-8 at 6–7 (Minutes of Special Meeting of ITT's Board of Directors, May 6, 2015).  At this meeting, the Board passed a resolution creating a Transaction Committee comprised of board members Thomas Morgan, John Cozzi, and John Dean, to "provide Mr. Modany [] with direction and oversight in the context of discussions" about potential transactions.  *Id.* at 8–9.

Mr. Modany also often consulted with attorneys Blain Butner, Michael Goldstein, Jay Vaughn and others from Cooley LLP who were retained for their specialized expertise in higher education regulatory matters and to advise on potential transactions.  Dkt. 109-8 at 29; dkt. 111-6.

## 2.  The Board retains Mr. Modany as CEO

On August 4, 2014, Mr. Modany resigned from the Board and gave notice to ITT's Board that he intended to resign as CEO.  Dkt. 108-2 at 26.  After conducting a search for his replacement, the Board, advised by counsel, concluded that ITT would be best served by Mr. Modany continuing to serve as

4

CEO, asked Modany to rescind his resignation, and voted to approve his re-instatement as CEO under a modified, at-will employment agreement. Dkt. 110-3 at 2-5; dkt. 110-2 at 3. The modified agreement would provide Mr. Modany a payout of twice his salary if he was terminated without cause or resigned for good cause. Dkt. 110-2 at 3; dkt. 110-3 at 2. If, on the other hand, his employment ended through a change-in-control transaction, he would receive a three-times multiplier under the terms of a pre-existing Senior Executive Severance Plan. Dkt. 110-3 at 3–4. In addition to being approved by the Board, the terms of Mr. Modany's compensation were disclosed in ITT's public filings. Dkt. 110-2 at 3 (ITT's SEC Form 8-K Report, December 31, 2015).

### 3. ED Review of ACICS

On April 11, 2016, the status of ITT's accrediting agency, the Accrediting Council for Independent Colleges and Schools (ACICS), was put in jeopardy when the Attorneys General of several states asked the ED to "deny [its] federal recognition." Dkt. 110-9 at 2–3. Cooley attorney Mike Goldstein predicted to Mr. Modany that ACICS would not lose recognition but that "the real effect" of the letter for ITT "is going to be making ACICS more aggressive, so as to prove its mettle." *Id.* Mr. Modany shared this exchange with Mr. Dean. *Id.*

### B. Crisis Period

What the Trustee refers to as the Crisis Period began on April 20, 2016, when ITT received a "show cause" letter from ACICS. Dkt. 3 at 17; dkt. 110-8. In the letter, ACICS directed ITT "to show cause . . . why its current grants of

accreditation should not be withdrawn by suspension or otherwise

conditioned." Dkt. 110-8 at 3.  The letter further ordered ITT to appear at the

August ACICS meeting and requested information about the issues ACICS had

identified, including "a listing, by campus including all online activity, of

comparable programs offered at other institutions in case teach-out

agreements or transfer arrangements are needed for students to complete their

programs elsewhere." *Id.* at 3, 4.

### 1. ITT decides to pursue a strategic transaction with the Dream Center Foundation

At ITT's April 24, 2016, board meeting, the Board and Mr. Modany

discussed the show cause letter and several potential transactions that the

company could pursue.  Dkt. 111-5 at 3–7, 10–11.

One potential transaction was with the Dream Center Foundation (DCF),

a non-profit entity.  *Id.* at 7–8.  Mr. Modany explained to the Board that this

deal would entail "contribut[ing] its schools to" DCF but ITT remaining a

publicly traded company.  *Id.* at 7.  ITT would then provide administrative

services and other support to the DCF-run schools.  *Id.*  This "change in

control" transaction would require ED approval.  *Id.* at 8–11.  Mr. Modany told

the Board that he believed ED would be willing to approve the deal because it

"had approved similar transactions before" and because Cooley attorney Mike

Goldstein, had advised him that "he believed [ED] would be receptive to the

Dream Center taking over [ITT's] schools." *Id.* at 8.  Mr. Modany also discussed

other potential transaction options.  *Id.*

As reflected in the minutes of board meeting, the Board discussed these options:

> [The Board] asked Mr. Modany to discuss the alternatives available to the Corporation in the event it fails to consummate a strategic transaction. Mr. Modany then outlined various potential alternatives available to the Corporation in that situation, but noted that management believed the Corporation should stay focused on pursuing a strategic transaction with a non-profit entity. After a brief discussion, the Board stated that it agreed with management that the Corporation should continue to focus its efforts on pursuing a strategic transaction with a non-profit entity.

*Id.* at 10.

On May 4, 2016, ITT and DCF signed a letter of intent (LOI) setting forth the terms of a transaction that would result in ITT being split into two organizations: a not-for-profit academic institution and a for-profit, publicly traded management services company.  Dkt. 123-33 (May 4, 2016, Letter of Intent).  DCF would own the academic assets and become the program participant with the ED.  *Id.* at 2.  The for-profit ITT entity would own the real estate and provide management services to the academic institutions.  *Id.*  That same day, Mr. Modany informed the Board's Transaction Committee about the LOI, as well as the status of financing options for the DCF deal.  Dkt. 143-25.

### 2. ED demands a surety increase and requests teach-out plans

On June 6, 2016, the ED sent ITT a letter explaining that it considered ACICS's show cause letter as "represent[ing] an increased risk to Title IV funds that ITT administers on behalf of its students."  Dkt. 111-8 at 3. Consequently, ED increased ITT's surety requirement by $43 million (in addition to the $79 million ITT already had paid) as a requirement for ITT to

remain eligible to participate in federal loan programs. *Id.* at 5. The letter gave ITT 45 days to comply. *Id.*

The same day, an ED employee emailed Mr. Modany asking whether ITT had "developed teach-out plans for any or all of its campuses, and if so" to provide the specifics of those plans. Dkt. 123-9. The inquiry recognized that teach-out plans are only required to be submitted to a school's accreditor when specific, triggering events occur but also reminded Mr. Modany that, "[s]ome institutions may prepare such plans for the chance that those events will occur." *Id.*

Mr. Modany then discussed ITT's options for getting relief from the increased surety with Cooley attorney, Blain Butner. Dkt. 111 at 22–24 (Butner Dep. at 89:5–91:11); dkt. 112 at 2–3. He told Mr. Butner that he had told ED representatives that ITT could not "do another $40 million . . . [it would] shut us down." Dkt. 111 at 23–24 (Butner Dep. at 90:21–91:2). He also said that the ED representatives told him it was not their intent to shut ITT down and they would entertain an alternative if ITT suggested one. *Id.* at 91:2–3.

Mr. Modany asked Mr. Butner whether he should propose that ITT institute a "teach-out for two years" or transfer its students to a non-profit college—as contemplated in the DCF deal. *Id.* at 92:11–93:4. Mr. Butner advised, "don't offer a teach-out," *id.* at 93:9, because the ED could see that as an easy way of getting ITT out of business and that "it was premature to sort of concede [by offering a teach-out] that we had to close down." *Id.* at 93:23–94:4.

Instead, he recommended: "Let's see if we can negotiate with them . . . don't offer a teach-out now.  We have better options."  *Id.* at 94:4–8.  At this time, Mr. Butner and his colleague Mr. Goldstein believed that negotiating with the ED was a better option than offering a teach-out because they did not believe that the ED intended to force ITT to close.  *Id.* at 101:19–102:9.

On June 8, ITT and DCF submitted the change-of-ownership applications to the ED for review and approval.  Dkts. 112-2; 112-3.  Mr. Modany updated the Board about the submission by email the same day.  Dkt. 143-28.

On June 11, Executive Chairman of the Board John Dean and board member Vin Weber discussed the impact of the ED's increased surety demand.  Dkt. 143-19.  Mr. Dean expressed hope that the ED would "look at the [] alternatives Kevin [Modany] offered" but explained that the ED's hesitation on some of the DCF-deal proposed agreements "may end up killing" the deal.  *Id.* He also explained that "[a]ll told, I think we are doing what we should to maximize survival, but unless we get a positive sign from ED, we will have to consider teaching out.  Finally, I note that ED may have concluded we are dead meat.  If so, they will reject all alternatives and focus on maximizing recoveries from our remaining assets."  *Id.*

On June 14, 2016, Mr. Modany replied to the ED's increased surety demand explaining that a $43.9 million increase over the existing $79.7 million surety would "very likely precipitate" closure of ITT's schools.  Dkt. 123-25 at 4. He requested that the ED either allow the surety to remain at its existing

amount or allow ITT to pay an additional $12.6 million in two installments over the coming months.  *Id.* at 4–5.

The next day, ITT responded to ACICS's show cause letter.  Dkt. 113. This response included information about ITT's history with handling teach-outs and explained that it had "no immediate plans to close all or most of its campuses" but that "in the event it is required, ITT has repeatedly demonstrated the ability to do so effectively while limiting the impact on students."  *Id.* at 56.  ITT then provided details including its entire student roster, a list of comparable programs, a plan for the care of students' academic records, and financing information.  *Id.* at 56–58.

The same day, ED staff publicly announced that they planned "to recommend that ACICS accreditation be revoked."  Dkt. 143-17.  Mr. Modany immediately passed this information along to the entire Board by email with the assurance that "[w]e will share more information as it becomes available however I don't need to explain the gravity of this development."  *Id.* at 2.

On June 16, 2016, Mr. Modany replied to the ED's teachout inquiry that ITT had "not developed any formal teach-out plans for any [campuses not actively closing] or for the institutions as a whole."  Dkt. 113-1; dkt. 123-10. But he assured the ED that ITT "will continue to submit teach-out plans" when necessary.  Dkt. 123-10 at 3.

A week later, on June 22, Mr. Modany emailed Mr. Dean about the ED's review of ACICS.

> I think we've been set up to be taken out by ED in their dealings
> with ACICS . . . perhaps most distressing, the document from the

10

> ED says that if an accreditor withdraws accreditation from an
> institution (which ACICS may do with us at the August meeting) . .
> . that the institution is INELIGIBLE to seek accreditation from
> another accreditor.  Thus, if ED plays this right, they could force
> ACICS to revoke our accreditation in August, then revoke ACICS
> accreditation at some date subsequent to the August revocation . . .
> ultimately resulting in our ineligibility to secure accreditation from
> any other recognized accreditor!

Dkt. 123-21 at 2.

### 3. July 1 board meeting

At the July 1, 2016, board meeting, the Board discussed the ED's June 6

demand for increased surety and Mr. Modany's June 14 response.  Dkt. 113-6

at 9.  Mr. Modany "relayed the details of the discussion he had with Cooley LLP

[] regarding" other legal and regulatory matters facing ITT and responded to the

Board's questions on these topics.  Dkt. 111-3 at 4.  He also discussed the

ACICS accreditation issue, explaining "that if a school's grants of accreditation

are under review, as is the situation with [ITT], the school may not seek

accreditation from another national accrediting agency. As a result, [ITT] could

not begin a process of seeking a new accreditor in lieu of ACICS at this time."

*Id.* at 3–4.

Then, the Board reviewed and discussed three potential models for how

ITT could continue operating in the near term: (1) operating; (2) hybrid; and (3)

suspend new enrollment.  Dkt. 111-3 at 5–6; dkt. 113-6 at 10–11; dkt. 113-7

at 2.  Under option one, the "operating" model, enrollment at some campuses

would be suspended but ITT would maintain operations through cost saving

measures.  Dkt. 113-6 at 11.  Under option three, ITT would suspend "new

student enrollment at all campuses" and initiate a material reduction of

employees across its headquarters and campuses but maintain operations to the extent needed to allow existing students to complete their programs.  Dkt. 113-6 at 11.  Option three essentially proposed an "internal teach-out" or "self teach-out" that would "allow[] students to finish their education at the location where they enrolled, and graduate with a certificate or degree from that school."  Dkt. 123-14 at 20 (Report of Trustee's Expert, Dr. Jamie Morley).[4]

The Board directed Mr. Modany to pursue option one, the "operating" approach.  Dkt. 111-3 at 5.  The Board considered this option "most likely to generate value for [ITT's] shareholders relative to the other scenarios at the current time."  Dkt. 111-3 at 6.

On July 6, the ED responded to Mr. Modany's June 14, 2016, request that the ED permit ITT to pay a lower surety increase in two installments.  Dkt. 113-8 at 2.  While it did not agree to lower the $43.9 million demanded, the ED would allow ITT to pay the surety in three installments of $14.6 million over the coming months, *id.*, and asked ITT to send it a copy of ITT's response to ACICS's show cause letter, dkt. 123-22 at 2.  Mr. Modany forwarded this request to Mr. Dean, explaining:

> I think they will [] keep digging and digging and digging until they find enough of a reason to drop the atom bomb.  This has been brewing for several years now and with the Administration's time drawing to a close, they must feel the pressure to bring this mission in for a close!  I hope I'm reacting to this in an overly paranoid manner but history suggests otherwise.

*Id.*  ITT paid the first installment of $14.6 million on July 20.  Dkt. 113-9 at 4.

---

[4] The term "teach-out" does not appear in the July 1 board meeting minutes.

On July 23, Mr. Modany emailed Mr. Dean with an update about the DCF negotiations, explaining that the core documentation for the deal was "substantially complete" and that the DCF board would be voting on the proposal soon.  Dkt. 123-23 at 2.  He said:

> We will discuss all in more detail at the meeting however I think it's all coming to a head (including the fact that the pressure from the ED is materially intensifying . . . suggesting some sort of additional action from them is eminent [sic] . . . they seem to be looking in every nook and cranny for a reason to do something).  Net/net . . . I think we are weeks away from a material event . . . which I hope is a public announcement of an executed agreement with DCF (contingent on ED/ACICS/State approval) but could be the ED realizing that we figured out a way to pay the surety so they now need to come up with a plan to put the death nail in the coffin . . . once and for all!

*Id.*

### 4. July 24 board meeting

At the July 24 board meeting, Mr. Modany explained the "objectives of the meeting are to discuss the measures the Corporation has implemented to address the new surety requirement from the [ED], the status of regulatory and accreditation matters affecting the Corporation and the status of the potential strategic transaction with [DCF]."  Dkt. 114-1 at 2.

With respect to the potential DCF transaction, Mr. Modany explained that ITT and DCF were "working diligently to document" the transaction but "reminded the Board that the ED would need to approve the proposed transaction with the Dream Center, and it is unknown whether the ED would provide such approval."  *Id.* at 5.  He assured the Board that "given all of the factors and uncertainties impacting [ITT], management had been modeling what a full teach-out scenario would look like," and said "that the Board would

13

be provided with a detailed analysis of a full teach-out . . . and any other alternatives, prior to formally approving" the DCF deal.  Dkt. 114-1 at 4, 5. After this discussion, "[t]he Board reaffirmed that the Corporation should continue to focus its efforts on pursuing a strategic transaction with the Dream Center."  *Id.*

With respect to the ED, the Board discussed the interplay between the ED's review of ACICS's recognition and ACICS's show cause letter to ITT.  While Mr. Modany believed that ITT "should prevail in the ACICS show cause matter, [] due to the overall regulatory environment, the outcome is uncertain."  *Id.* at 6.  He also noted that there was "significant uncertainty regarding" whether the ED would recertify ACICS.  *Id.*  Mr. Modany also responded to Board comments and questions as they discussed the "potential impact on the Dream Center transaction and potential actions by the ED if the ACICS were to decide to withdraw the accreditation of" ITT.  *Id.*

### 5. August negotiations with DCF

While DCF and ITT had already submitted their change-of-ownership applications to ED for approval in June, in early August they were still working out the specific terms of the transaction.  On August 2, an ED representative asked Mr. Modany for an updated version of one of the deal documents.  Dkt. 123-34 at 2.  Mr. Modany forwarded this exchange to Mike Goldstein and Lisa Bureau, Cooley attorneys who had been assisting with the deal documentation. *Id.*  He also expressed frustration with DCF:  "I'm running out of patience with these folks.  Starting to feel like we're chasing a pink and purple unicorn!"  *Id.*

14

Despite these frustrations, ITT and DCF made progress on the deal and on August 14, Mr. Modany sent the entire Board a lengthy email with updates on the status of the deal, the potential risks to its finalization, and several other issues. Dkt. 143-13. He explained that they had been through "several rounds of negotiations with DCF regarding the form and substance of the agreements" and, a few days earlier, had "conducted a multi-hour, successful negotiation of the major outstanding issues related to" specific parts of the agreement. *Id.* He explained that ITT's interactions with the ED staff had been positive but that there had been recent no communications with "higher level officials at the ED." *Id.*

Mr. Modany told the Board that DCF's Board of Trustees was expected to review and approve the transaction sometime between August 18 and 25. *Id.* at 3. While it was expected they would approve, he explained that a "negative ACICS decision or additional ED action against ITT or ACICS [] could have an impact on the vote regardless of the current level of support" and that "anything c[ould] happen" by the time the next semester started in a few weeks. *Id.* Finally, he reminded the Board both that "the ED will likely not give us a decision on our request for the [change-of-ownership] application until AFTER we announce the transaction" and "we all know that they are materially influenced by the media reports so it will greatly benefit us to have a PR plan at the ready." *Id.* at 4.

On August 17, ACICS informed ITT that it was not revoking accreditation, but it was continuing its "show cause" status based on the

response ITT had sent.  Dkt. 114-7.  ACICS explained that ITT had adequately "responded to the Council's teach-out plan request, including a complete listing of all 32,770 current students, their academic programs, and expected graduation dates; a listing of comparable residential and online programs; and the information for a third-party custodian for permanent student records."  *Id.* at 3.  "Nonetheless . . . the ongoing nature of the adverse information and ITT's responses to Council requests for information continue to raise questions," so ACICS requested further information to be submitted prior to the Council's December meeting.  *Id.* at 4–6.  Mr. Modany forwarded the letter to the Board by email.  Dkt. 143-14 at 2.

### 6. The ED demands another surety increase

On August 25, 2016, the ED demanded another increase in ITT's surety "from the current $94,353,980 to $247,292,364."  Dkt. 113-9 at 4.  The ED acknowledged that ACICS "no longer expresses concerns about the quality of instructional materials or development and submission of a teach-out plan," *id.* at 3, but concluded that the other issues ACICS had identified meant that ITT was noncompliant with the ED's rules.  *Id.*

The ED outlined conditions that ITT would have to satisfy to remain eligible for federal student loan programs.  *Id.* at 4.  Among those conditions, ITT had 30 days to post the additional $152 million surety, and to provide the ED with "teach-out agreements for all ITT campuses and locations."  *Id.* at 4–5. Additionally, the ED ordered ITT not to "pay, or agree to pay, any bonuses, severance payments, raises or retention payments to any of its Management or

16

Directors . . . without separate approval from the Department." *Id.* Mike
Goldstein from Cooley advised Mr. Modany that the ED did not have the
authority to regulate ITT's compensation decisions.  Dkt. 115-1 at 2.

ITT responded to the ED's demand letter on August 30, 2016.  Dkt. 123-
3.  The response asked the ED to consider three options: allow ITT to (1)
pursue the DCF deal with the understanding that, post-transaction, ITT would
have "no continuing role as a servicing company"; (2) shift gears to focus on a
potential deal that would allow Indiana Tech to acquire ITT's schools, about
which there had already been preliminary discussions; or (3) "proceed with []
an orderly teach-out of all our campuses and students." *Id.* at 3–4.  The letter
explained that a full teach-out of all of ITT's students "would be a huge
undertaking," so ITT requested until December 2, 2016, to complete any teach-
out the ED would approve. *Id.* at 4.  To achieve any of these goals, as well as to
protect ITT's students and avoid potentially "hundreds of millions of dollars of
students' federal loans being discharged due to the schools' closure," ITT
"would need relief from the [] sanctions imposed" in the demand letter. *Id.* at
2–3.

### 7.  DCF and ITT negotiations after the ED's August 25 letter

In response to the ED's August 25 demand letter, counsel for DCF sent
an email to Mr. Modany and ITT's counsel, "proposing to acquire ITT" and
explaining that "the terms will likely need to include interim involvement by
DCF . . . in management prior to closing."  Dkt. 143-50 at 2–3 (email dated
August 26, 2016 from R. Holt to K. Modany and Cooley attorneys).  Mr. Holt,

DCF's counsel, offered to "make draft changes" to the change in control application already submitted to the ED "that can be circulated to all of you for comment."  *Id.* at 3.  When Mr. Modany shared this email with Mr. Dean the next day, August 27, Mr. Dean agreed "this is a real long shot."  *Id.* at 2.

On August 29, Mr. Holt sent ITT's counsel an email outlining the "draft changes" to the DCF/ITT application materials.  Dkt. 123-41. The proposal provided that "subject to the ED granting relief from restrictive measures announced on August 25, ITT and DCF are in agreement that the following action will be taken during the period leading up to a closing on the DCF transaction:"

> (a) ITT would accept management changes and DCF executives would "become involved in ITT management;"
> (b) ITT/DCF would "remain bound" by the ED's "prohibition against any changes in compensation for ITT employees;"
> (c) ITT/DCF would accept and pay for a monitor to "oversee management of the company prior to the DCF closing;"
> (d) ITT/DCF would work together to address and resolve "pending regulatory litigation and investigations" targeting ITT;
> (e) ITT/DCF would "operate only in the ordinary course but will be able to enroll new students" only subject to strict measures.

Dkt. 123-42 at 4–5; dkt. 123-41 (R. Holt email to J. Vaughan and M. Goldstein, August 29, 2016, 4:21 p.m.).

Mr. Modany quickly responded to Mr. Holt that ITT "had issues with the suggested changes."  Dkt. 123-42 at 3 (K. Modany email to R. Holt, August 29, 2016, 5:30 p.m.).  Mike Goldstein gave Modany his observation of DCF's proposal:

> The bottom line is there nothing in law that supports what the Department of Education is asking, and there is nothing in law that requires what Ron is suggesting we offer. We are, in effect, in a

18

> commercial transaction were [sic] each side is trying to get the most for
> itself and the most from the other side.

Dkt. 115-1 at 2 (email from M. Goldstein to K. Modany, Aug. 29 at 6:22 p.m.).

Mr. Holt replied to Mr. Modany's email by explaining his belief that "some

version of what I have outlined is going to be needed to get ED to roll back the

ED measures announced last Thursday that threaten the ability of ITT to

operate much longer without relief." *Id.* at 2 (R. Holt email to K. Modany,

August 29, 2016, 6:37 p.m.).  Mr. Modany responded that "ITT isn't agreeing to

do anything that was suggested in your summary. . . The issue is that ITT isn't

going to do these things pre acquisition, DCF can do them post acquisition".

*Id.* (K. Modany email to R. Holt, August 29, 2016, 5:46 p.m.).[5]  Mr. Modany had

not shown the proposed changes to any board member before he sent Mr. Holt

this email.

Shortly after Mr. Modany conveyed his concerns about the proposed

terms to DCF, Tom Snyder, who had been identified as the likely head of the

post-transaction ITT/DCF schools, contacted board members Sam Odle and

Mr. Dean to discuss the DCF proposal.  Dkt. 123-50 at 2; dkt. 143-46.  Mr.

Snyder then told ED officials on September 1, that "the board is not seeing the

proposal from us to take over the school and resolve all the open financial

issues" and said that Mr. Modany had rejected the proposal.  Dkt. 123-50 at 2.

Later that same day, Mr. Odle asked Mr. Dean whether such a proposal had

been made to which Mr. Dean replied, "I understand that we have not received

---

[5] The time stamps on emails in this exchange appear inconsistent because there was a
time-zone difference among the recipients, *see* dkt. 151 at 19 n.14.

any proposal from the Dream Center, but I just confirmed, through Cooley, that one is in the works."  Dkt. 123-51 at 2.

Mr. Dean and Mr. Modany then discussed the DCF deal status and Mr. Modany reached out to DCF, copying Cooley attorneys and Mr. Dean:  "There appears to be some confusion that led to Tom [Snyder] reaching out to John Dean for clarification."  Dkt. 143-32 at 2.  He said that, from ITT's perspective, there had been no formal proposal for a transaction along the lines of what had been proposed as the edits to the change-of-ownership application.  *Id.*  He stressed, "there is no disconnect between" his statement that ITT would not agree to pre-transaction change in control, "and the positions of the Board . . . We hope this email clarifies any miscommunication that may have occurred or misunderstanding of the messages and positions of the Board that have been delivered up to this point."  *Id.*

Mr. Dean followed up with Mr. Odle several hours later explaining that he had now reviewed what DCF was proposing—"basically to shift control of the company to DCF before the transfer, which is conditioned on regulatory approvals which I believe are highly unlikely."  Dkt. 123-51 at 2.  Mr. Dean later testified that he understood that DCF had proposed the pre-transaction change in control "and that Kevin was opposed.  I agreed with them that the transfer of control of the company to an outside company prior to closure, with no certainty that closure would take place, was a nonstarter."  Dkt. 115-3 at 13 (Dean Dep. II at 330:7–13).

20

Mr. Modany and counsel from Cooley continued to work with DCF to see if they could agree on changes to application that did not suggest a pre-transaction change in ownership.  Dkt. 143-32 at 2–11.  Updated terms were eventually agreed upon and submitted to the ED on August 31.  *Id.* at 3.

### 8.  The end of ITT

On September 2, the ED rejected ITT's request to have three months to complete the DCF transaction, pursue a transaction with Indiana Tech, or conduct an orderly teach-out because those options did not "best serve" the interests of students and taxpayers.  Dkt. 115-6 at 2.  The ED maintained its demand-letter position but added that it was "very interested in working with [ITT] to take all available steps to protect the interests of ITT students and coordinating our efforts in that regard."  *Id.*

On September 4, ITT's Board approved a resolution to file bankruptcy.  Dkt. 116-1 at 2.  On September 6, ITT announced publicly that it was "permanently discontinu[ing] academic operations of all its ITT Technical Institutes."  Dkt. 116-2 at 3.  On the same day, Mr. Modany discussed the options for students to transfer to other programs with members of ITT staff.  Dkt. 143-24 at 2.  He explained that ITT "told students about [] agreements in place as well as schools in their area that offer similar programs of study."  *Id.*  He said follow-up information would be provided with all transfer options once formal teach-out agreements had been completed.  *Id.*  He explained that "[n]ow that we have announced closure, this effort should be a focus area (we couldn't do it before hand due to confidentiality)."  *Id.*

21

The bankruptcy petition was filed September 16 and was announced publicly the same day along with the news that the Board had resigned, and that Mr. Modany, Mr. Dean, and other executive staff had "ceased to be officers and employees of the company, effective September 14, 2016." Dkt. 116-7 at 3.

By March of 2017, the ED had granted over $140 million in closed school loan discharges to ITT's former students and anticipated that the total loan discharge amount could reach over $460 million. Dkt. 123-15 at 5. Under Title IV, the ED had the right to recover from ITT for these discharges, which it pursued through a claim in ITT's bankruptcy for over $230 million. *Id.* at 3. Mr. Modany also submitted a proof of claim in ITT's bankruptcy for nearly $3.4 million in severance pay but contended his claim could be as high as $5 million based on terms in his severance plan. Dkt. 123-40 at 3, 6.

### 9. Procedural background

The Trustee in ITT's bankruptcy filed an adversary proceeding against ITT's former directors and Mr. Modany alleging breach of "their fiduciary duties of loyalty, care, and good faith owing to ITT and its stakeholders during the period April 20, 2016 until ITT's September 16, 2016 bankruptcy." Dkt. 3 at 10. Mr. Modany and the former directors moved to dismiss for failure to state a claim. Dkts. 39, 40. The Court granted the directors' motion, dkt. 69 at 8–20, but denied Mr. Modany's motion because (1) "the Trustee has alleged a claim for breach of the duty of loyalty because the allegations are sufficient to support the inference that the purpose behind Mr. Modany's decisions was

22

something 'other than that of advancing the best interests of the corporation,'" *id.* at 24 (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006)), and (2) that the "complaint alleges sufficient facts to support the inference that Mr. Modany [dismissed potential transactions] without fairly considering the offers and thus states a claim for breach of the duty of care," *id.* at 25.

Now with a developed evidentiary record, Mr. Modany has moved for summary judgment on all claims against him.  Dkt. 108.

## II.
## Applicable Law

### A. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584 (citation omitted).  But a court need not draw inferences that are "'supported by only

speculation or conjecture.'"  *Williams v. Brooks*, 809 F.3d 936, 941 (7th Cir.

2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)).

### B. Fiduciary Duties

The claims for breach of fiduciary duties are governed by Delaware law.

Ind. Code § 23-0.5-5-1(a)(1); dkt. 119 at 21.  Under Delaware law, a

corporation's "board of directors has the ultimate responsibility for managing

the business and affairs of a corporation."  *Mills Acquisition Co. v. Macmillan,

Inc.*, 559 A.2d 1261, 1280 (Del. 1989).  A board makes all decisions regarding

the hiring and firing of corporate officers, 8 Del. C. § 142 (b), and generally

retains authority over the most significant corporate decisions.  *In re Caremark

Intern. Inc. Derivative Litigation*, 698 A.2d 959, 968 (Del. Ch. 1996).  As they

carry out this function, board members owe fiduciary duties of care and loyalty

to the corporation and its shareholders.  *Mills*, 559 A.2d at 1280 (citing *Revlon,

Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del. 1986)).

Corporate officers owe the same fiduciary duties to the corporation.  *Gantler v.

Stephens*, 965 A.2d 695, 708–09 (Del. 2009).

To establish liability for breach of fiduciary duty, a plaintiff must

demonstrate (1) that the defendant owed a fiduciary duty and (2) that the

defendant breached it.  *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).

"[A] breach of fiduciary duty analysis begins with the rebuttable presumption

that [fiduciaries] acted with loyalty and care."  *Crescent/Mach I Partners, L.P. v.

Turner*, 846 A.2d 963, 979 (Del. Ch. 2000); *see In re Xura Stockholder Litig.*,

2018 WL 6498677 at *11 n.113 (Del. Ch. 2018).

To rebut the presumption created by the business judgment rule, the "plaintiff assumes the burden of providing evidence that [fiduciaries], in reaching their challenged decision, breached any one of the *triads* of their fiduciary duty—good faith, loyalty or due care." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993); *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). "If a [] plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments." *Cede*, 634 A.2d at 361; *see Gantler*, 965 A.2d at 706.

### III.
### Analysis

Mr. Modany has moved for summary judgment, arguing that the Trustee's designated evidence does not overcome the presumption that he acted with loyalty and care in discharging his duties as CEO.  Dkt. 119 at 36–37.  The Trustee responds that the presumption is overcome by her designated evidence showing that Mr. Modany breached the duty of care when he failed to (1) inform the Board about "critical" information and (2) "put teach-outs in place," dkt. 139 at 17, and that he breached the duties of loyalty and good faith "by failing to inform the Board and putting his own self-interests above ITT's to personally make millions," *id.* at 33.

### A. Duty of Care

The duty of care requires that, when acting on behalf of a corporation, a corporate officer must "use that amount of care which ordinarily careful and

prudent men would use in similar circumstances." *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 749 (Del. Ch. 2005). "[L]iability for breaching the duty of care 'is predicated upon concepts of gross negligence.'" *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005) (quoting *Aronson v. Lewis*, 475 A.2d 805 (Del. 1984) (overruled on other grounds)). Gross negligence is established by showing "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Id.*

### 1. Informing the board

The Trustee argues that Mr. Modany breached the duty of care by failing to provide the Board with material information. Dkt. 139 at 8. Mr. Modany responds that the undisputed evidence shows that the Board was informed about all material information. Dkt. 151 at 10.

The CEO of a company has "a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 781 (Del Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). A corporate officer's failure to inform the board of directors may violate the duty of loyalty or the duty of care if "any failure in information sharing was the product of gross negligence or disloyalty." *Hampshire Group, Ltd., v. Kuttner*, 2010 WL 2739995 at *13 (Del. Ch. 2010) (citing *Science Accessories Corp. v. Summagraphics Corp.,* 425 A.2d 957, 962 (Del. 1980)); *see also Bamford v. Penfold, L.P.*, 2020 WL 967942 at *19 n.13 (Del Ch. 2020)

(citing *Restatement (Third) of Agency* § 8.11 (recognizing that an agent has a "duty to provide [its] principal with facts that the agent knows")).  A corporate officer may breach the duty to provide the board with information by withholding facts that "alter the nature" of the information the board "knew of in a material way."  *City of Fort Myers General Employees' Pension Fund v. Haley*, 235 A.3d 702, 718 (Del. 2020).  "'Material,' in this context, means that the information is 'relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking.'"  *Id.* (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 n.49 (Del. 2000)).

Here, the Trustee argues that Mr. Modany didn't inform the Board about four "critical" issues: (1) that he believed the ED would put ITT out of business, (2) that ITT could be liable for loan discharges if it closed without teachouts, (3) that he rejected DCF terms not favorable to him, and (4) that it was unlikely ED would approve a DCF deal.  *Id.* at 16–17.  Under the business judgment rule, there is a presumption that Mr. Modany acted with due care in informing the Board.  *Cede & Co.*, 634 A.2d at 361.  Therefore, the Trustee bears the burden of designating evidence from which a jury could find that Mr. Modany was grossly negligent in failing to inform the Board of material information.  *Id.*

   a.   Mr. Modany's belief that the ED would put ITT out of business

The Trustee argues that Mr. Modany did not inform the Board, in July of 2016, of his belief that the ED could take action at any moment that would force ITT to close.  Dkt. 139 at 17–19.  The Trustee argues that Mr. Modany's

27

failure to share this belief was reckless and grossly negligent because it was material to the Board's decisionmaking, *id.* at 19, but she does not identify specific decisions that the Board may have made differently if these beliefs had been shared.

The designated evidence establishes that, in June and July, Mr. Modany made clear to Mr. Dean, who at the time was the executive chairman of the board of directors, his belief that the ED's actions against ACICS were part of a larger play to end ITT by leaving it without an accrediting body, *see* dkt. 123-21 (K. Modany email to J. Dean, June 22, 2016); that the ED's tactics in asking for a copy of ITT's "show cause" response to ACICS were aimed at forcing ITT out of business, *see* dkt. 123-22 (K. Modany email to J. Dean, July 18, 2016); and that he worried that the ED would realize it "need[ed] to come up with a plan to put the death nail in the coffin . . . once and for all[,]" dkt. 123-23 (K. Modany email to J. Dean, July 23, 2016).[6]

To support her contention that these beliefs were material yet never conveyed to the Board, the Trustee designates portions of former board member deposition testimony.  For example, she designates the following portion from Mr. Odle's deposition where he is asked about Mr. Modany's June 22 email:

> Q: Do you know if Mr. Modany expressed his concern to you around this time about the Department of Education setting up ITT?
>
> A: I think we had a number of discussions about, you know, working with ED and new regulations coming in and all those things.  I don't remember this specifically.

---

[6] The relevant portions of these emails are included *supra* at pp. 11–13.

. . .

Q: Did Kevin Modany ever tell you, as a board member, that he believed that ITT was being set up to be taken out by the Department of Education?

A: I don't know if I heard those words.  I knew that he felt strongly that the rules were onerous to ITT.
. . .

Q: Did you know, as a board member of ITT in [] July of 2016, that the Department of Education could take imminent action that would put ITT in a position that would require it to close its doors? [ ]

A: As a board member, I always knew that was a risk.

Q: And do you remember Kevin Modany advising the board that it was his belief that that actually was going to happen?

A: I don't remember.

Q: Certainly, if that was Kevin Modany's belief in the July 26 timeframe, you would have expected and wanted him to inform the board of that belief; right?

A: Right.

Dkt. 123-7 at 183, 187, 222 (Odle Dep. at 182:16–22, 186:14–20, 221:1–24). [7]

The cited portions of other board member testimony are not materially different.  *See* dkt. 123-6 (Morgan Dep. at 300:3–11, 302:13–22, 303:18–304:13); dkt. 123-5 at 199–20 (Cohen Dep. at 198:10–199:20).

However, a failure to recall whether information was provided does not create an issue of fact when there is affirmative evidence that it was provided. *See Tinder v. Pinkerton Security*, 305 F.3d 728, 736 (7th Cir. 2002); *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) (failure to recall

---

[7] Objections are omitted.

a conversation did not create genuine issue of fact when there was affirmative testimony that the conversation occurred).

Here, Mr. Odle's affirmative testimony is that "[as a board member, I always knew" that the ED taking "imminent action" to put ITT out of business "was a risk."  Dkt. 123-7 at 222.  Moreover, the threat that the ED and the regulatory environment posed to ITT was similarly acknowledged by other board members in their depositions, *see supra* at p. 4 (Mr. Cozzi testifying that the ED had an "end game" to put for-profit education companies out of business; Mr. Cohen testifying that the ED could make it "very difficult" for ITT to continue operating; Mr. Dean testifying he was aware the other "shoe could drop" at any time), and was discussed internally by board members too.  *See* dkt. 143-19 (June 11, 2016, J. Dean email to V. Weber, "ED may have concluded we are dead meat.").

While the Trustee's designated evidence establishes that some board members did not recall specific conversations in which Mr. Modany advised the Board about the "imminent" threat that the ED posed to ITT, viewed in the light most favorable to the Trustee, this does not create a genuine issue of material fact as to whether Mr. Modany failed to "provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles" with respect to this issue.  *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 781 (Del Ch. 2016).  Therefore, the Trustee's designated evidence that some board members did not recall certain conversations is not sufficient to

overcome the presumption that Mr. Modany acted with due care in informing

the Board on the threat ITT faced from the ED and the regulatory environment.

> b. <u>ITT's potential liability for closed school loan discharges if it closed without teach-outs</u>

The Trustee argues that Mr. Modany did not inform the Board about

"closed school loan discharges" which could make ITT liable to the ED for

"hundreds of millions" in discharges if it closed without teach-outs.  Dkt. 139

at 9 ¶ 3; 25–27.  Again, the Trustee designates portions of board member

testimony where some board members did not recall what Mr. Modany told

them:

> Q: Do you – you're not aware of the board being advised of potential liability that ITT could have for closed school loan discharges, are you?
>
> A: I do not recall that.
>
> Q: You don't recall any discussions that the board had with Kevin Modany about that topic, right?
>
> A: I don't recognize the topic.
>
> Q: Did you have an understanding that if a . . . school like ITT closes and does not have a teach-out in place where the students have a place to go to complete their education that those students can apply through the federal government to have their student loans refunded or forgiven? []
>
> A: You're touching on things I don't recall.

Dkt. 123-6 at 268–69 (Morgan Dep. at 265:19–2686:22).[8]

---

[8] The cited portions of other board member testimony are not materially different.  *See* dkt. 123-5 at 63–64 (Cohen Dep. at 62:14–63:14); dkt. 123-4 at 103–104 (Brown Dep. at 102:5–103:13); dkt. 123-7 at 124–25 (Odle Dep. at 123:17–124:4).

Other board members testified that they were aware of that closed school loan discharges were a potential problem and liability for ITT.  Mr. Dean testified: "I did have an understanding generally of the closed-school discharge provisions, of the regulations, and I was familiar with the fact that there was a potential liability of the institution in the event of a closed-school discharge." Dkt. 123-8 at 42-43.  And Mr. Odle similarly recalled that, at the time ITT closed "I knew that there [] were financial implications to student loans as well as to the institution if we were not able to get the ED to modify its request." Dkt. 123-7 at 239 (Odle Dep. at 238:3–8).  As noted above, a board member's failure to recall discussion of a particular topic does not create a genuine issue of material fact as to whether Mr. Modany failed to inform the board where there is affirmative evidence that board members were informed about the topic.  *Tinder*, 305 F.3d at 736.

Moreover, Mr. Modany has designated several emails that he sent to Board in which closed school loan discharges are discussed, dkt. 143-1, dkt. 143-2, dkt. 143-3, and which explain the ED's intention to modify regulations to allow a school to be held liable for them.  Dkt. 143-2.  Mr. Modany also forwarded to the Board the proposed updated Department of Education closed school loan regulations the day they were announced.  Dkt. 143-3.

The Trustee has not designated evidence from which a jury could reasonably find that Mr. Modany did not inform the Board about ITT's potential liability for loan discharges.  Viewed most favorably to the Trustee, it shows only that some board members didn't recall discussing it.  But because there is

32

affirmative evidence that Mr. Modany provided this information to the Board, no reasonable jury could find that Mr. Modany breached the duty of care by failing to inform the Board about closed school loan discharges and the risk they posed to ITT.

        c.    <u>The potential transaction with the Dream Center Foundation</u>

The Trustee argues that Mr. Modany failed to disclose to the Board two key things about the potential transaction with DCF.  First, that ED was not likely to approve it, dkt. 139 at 24–25; and second, that Mr. Modany rejected terms proposed by DCF that may have caused the ED to approve the transaction, *id.* at 25–27.

        i.    <u>Modany's belief that that ED wasn't likely to approve the DCF transaction</u>

The Trustee argues that Mr. Modany "concealed" his belief that the ED was unlikely to approve the DCF deal.  Dkt. 139 at 30.  In support, she designates an email in which Mr. Modany explains to Mr. Dean that the prospect of the ED approving the DCF deal is "highly questionable," dkt. 123-35; and an email to attorneys at Cooley in which Mr. Modany says that negotiating with DCF felt like "chasing a pink and purple unicorn," dkt. 123-34.  She asserts that this information was never conveyed to the Board.  Dkt. 139 at 31.

But the designated evidence does not support the Trustee's position.  Specifically, she relies on portions of Mr. Dean's deposition where he is questioned about Mr. Modany's June 6 email expressing that ED approval of the DCF deal was "highly questionable," dkt. 123-8 at 64–67 (Dean. Dep. II at

63:9–66:10).  While Mr. Dean testified that he didn't recall Mr. Modany

informing him about this belief, the designated evidence shows that he did.

*See* dkt. 123-35 (June 6 email from K. Modany to J. Dean).

Moreover, the minutes from the July board meetings show that Mr.

Modany informed the Board that there was a real possibility that the ED may

not approve the DCF transaction.  Even though ITT and DCF had executed a

Letter of Intent, dkt. 123-33, and submitted applications to the ED for review,

dkt. 143-28, at the July 1 meeting, Mr. Modany discussed other options that

were available to ITT "in the event the [ED] indicates that it has concerns with

[DCF]," dkt. 111-3 at 5–7.  At the same meeting, he also discussed additional

regulatory approvals that would be required for a potential transaction,

particularly those from ACICS and state education authorities.  *Id.* at 10.  And

three weeks later at the July 24 meeting, Mr. Modany "reminded the Board that

the ED would need to approve the proposed transaction with [DCF], and it was

unknown whether the ED would provide such approval."  Dkt. 114-1 at 5.

Therefore, board members' failure to recall those discussions, dkt. 123-7

at 174–75 (Odle Dep. at 173:17–174:13), does not allow a reasonable jury to

find that Mr. Modany concealed from the Board material information about the

likelihood that the ED may not approve the DCF deal.  *Tinder*, 305 F.3d at 736.

ii.   Mr. Modany's rejection of terms proposed by DCF after the
ED's August 25 demand letter

The Trustee argues that Mr. Modany's "decision to reject a major

transaction on his own creates a fact dispute over whether he was grossly

negligent and breached his duty of care in doing so."  Dkt. 139 at 33.  In

support of this argument, the Trustee points out that Mr. Modany responded to DCF's August 29 proposal to update the change-in-control application "within seventy minutes" and without consulting the Board. Dkt. 123-42.

Mr. Modany does not dispute that the draft changes in their original form were not shared with the Board, but argues that no reasonable juror could find that these facts amount to a breach of the duty of care in "reject[ing] a major transaction" without the Board's knowledge. Dkt. 151 at 15.

The undisputed evidence shows that the August 29 proposed terms were DCF's first draft for updating the change-of-ownership applications that ITT and DCF had submitted to the ED for approval. *See* dkt. 143-50 at 3 (Aug. 26 email from R. Holt to K. Modany and Cooley attorneys). The proposed changes would tell the ED that DCF would take control of ITT's schools prior to the transaction's finalization. Dkt. 123-41 at 3 (Aug. 29 email from R. Holt to Cooley attorneys with proposed updates to "Question 69" of the application).

After he told DCF's counsel that ITT would not agree to the pre-transaction terms, *see supra* at p. 19–22, Mr. Modany and counsel from Cooley continued to work with DCF to see if they could reach an agreed update to the application. *See id.*; dkt. 143-32 at 2–11. Updated terms were eventually agreed upon and submitted to the ED on August 31. Dkt. 143-32 at 3.

It was not until September 2 that DCF formally proposed to both Mr. Modany and Mr. Dean to purchase all of ITT's "school assets" including student rosters and real estate for $14 million. Dkt. 143-35 at 2–3. That proposal, however, remained subject to the ED's agreement to suspend the sanctions

35

levied in the August 25 demand letter. *Id.* When asked about this proposal at his deposition, DCF's counsel Mr. Holt testified that "we all knew [ED approval of the deal] was a long shot at that point in time." Dkt. 123-43 at 45. And while Mr. Modany thought that the offer was "a joke," he told Mr. Dean he would share the offer with the Board anyway. Dkt. 143-35 at 2.

But, less than two hours later, ITT received the ED's rejection of the request for relief from the demand letter—which included a request for more time to finalize the DCF deal. Dkt. 123-28. Therefore, Mr. Modany responded to the proposal by informing DCF that the ED had rejected ITT's request to be allowed to time to reach a deal with DCF: "I'm not sure there is anything left to discuss." Dkt. 143-36 at 2.

Any failure to bring the draft changes to the Board's attention only creates a genuine issue of fact if a reasonable jury could find Mr. Modany's failure to do so was grossly negligent. The Trustee has presented no evidence to support such an inference. Rather, as the Trustee's adversary complaint in this case points out, "Modany later clarified that his email reflected the Board's position and the Directors did not dispute this." Dkt. 3 at 31.[9]

Therefore, the Trustee has not designated evidence from which a jury could infer that Mr. Modany's handling of the DCF proposal was contrary to the Board's wishes or grossly negligent.

---

[9] The record evidence supports that conclusion, *see supra* at p. 19–22; dkt. 143-32 ("there is no disconnect between the messages below [referring to the "rejection emails"] and the positions of the Board in particular as it relates to the issues noted in the section of the [application] below.").

36

                                *    *    *

The Trustee's designated evidence has not overcome the presumption that Mr. Modany acted reasonably in sharing material information with the ITT Board.  No reasonable jury could find that Mr. Modany was grossly negligent in how he conveyed information to the Board or that the board was uninformed about the threats facing ITT.  *In re Walt Disney Co. Derivative Litigation*, 907 A.2d 693, 761 (Del. Ch. 2005); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 781 (Del Ch. 2016).

### 2. Teach-out Decision

Mr. Modany argues that he could not have breached the duty of care by pursuing a strategic transaction rather than a teach-out because he did so on advice of counsel and at the Board's instruction.  Dkt. 119 at 28.  The Trustee responds that Mr. Modany "never had any discussions with the [B]oard about teach-outs . . . as a result the [B]oard didn't make any decisions about teach-outs" and "Cooley never advised Modany to not put teach-outs in place or have them in place if ITT closed."  *Id.* at 17, 21.  She maintains that a reasonable jury could find Mr. Modany was grossly negligent for failing to "have teach-outs in place." *Id.*

Due to the Board's oversight role, "officers have a duty to comply with the board's directives.  *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 782 (Del. Ch. 2016) (*citing* Restatement (Third) of Agency § 8.09 (2006)).  Stated another way, "[a] chief executive officer ... may not act in a manner contrary to the express desires of the board of directors."  *Disney,* 907 A.2d at 775 n.570.

                                     37

Here, the designated evidence shows that Mr. Modany sought advice of counsel regarding whether to implement a teach-out as early as June 6 of 2016, when ITT was attempting to negotiate with the ED to lower its surety demand and was advised that it was "premature" to offer to the ED that the school could begin a teach-out; rather, Mr. Butner, an attorney from Cooley, advised Mr. Modany "not to offer a teachout now" because that there were "better options."  Dkt. 123-2 at 93–95 (Butner Dep. at 92–94).

The designated evidence further shows that the Board knew about the option of implementing a teach-out.  In June of 2018, board members Dean and Weber discussed that "unless we get a positive sign from Ed, we will have to consider teaching out."  Dkt. 143-19.  When asked about teach-out discussions that occurred "in the July time period," board member Mr. Odle testified: "I can't say I remember specifically, but I know we discussed teach-outs.  I know we discussed other scenarios and transactions, and I believe this DCF [deal] . . . we were pursuing that as being a better long-term strategy for the organization and for the students."  Dkt. 111-4 at 13–14 (Odle Dep. at 244:18–245:6).  He didn't recall discussing a timeframe for how long it would take to teach-out ITT's students "because . . . we didn't pick that option.  We picked other options to pursue that our advisors and professionals told us were the better option."  *Id.* at 245:7–16.

Moreover, board members Brown and Morgan testified that the Board was focused on a way to continue operations rather than pursue a teach-out, which would have required shutting ITT down.  *See* dkt. 115-8 at 22 (Brown

38

Dep. at 101:11–20); dkt. 108-7 at 43, 47–48 (Morgan Dep. at 275:13–16, 279:19–280:3); *see also* dkt. 143-19 (June 11, 2016, J. Dean email to V. Weber, noting ITT may "have to consider teaching out"); dkt. 111-3 (July 1 board meeting minutes discussing the option of suspending new enrollment and allowing enrolled students to finish their programs).  And Mr. Dean testified that Mr. Modany did not pursue a teach-out at that time because "Kevin Modany was executing what he understood to be the direction of the [B]oard."  Dkt 123-8 at 296 (Dean Dep. at 295:14–16).  The minutes of the July 24 board meeting similarly reflect that "Mr. Modany and the Board discussed that the Board would be provided with a detailed analysis of a full teach-out . . . and any other alternatives, prior to formally approving" the DCF deal.  Dkt. 114-1 at 4, 5.  After this discussion, "[t]he Board reaffirmed that the Corporation should continue to focus its efforts on pursuing a strategic transaction with the Dream Center."  *Id.*

The designated evidence does not show that Mr. Modany failed to provide the Board with material information regarding the option of teaching out, so a jury could not reasonably conclude that ITT did not implement a teach-out because of gross negligence attributable to Mr. Modany.[10]  And in deciding to pursue an operating approach rather than a teach-out culminating with shutting ITT down, the Board considered the operating approach option "most

---

[10] *See also* dkt. 69 at 12 (Order on Motion to Dismiss, finding that, because the ED acknowledged that ACICS no longer had concerns about ITT's teach-out plan, the Trustee had not sufficiently alleged that the Board's decision not to pursue a teach-out "lacked any rational business justification.").

likely to generate value for [ITT's] shareholders relative to the other scenarios at the current time." Dkt. 111-3 at 6. The Court will not second-guess that decision where the Trustee has designated no evidence that the Board's fiduciary obligations extended beyond the corporation and its shareholders. *See* dkt. 119 at 21-26 (discussion of uncontested designated evidence that ITT was solvent until at least August 25, 2016, so the board owed a fiduciary duty only to ITT's shareholders and not to any other individuals or entity).[11] No reasonable jury could find from the designated evidence that the decision not to teach-out ITT's students during the crisis period was "without the bounds of reason." *Benihana*, 891 A.2d at 192.

### B. Duty of Loyalty

The duty of loyalty requires "that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). A fiduciary may violate the duty of loyalty by acting out of self-interest, failing to exercise independence, or failing to act in good faith. *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014); *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (recognizing that the duty of loyalty includes the duty to act in good faith). Examples of bad faith include when a fiduciary "intentionally acts with a purpose other than that of advancing the best

---

[11] To the extent the Trustee alleged that students may have been owed a fiduciary duty, this claim was waived by her failure to respond to Mr. Modany's arguments to the contrary. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

interests of the corporation" or "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

The Trustee first argues that "the same record facts showing [Mr.] Modany breached his duty of care also show he acted in bad-faith." Dkt. 139 at 34. However, under Delaware law "a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." *Stone*, 911 A.2d at 369 (citing *In re Walt Disney Co.*, 906 A.2d at 27). The Court has already found that no jury could reasonably find that Mr. Modany's actions in informing the Board and deciding not to do a teach-out amounted to gross negligence. Therefore, no reasonable jury could find that those actions were a breach of the duty of loyalty or good faith.

Next, the Trustee contends that Mr. Modany's handling of the DCF deal breached the duty of loyalty because he "focused the [B]oard on DCF so he'd get his millions in severance or CEO salary." Dkt. 139 at 35. The Court stated in its order denying Mr. Modany's motion to dismiss:

> CEOs do not violate their duty of loyalty merely by wanting to retain their position and pay. But they may not pursue that desire if it runs contrary to their duty of 'advancing the best interests of the corporation.' *In re Walt Disney Co.*, 906 A.2d at 67. A CEO cannot pursue an acquisition strategy if the chief motivation behind that strategy is retaining the CEO's compensation rather than the best interests of the company.

41

Dkt. 69 at 23 (citing *In re Enivid.*, 345 B.R. 426, 434-440 (Bankr. D. Mass. 2006). The Court found that the Trustee's complaint sufficiently "alleged enough facts to support the inference that Mr. Modany did that here." *Id.*

But now the Court is deciding a motion for summary judgment on a developed evidentiary record. And while the Court is obligated to draw reasonable inferences in the Trustee's favor, there must be facts that support inferences that she asks to be drawn. Here, the Trustee designates emails where Mr. Modany discussed the amount of severance he may be entitled to if a strategic transaction closed, dkt. 123-36, dkt. 123-39, but she does not designate any evidence to suggest that considerations about his severance were the chief motivation in his negotiations with DCF. *In re Enivid.*, 345 B.R. at 434-440. Nor does she designate evidence showing that he concealed information about his compensation or interest in a transaction from the Board.[12] To the contrary, the undisputed facts are that the Board approved the terms of Mr. Modany's compensation package and that the same information was disclosed in ITT's public filings. Dkt. 110-3 at 2–4; dkt. 110-2 at 3 (ITT's SEC Form 8-K Report, December 31, 2015).

The Trustee further contends that Mr. Modany's "rejection" of DCF-proposed updates to the change-in-control application exposes a conflict of interest because they would have replaced him as CEO, dkt. 139 at 37–38.

---

[12] The Trustee's designated evidence regarding post-bankruptcy emails where Mr. Modany discussed his severance are not relevant here because her breach of duty of loyalty allegations are limited to the Crisis Period, which ended when ITT filed for bankruptcy on September 16, 2016.

But the Court has already found that no reasonable juror could find that Mr. Modany's handling of the DCF deal breached the duty of care.  That conclusion precludes a finding that Mr. Modany breached the duty of loyalty because the Trustee has designated no evidence suggesting any such conduct was "more culpable than" that the conduct alleged with respect to the duty of care.  *Stone*, 911 A.2d at 369.

The cases the Trustee cites do not lead to a different outcome.  *In re Xura S'holder Litig.*, 2018 WL 6498677 (Del. Ch. 2018), *In re Answers Corp. S'holder Litig.*, 2012 WL 1255133 (Del Ch. 2012), and *In re Enivid. Inc.*, 345 B.R. 426 (Bankr. D.Mass. 2006) all considered breach of duty of loyalty allegations in the context of a motion to dismiss.  Like the allegations against Mr. Modany here, *see* dkt. 69, the complaints in those cases were found to sufficiently to state a claim for breach of the duty of loyalty.  But none of those decisions were based on a developed evidentiary record on a motion for summary judgment.

In the Trustee's only cited summary judgment case, *Chen v. Howard-Anderson*, the court found a genuine issue of material fact that "could support a reasonable inference of favoritism" by the CEO because he delayed discussions in one possible deal while responding "supportively" to the "acquirer that was willing to confirm that it would honor management's change in control agreements and monetize all equity awards."  87 A.3d 648, 686–87 (Del. Ch. 2014).  Here, The Trustee has not designated evidence that Mr. Modany acted with "favoritism" toward DCF because of any improper financial motive.  Rather, the designated evidence shows that the Board knew the

43

material terms of the DCF deal as well as the terms of Mr. Modany's compensation, *see* dkt. 110-2 at 3; dkt. 110-3 at 2–4; that Mr. Modany repeatedly informed the Board about the roadblocks the DCF deal faced, *see e.g.*, dkt. 143-13; that he presented them with alternatives, *see* dkt. 111-5 at 8; dkt. 114-1 at 4–5; and that the Board directed him to keep pursuing the deal. dkt. 114-1 at 4–5.  Moreover, he proposed to the ED that ITT could pursue an alternative deal with Indiana Tech or initiating a teach-out as options for gaining relief from the ED's August 25 demand letter.  *See* dkt. 115-5.

The Trustee therefore has not designated evidence to overcome the presumption that Mr. Modany pursued the DCF deal because it was in ITT's best interest.  Therefore, no jury could reasonably find or infer that Mr. Modany breached the duty of loyalty and good faith.

*      *      *

In the absence of designated evidence from which a jury could reasonably find that Mr. Modany did not act with loyalty and care when discharging his duties as ITT's CEO during the Crisis Period, the Court will not second-guess decisions that were made under evolving and complex circumstances.  *Cede*, 634 A.2d at 361; *see Gantler*, 965 A.2d at 706.  The Trustee has not designated such evidence, so Mr. Modany is entitled to summary judgment on the Trustee's claims for breach of fiduciary duty.  *Cede*, 634 A.2d at 361.  Because the Trustee's claim for equitable subordination is premised on the breach of fiduciary duty claims, dkt. 139 at 40–41, Mr. Modany is entitled to summary judgment on that claim as well.

**IV.**
**Conclusion**

Mr. Modany's motion for summary judgment is **GRANTED**.  Dkt. [108].

The parties' motions regarding expert witnesses are therefore **denied as moot**.

Dkts. [124], [126], [128], [130], [132], [134], [135], [138] and [154].

Final judgment shall issue by separate entry.

**SO ORDERED.**

Date: 6/27/2022

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Richard B. Allyn
ROBINS, KAPLAN LLP
rallyn@robinskaplan.com

Thomas Berndt
ROBINS KAPLAN LLP
TBerndt@RobinsKaplan.com

Michael Collyard
ROBINS KAPLAN LLP
mcollyard@robinskaplan.com

Joseph P. Davis, III
GREENBERG TRAURIG LLP
davisjo@gtlaw.com

Kevin D. Finger
GREENBERG TRAURIG, P.C.
fingerk@gtlaw.com

Gregory Forrest Hahn
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
ghahn@boselaw.com

John C. Hoard
RUBIN & LEVIN, P.C.

johnh@rubin-levin.net

Alison T. Holdway
GREENBERG TRAURIG, LLP
holdwaya@gtlaw.com

Peter Ihrig
ROBINS KAPLAN LLP
pihrig@robinskaplan.com

Vilda Samuel Laurin, III
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
slaurin@boselaw.com

David Ian Miller
GREENBERG TRAURIG, LLP
david.miller@gtlaw.com

James P. Moloy
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmoloy@boselaw.com

Ronald James Schutz
ROBINS, KAPLAN LLP
rschutz@robinskaplan.com

Meredith R. Theisen
RUBIN & LEVIN, P.C.
mtheisen@rubin-levin.net

Paul D. Vink
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pvink@boselaw.com

Mian R. Wang
GREENBERG TRAURIG, LLP
wangm@gtlaw.com